IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT
IN AND FOR POLK COUNTY, STATE OF FLORIDA
CIVIL DIVISION

The Estate of JUANITA AMELIA JACKSON,
by and through CATHY JACKSON-PLATTS
f/k/a CATHERINE WHATLEY,
Personal Representative,
     Plaintiff,

                         CASE NO.:   2004-CA-3229
vs.                         DIVISION:  07

TRANS HEALTH MANAGEMENT, INC.;
TRANS HEALTHCARE, INC.;
     Defendants.

_____/

**PLAINTIFF'S MOTION TO IMPLEAD NEW DEFENDANT GENERAL
ELECTRIC CAPITAL CORPORATION IN PROCEEDINGS SUPPLEMENTAL
TO EXECUTION AND FOR AN ORDER TO SHOW CAUSE AS TO WHY
GENERAL ELECTRIC CAPITAL CORPORATION SHOULD NOT BE LIABLE
FOR THE FINAL JUDGMENT**

Plaintiff, the Estate of Juanita Amelia Jackson, (hereinafter "Estate of Jackson"),

by and through the undersigned counsel of record, moves pursuant the Florida Rules of

Civil Procedure and Florida Statutes, § 56.29 to implead as an additional Defendant

General Electric Capital Corporation (GECC) in Proceedings Supplemental to Enforce

the Judgment dated July 22, 2010 entered against Defendants Trans Healthcare, Inc. and

Trans Health Management, Inc. (the Trans Health Defendants), and for an Order to Show

Cause as to why GECC should not be liable for the Final Judgment against the Trans

Health Defendants, and as grounds therefore would show this Court the following:

     I.     **SUMMARY OF THE BASIS FOR IMPLEADER OF GECC**

     1.     In 2003, Juanita Jackson was living as a resident at Auburndale Oaks

Healthcare Center in Polk County, Florida. The Trans Health Defendants had a

management agreement, and operated the nursing home where Mrs. Jackson remained a resident until her discharge on May 30, 2003.  She died on July 6, 2003.   The Estate of Jackson sued the Trans Health Defendants for negligence, filing its Complaint on July 30, 2004 in the Circuit Court for Polk County.  The suit continued to a jury trial.

2.      A Final Judgment was entered against Trans Healthcare, Inc. and Trans Health Management, Inc. in the above referenced case on July 22, 2010.  They were each found liable to the Estate of Jackson in the amount of Fifty Five Million Dollars ($55,000,000) for a total judgment of One Hundred Ten Million Dollars ($110,000,000), attached hereto as Exhibit "A".

3.      The Estate of Juanita Jackson has obtained evidence that GECC became a private equity investor in the Trans Health Defendants.  GECC gained power and control over the Trans Health Defendants to the extent that GECC became one of the controlling owners.  During the time this suit has been pending, GECC conspired with Rubin Schron, a real estate investor, to divide up the assets of the Trans Health Defendants between themselves.  This resulted in millions of dollars of the Defendants' property and assets being fraudulently transferred to GECC and third parties.  These actions were done for the purpose of delaying, hindering and defrauding creditors, including the Estate of Jackson.

4.      GECC further conspired with the Trans Health Defendants and Rubin Schron to cover up the transfers.  GECC's collection attorneys filed an ex parte petition for receivership under Maryland law relating to dissolved corporations in January 2009 without meeting the basic jurisdictional requirements under Maryland law, i.e., there was no dissolution of the corporations included in the petition.  GECC has profited from this

abuse of process.   It was paid over Fifty Five Million Dollars ($55,000,000) from the assets of the Trans Health Defendants without regard to the rights of other creditors.

5.     GECC's collection attorneys obtained the receivership order and then used it as a mechanism to avoid, hinder, delay, confuse and otherwise prevent legitimate creditors, including the Estate of Jackson, from collecting on debts owed by the companies.  GECC and its co-conspirators attempted to perpetrate a fraud on the Courts in Florida by domesticating an illegal ex parte order and then seeking to stay this lawsuit and other lawsuits, both in Florida and other states.

## II.     PURPOSE OF PROCEEDINGS SUPPLEMENTAL

6.     The Estate of Jackson is a judgment creditor and is entitled to institute proceedings supplemental to execution, and implead third parties, where the creditor's motion states that judgment debtors had transferred funds to third parties with the intent of placing these funds or assets beyond creditor's reach, to defraud, hinder, or delay satisfaction of judgment; more specific allegations are not required.  *NTS Fort Lauderdale Office Joint Venture v. Serchay,* 710 So.2d 1027 (Fla. 4th DCA 1998).

7.     The Circuit Courts have broad discretionary powers for purpose of subjecting all property, or property rights of a defendant in execution, however fraudulently conveyed or concealed, and whether in name or possession of third parties, to the satisfaction of judgment outstanding against a defendant.  *State ex rel. Phoenix Tax Title Corporation v. Viney*, 120 Fla. 657, 163 So. 57 (Fla. 1935); *Ryan's Furniture Exchange v. McNair,* 120 Fla. 109, 162 So. 483 (Fla. 1935).

8.     Once the Estate shows that a writ of execution is valid and unsatisfied, the Court should grant the motion for order authorizing a supplemental, postjudgment

proceeding to implead nonparties to which judgment debtor allegedly made fraudulent transfers of assets to thwart the judgment creditor from satisfying its judgment. *Mission Bay Campland, Inc. v. Summer Financial Corp.,* 71 F.R.D. 432 (M.D. Fla. 1976).

9.      Proceedings supplemental are equitable in nature and should be liberally construed. They enable speedy and direct proceedings in the same court in which the judgment was recovered to better afford a judgment creditor, like the Estate of Juanita Jackson, the most complete relief possible in satisfying the judgment. *Zureikat v. Shaibani,* 944 So.2d 1019 (Fla. 5th DCA 2006).

### III.     FACTS WHICH SHOW THAT GECC CAUSED AND BENEFITED FROM FRAUDULENT TRANSFERS OF THE PROPERTY AND ASSETS OF THE TRANS HEALTH DEFENDANTS IN ORDER TO HINDER, DELAY, DEFRAUD, CONFUSE AND MISLEAD CREDITORS

#### A.  GECC Defrauded Creditors in Florida.

10.      General Electric Capital Corporation, Inc. ("GECC") is a for profit Delaware corporation with its principal offices in Norwalk, Connecticut. GECC is registered to do and does business in Florida. Defendant GECC has systematic, substantial, and continuous contacts with the state of Florida. GECC was a large investor in, and controlled the Trans Health Defendants. GECC conspired with the Trans Health Defendants and with Rubin Schron to defraud creditors in Florida and are therefore reasonably expect to be haled into a Florida Court.

#### B.  The wrongful Activities of GECC

11.      The Trans Health Defendants had several loans from Ventas, Inc., which had enabled them to purchase nursing home leases, properties, and management contracts.

12.     In December 2002, Ventas, Inc. transferred to GECC senior loans between the Trans Health Defendants and Ventas, Inc. in the amount of Forty Two Million Dollars ($42,000,000.00).  GECC, as a major investor, began gaining and exercising control over the Trans Health Defendants in order to protect its investment.

13.     In 2002 and 2003, Trans Healthcare, Inc. attempted the acquisition of hundreds of nursing home properties owned by Integrated Health Services (IHS) which were being sold by the United States Bankruptcy Trustee.  They were unsuccessful and Abe Briarwood, Inc., controlled by a real estate investor, Rubin Schron, purchased these IHS nursing homes.  However, by July of 2003, the Trans Health Defendants entered into agreements with Abe Briarwood, Inc. to lease, manage, and control many of the former IHS nursing homes.

14.     GECC gained control over the income stream to the Trans Health Defendants.  A cash management agreement required that all income received from the operation of Trans Health Defendants' nursing homes be placed in lockboxes and sweep accounts controlled by GECC to insure that GECC was paid first before the Trans Health Defendants could pay for the daily operation of the nursing homes.

15.     GECC, as a major private equity investor, exercised improper control over the officers, directors, and corporate governing structures of the Trans Health Defendants.  This was done to confuse, mislead, and hinder legitimate creditors, including the Estate of Jackson.

16.      When GECC became aware that there were numerous nursing home residents such as Juanita Jackson making claims for injuries caused by the Trans Health Defendants' negligence, GECC conspired with the Trans Health Defendants, as well as

Rubin Schron, to improperly transfer the assets of Trans Healthcare, Inc. to various corporate entities.  These companies were created to receive the transferred assets and to benefit GECC and Schron.  The transfers made it virtually impossible for creditors to collect on debts owed by these Trans Health Defendants.

17.    As of May 31, 2003, the Trans Health Defendants' parent company, THI Holdings, LLC, had grown to a net worth of Forty One Million, Four Hundred Thousand Dollars ($41,400,000.00).  (See Proffer of THI Holdings, LLC, CFO Jeffrey Barnhill filed in *Integrated Health Services, Inc. Bankruptcy* Case No. 00-00389 (MFW) in the United States Bankruptcy Court for the District of Delaware, Attached as Exhibit "B").  In fact, THI Holding, LLC's revenue for five months of 2003 alone was One Hundred and Four Million, Eight Hundred Thousand Dollars ($104,800,000.00).

### i.    Fraudulent Transfers in 2003

18.    In August 2003, as part of GECC's, Rubin Schron's, and the Trans Health Defendants' scheme to improperly confuse, defraud, mislead, hinder and delay creditors, they instituted a series of corporate maneuvers.  This resulted in Trans Healthcare, Inc. transferring its stock to a holding company, THI Holdings, LLC, controlled by GECC and Schron without the Defendant Trans HealthCare, Inc. receiving any reasonably equivalent value. (Deposition of W. Bradley Bennett, former CEO Trans Health Defendants, *Jeffrey A. Barnhill, et al. v. Trans Healthcare, Inc*., et al. Middle District Pennsylvania, Case No. 04-1858, dated November 4, 2005 (*Bennett* depo.) pages 17-18; 37-38, Exhibit "C").

19.    THI Holdings, LLC set up another shell company, THI of Baltimore, Inc., which was also controlled by GECC and its co-conspirators, Schron and his agents. THI

of Baltimore, Inc. operated the former IHS owned nursing homes through other shell subsidiaries. (*Id.*, pages 5-6; 17-18; 37-38; 95-96; *Schron, et al. v. Leonard Grunstein, et al*, Supreme Court New York County, New York, case number 650702/10, (*Schron* complaint), attached as Exhibit "D", paragraphs 71-84).

20.     Despite this new corporate structure, in reality, the operation of these nursing homes, including Auburndale Oaks, where Mrs. Jackson had lived, was performed through Defendant Trans Health Management, Inc. which remained the most valuable subsidiary of Defendant Trans Healthcare, Inc.

21.     This splitting up and transfer of the valuable assets of Trans Healthcare, Inc.  between GECC and Schron was made within one year of the service of process in the instant lawsuit and is presumed to have been made to delay, hinder or defraud the Estate of Juanita Jackson pursuant to Fla. Stat. section 56.29(6)(a).

## ii.  Fraudulent Transfers in 2006

22.     As of January 23, 2006, THI Holdings, LLC had an adjusted enterprise value of One Hundred and Eighty Three Million, Eight Hundred and Seventy Three Thousand, Seven Hundred Thirty Dollars ($183,873,730).   Valuation Report dated January 23, 2006 by the Lancaster Group, LLC, attached hereto as Exhibit "E".

23.     In March 2006, GECC entered into two loan agreements with the Trans Health Entities, one for Forty Two Million Dollars ($42,000,000.00) and the other in the amount of Thirteen Million Dollars ($13,000,000.00).  A lien on substantially all of Trans Health's assets was taken by GECC.

24.     In March 2006, GECC and its co-conspirator, Rubin Schron, again transferred Trans Health assets to themselves without regard to the rights of Trans Health

creditors.  They transferred some of the Trans Health entities and their assets to other companies they controlled which included the newly created Fundamental Long Term Care Holdings, Inc., Fundamental Long Term Care Holdings, LLC, and related affiliates, including Fundamental Administrative Services, Inc. (See Interrogatory Answers, *Spivery Jones v. TFN Health Care Investors, LLC, et al*, Montgomery County Court, Pennsylvania, attached as Exhibit "F", no.6; *Bodner, et al v. Leonard Grunstein, et. al.*, Supreme Court of New York County, New York (*Bodner* Complaint) attached as Exhibit "G", paragraphs 90-110).

25.    By conspiring with the Trans Health Defendants and Schron, GECC guaranteed it would receive preferential payments over other legitimate creditors.  In return for insuring that GECC had its loans repaid to the detriment of other creditors of Trans Healthcare, Inc., Schron and his agents were able to restructure and obtain a return on their investment that would not be possible if legitimate creditors were paid.

26.    As a result of all these unlawful and wrongful transfers, Trans Healthcare, Inc. was left with only a small group of unprofitable subsidiaries and property.  By virtue of the conspiracy GECC and Schron prevented the Trans Health Defendants from paying their debts as debts became due.

## D.  GECC Abuses Process by Causing a Fraudulent Receivership of Trans Healthcare to be filed in Maryland state court.

27.    In January, 2009, GECC, Rubin Schron and the Trans Health Defendants through GECC's collection attorneys, Tydings & Rosenberg, LLC, filed an ex parte, uncontested receivership on behalf of the Trans Health Defendants and affiliates in Maryland.  (See *Trans Healthcare, Inc., et al*'s Emergency Voluntary Petition for Appointment of a Receiver, Circuit Court of Baltimore County, Maryland, Case No. C09-

141, Exhibit "H").  Under Maryland law, the receivership statute requires dissolution of the company before the receivership can go forward.  Here, the companies never dissolved and under Maryland law the Order Appointing the Receiver was invalid.

28.     The co-conspirators hand picked a receiver, Michael Sandnes, a former director of operations of Trans Healthcare, Inc., who was appointed just one day after the Maryland court filing without creditors being provided any notice, or opportunity to object.

29.     In its January 2009 Petition for Receivership, Trans Healthcare, Inc. listed legitimate unsecured creditors of over Fifteen Million Dollars ($15,000,000.00) yet claimed they only had assets of Three Million, Two Hundred Thousand Dollars ($3,200,000.00), despite the fact they had a value of over One Hundred and Eighty Million Dollars ($180,000,000.00) just three years before.

30.     On April 8, 2009, GECC, and the receiver it controlled caused a certification of satisfaction of the former GECC "debt" to be filed in the Maryland Court. (See Receiver's Response to Court's Request for Further Information in Support of Pending Fee Applications, in *Re: the Receivership of Trans Healthcare, Inc. et al*, Exhibit "I").  This certification confirmed GECC had been paid in full ($55,000,000 and interest). By paying GECC, without paying other creditors, Rubin Schron and his affiliated companies were able to keep assets they had fraudulently received and avoid any liability to GECC or other creditors.

31.     The co-conspirators GECC, Rubin Schron, and Trans Healthcare, Inc. utilized the subterfuge of an ex parte receivership rather than filing for bankruptcy because they realized that their illegal transfer of the Trans Health Defendants' assets for

their own benefit to defraud legitimate creditors would never withstand the close scrutiny of a Federal Bankruptcy Court.

### E.  GECC Commits An Abuse Of Process in Florida By Improperly Attempting to Stay These Proceedings

32.     On June 15, 2009, as a part of their continuing efforts to delay, hinder, and defraud the Estate of Juanita Jackson, the co-conspirators had their attorneys file a Motion to Domesticate the Receivership Order in the State of Florida so they could enforce it here.  (See Motion to Expedite Domestication of Receivership Order dated June 15, 2009, in *Re: the Receivership of Trans Healthcare, Inc. et al*.  Attached hereto as Exhibit "J".)

33.     The Motion was filed in Miami, Florida although no case was pending against the Trans Health Defendants in Dade County.  In the Motion, the receiver claimed that "the receivership is a liquidating receivership and upon the discharge of the receiver, there will be no entity from which the Plaintiffs may obtain recovery", See Paragraph 5. *Id.*  The receiver also claimed that "the expeditious enforcement of the receivership order is required because the receivership is drawing to a close and the receiver must make arrangements for the disposition of the remaining assets of the estates", see paragraph 12. There was no mention that the order was obtained ex parte without meeting basic jurisdictional requirements under Maryland Law.

34.     On January 13, 2009, GECC and Schron caused the Trans Health Defendants to file a Motion to Stay in this case based on the fraudulent receivership order.  This was another improper attempt to defraud, confuse, hinder and delay the Estate.  This Court denied the motion.

35.     Defendants filed motions to stay pending lawsuits against them in five (5) other cases in different jurisdictions in the State of Florida including Alachua, Pinellas, Polk and St. Lucie counties, all with a purpose of improperly hindering, delaying and defrauding creditors, including the Estate of Juanita Jackson.

36.     When GECC and Schron learned that they could not improperly stay these proceedings, they caused the Defendants' attorneys to withdraw.  This Court entered its Order Granting the Motion to Withdraw on June 4, 2010.  The Order provided that Kristi Anderson, Esquire would be the contact person for the Trans Health Defendants.  (See Order Granting the Motion to Withdraw dated June 4, 2010, attached hereto as Exhibit "K").  Kristi Anderson is general counsel for one of Schron's companies, Fundamental Administrative Services, Inc., which was created during the fraudulent transfers of the Trans Health Defendants' assets in 2006.

37.     On July 27, 2010, just five days after the Judgment was entered in this case, one of GECC's collection attorneys, Alan Grochal, Esq. of Tydings & Rosenberg, LLC, was appointed as a replacement to the original receiver.

38.     By this time, GECC's collection attorneys, Tydings & Rosenberg, LLC, simultaneously acted as the receiver, represented the receiver, represented the largest creditor GECC, and represented Trans Healthcare, Inc.  These are multiple conflicts of interests which are not waivable by counsel or their clients.  This is particularly true where the alleged receiver only has the power and a singular duty to act on behalf of the corporations' creditors which include the Estate of Juanita Jackson.

39.     Post judgment, GECC and Schron caused the Trans Health Defendants to violate this Court's Order requiring them to provide information on Form 1.977 about

their assets as required by Florida Law.  Tydings & Rosenberg, LLC sent a letter to this Court and the Estate of Jackson refusing to provide any information (See Exhibit "L"). GECC, Schron and the Trans Health Defendants have taken the position that they are free to transfer and dispose of valuable assets in order to defeat and defraud creditors, including the Estate of Jackson, and this Court has no power to stop them.

40.     GECC, the Trans Health Defendants and Rubin Schron conspired to fraudulently use the receivership as a mechanism to mislead creditors and the Maryland Courts into believing that Trans Healthcare, Inc. and its subsidiaries were insolvent.  In fact, Trans Healthcare, Inc. had previously owned or controlled assets in excess of One Hundred Eighty Million Dollars ($180,000,000).  These assets had been divided by and fraudulently transferred to Schron and GECC or companies controlled to defeat legitimate creditors.

## VI.   LEGAL ARGUMENT – THE ESTATE OF JUANITA JACKSON HAS MET ALL PREREQUISITES FOR PROCEEDINGS SUPPLEMENTAL, AND HAS MADE A PRIMA FACIE SHOWING THAT GECC SHOULD BE HELD LIABLE FOR PAYMENT OF THE FINAL JUDGMENT

41.     The Estate of Juanita Jackson requests that this Court implead GECC as a defendant in proceedings supplemental pursuant to Florida Statutes § 56.29 and Rule 1.250 of the Florida Rules of Civil Procedure in order to execute on the Judgment, and to recover property and proceeds which were improperly transferred for the benefit of GECC in an attempt to unlawfully defeat the rights of creditors, including the Estate of Juanita Jackson.

42.     The Estate of Juanita Jackson has filed an affidavit meeting the jurisdictional requirements that it has an outstanding recorded judgment and that

execution has been issued and remains unsatisfied.  Therefore, this Court has the authority and duty to implead GECC. See *Allied Indus. Int'l Inc. v. AGFA-Gevaert, Inc.,* 688 F. Supp. 1516, 1518 (S.D. Fla. 1988) (applying Fla. Stat. section 56.29).  There are only two jurisdictional prerequisites for proceedings supplemental:  (1) a returned and unsatisfied writ of execution; and (2) an affidavit averring that the writ is valid and unsatisfied, along with a list of third persons to be impleaded.  *Mejia v. Ruiz,* 985 So.2d 1109, 1112 (Fla. 3rd DCA 2008).  The Estate of Jackson has clearly met these requirements. (See Exhibits "M" and "N").

43.     The Florida Supreme Court has held that there is no requirement that a petition to implead be sworn to, or that a representative of the Estate of Juanita Jackson be examined by the court prior to impleading third parties.  All that is required is the filing of a motion to implead.  *Exceltech, Inc. v. Williams,* 597 So.2d 275 (Fla. 1992); *Standard Property Inv. Trust, Inc. v. Luskin*, 585 So.2d 1099, 1101-1102 (Fla. 4th DCA 1991).

44.     Florida Statute § 56.29 is intended to provide to the Estate of Juanita Jackson the most complete relief possible in satisfying its judgment without imposing the burden of initiating a separate action.  *See MCI Telecomm. Corp. v. O'Brien Mktg., Inc.*, 913 F. Supp. 1536, 1539 (S.D. Fla. 1995).  Based on the facts described above, the Estate of Jackson is entitled to implead GECC, in order to collect on the Final Judgment. Further, the Estate of Jackson reserves the right to move to implead additional parties should information show that such persons or entities are responsible in whole or in part for looting and fraudulent transfer of the assets of Trans Health Defendants.

## V.  THE RELIEF SOUGHT BY THE ESTATE OF JACKSON

The Estate of Juanita Jackson respectfully requests this Court:

1.      To enter an order impleading GECC as an additional defendant in proceeding supplemental;

2.      To enter an order to show cause as to why GECC should not be liable for payment of the final judgment;

3.      To require an officer of GECC to be examined in the county of his/her residence;

4.      To permit reasonable discovery regarding the fraudulent transfer of assets;

5.      To conduct an evidentiary hearing regarding the fraudulent transfers;

6.      To enter an order setting aside the fraudulent transfers;

7.      To enter a Final Judgment against GECC for $110,000,000.00;

8.      To award costs of these proceedings; and

9.      Such other equitable relief as is just under the circumstances.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the above has been sent by [ ] Hand Delivery [ ] Facsimile [**X**] U.S. Certified Mail to **Kristi Anderson, Esquire**; Fundamental Administrative Services, LLC, 920 Ridgebrook Road, Sparks, Maryland 21152, Registered Agent for Trans Health Management, Inc. and Trans Healthcare, Inc.; and **Carol Licko, Esquire**, Hogan Lovells, Attorney for General Electric Capital Corporation, 1111 Brickell Avenue, Suite 1900, Miami, Florida 33131 on this ___ day of December, 2010.

_____
Blair N. Mendes
Florida Bar No. 311900
James R. Freeman
Florida Bar No. 061971
WILKES & McHUGH, P.A.
One North Dale Mabry, Suite 800
Tampa, Florida 33609
813/873-0026 // 813/286-8820 Fax
Attorneys for Plaintiff/Judgment Creditor

IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT
IN AND FOR POLK COUNTY, STATE OF FLORIDA
CIVIL DIVISION

The Estate of JUANITA AMELIA JACKSON,
by and through CATHY JACKSON-PLATTS
f/k/a CATHERINE WHATLEY,
Personal Representative,

Plaintiff,

                                    CASE NO.:   2004-CA-3229
vs.                                   DIVISION:   07

TRANS HEALTH MANAGEMENT, INC.;
TRANS HEALTHCARE, INC.;

        Defendants.
_____/

### INDEX OF EXHIBITS TO
### PLAINTIFF'S MOTION TO IMPLEAD NEW DEFENDANT GENERAL
### ELECTRIC CAPITAL CORPORATION IN PROCEEDINGS SUPPLEMENTAL
### TO EXECUTION AND FOR AN ORDER TO SHOW CAUSE AS TO WHY
### GENERAL ELECTRIC CAPITAL CORPORATION SHOULD NOT BE LIABLE
### FOR THE FINAL JUDGMENT

| | |
|---|---|
| A | Final Judgment against Trans Health Defendants issued on July 22, 2010, Estate of Juanita Jackson v. Briar Hill, et al. Polk County Case No. 53-2004-CA-003229 |
| B | Proffer of Barnhill filed in Integrated Health Services, Inc. Bankruptcy Case No. 00-00389 (MFW) in the United States Bankruptcy Court for the District of Delaware |
| C | Deposition of W. Bradley Bennett taken on 11/4/2005 in the case of Barnhill vs. Trans Health Care, Inc., et al., Case No. 04-1858 |
| D | *Schron Complaint* (Rubin Schron, et al vs. Leonard Grunstein, et al, Supreme Court of New York County, New York) |
| E | Lancaster Group, LLC Valuation Report dated January 23, 2006 |
| F | Defendants, Trans Healthcare, Inc. and Trans Health Management, Inc.'s Answers and Objections to Plaintiff's "Corporate Status" Interrogatories, *Francina Spivery-Jones v. TFN Health Care Investors, LLC, et al*, Montgomery County, Pennsylvania Case No. 2006-06672 |

1

| G | *Bodner Complaint* (Bodner et. al. vs. Leonard Grunstein, et. al. Supreme Court of New York County, New York) |
|---|---|
| H | Emergency Voluntary Petition for Appointment of Receiver (In the Matter of: Trans Healthcare, Inc. et al, Baltimore County, Maryland Case No. C-09-141) |
| I | Receiver's Response to Court's Request for Further Information in Support of Pending Fee Applications, Baltimore County, Maryland, April 8, 2009 |
| J | Motion to Expedite Domestication of Receivership Order, Miami Dade County, Florida, Case No. 09-11513-CA-20 |
| K | Order Granting Motion to Withdraw, Estate of Juanita Jackson v. Briar Hill, et al. Polk County Case No. 53-2004-CA-003229 |
| L | Trans Healthcare, Inc. letter to this Court and to the Estate of Jackson's counsel dated August 11, 2010, |
| M | Execution on the Final Judgment against Trans Health Defendants issued on September 15, 2010, Estate of Juanita Jackson v. Briar Hill, et al. Polk County Case No. 53-2004-CA-003229 |
| N | Judgment Lien Affidavit filed by The Estate of Jackson's attorney on November 16, 2010 |

INSTR # 2010120046  OR BK 0818__PG 2178  07/30/2010  03:19:50 PM
Richard M. Weiss Clerk of County Polk County Recorded By Court

$BNM$
$56$

IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT
IN AND FOR POLK COUNTY FLORIDA
CIVIL DIVISION

FILED - GENERAL
POLK COUNTY CLERK
CIRCUIT COURT CIVIL
2010 JUL 23  AM 11: 20

The Estate of JUANITA AMELIA JACKSON,
by and through CATHY JACKSON-PLATTS
f/k/a CATHERINE WHATLEY,
Personal Representative,

Plaintiff,

vs.

BRIAR HILL, INC.; LYRIC HEALTH CARE
HOLDINGS III, INC; LYRIC HEALTH CARE LLC;
TFN HEALTHCARE INVESTORS, LLC; IHS
ACQUISITION NO. 153, INC.; ALLIANCE HEALTH
SERVICES, INC.; INTEGRATED HEALTH SERVICES,
INC.; TRANS HEALTH MANAGEMENT, INC.;
TRANS HEALTHCARE, INC.; DANIEL H. BEELER;
RICHARD KUHLMEYER; REBECCA BACHMAN;
and BARBARA BROWN; (as to INTEGRATED
HEALTH SERVICES AT AUBURNDALE n/k/a
AUBURNDALE OAKS HEALTHCARE CENTER)

Defendants.

_____/

CASE NO.: 2004-CA-3229
DIVISION: 07

INSTR # 2010121547
BK 08190 PGS 1564-1565 PG(s)2
RECORDED 08/03/2010 01:50:54 PM
RICHARD M WEISS, CLERK OF COURT
POLK COUNTY
RECORDING FEES 18.50
RECORDED BY J Christmas

## FINAL JUDGMENT

THIS CAUSE having come before this Court for a Jury Trial, and the Jury having

rendered a verdict for Plaintiff and against Defendants Trans Healthcare Inc., and Trans

Health Management, Inc.in the amount of Ten Million Dollars ($10,000,000.00) in

compensatory damages, and One Hundred Million Dollars ($100,000,000.00) in punitive

damages, an amount totaling One Hundred and Ten Million Dollars ($110,000,000.00), it

is hereby,

ORDERED AND ADJUDGED that Plaintiff, Juanita Amelia Jackson by and

through Cathy Jackson- Platts, Personal Representative, 4079 Lake Marianna Drive,



EXHIBIT
A

1

A TRUE COPY
CERTIFICATION LAST PAGE
RICHARD M. WEISS, CLERK

BK 08188 PG 2179

Winter Haven, FL 33881 does recover of and from Defendant, Trans Healthcare, Inc., 930 Ridgebrook Road, Sparks, Maryland, the sum of Five Million Dollars ($5,000,000.00) in compensatory damages, and Fifty Million Dollars ($50,000,000.00) in punitive damages, totaling an amount of Fifty-five Million Dollars ($55,000,000.00) that shall bear interest at the rate of 6% per year for which sum let execution issue.

**ORDERED AND ADJUDGED** that Plaintiff, Juanita Amelia Jackson by and through Cathy Jackson- Platts, Personal Representative, 4079 Lake Marianna Drive, Winter Haven, FL 33881 does recover of and from Defendant, Trans Health Management, Inc., 930 Ridgebrook Road, Sparks, Maryland, the sum of Five Million Dollars ($5,000,000.00) in compensatory damages, and Fifty Million Dollars ($50,000,000.00) in punitive damages, totaling an amount of Fifty-five Million Dollars ($55,000,000.00) that shall bear interest at the rate of 6% per year for which sum let execution issue.

This Court retains jurisdiction to tax costs in favor of Plaintiff and against Defendants at a future date.

**DONE AND ORDERED** in chambers in Bartow, Polk County, Florida, this 22 day of July, 2010.

Honorable J. Michael McCarthy
Circuit Court Judge

Copies furnished to:
Blair Mendes, Esquire
A. Lance Reins, Esquire
Kristi Anderson, Esquire
Trans Healthcare, Inc.
Trans Health Management, Inc.
Cathy Jackson-Platts, Personal Representative

STATE OF FLORIDA COUNTY OF POLK
CERTIFIED TO BE A TRUE COPY OF ORIGINAL
THIS August 03 2010
RICHARD M. WEISS, CLERK OF COURTS
BY Betty R. Peterson
Deputy Clerk

2

DEFENDANT'S
EXHIBIT
6
7/14/03

Exhibit 5

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
| | ) |
| INTEGRATED HEALTH SERVICES, INC., | ) |
| et al., | ) |
| | ) |
| | ) |
| | ) |
| Debtors. | ) |
| | ) |
| | ) |

Chapter 11

Case No. 00-00389 (MFW)

Jointly Administered

## PROFFER OF DIRECT EXAMINATION OF JEFFREY BARNHILL

Appearing in Court today as a witness on behalf of THI Holdings, LLC, is Jeffrey Barnhill.  If called upon to testify, Mr. Barnhill would testify to the following:

1.    Mr. Barnhill is the Senior Vice-President of Finance and Chief Financial Officer of Trans Health Management, Inc., which is a subsidiary of THI Holdings, LLC.   He has a Bachelor's degree in Business Administration, with a Specialization in Accounting, and a MBA with a Business Specialization in Healthcare.

2.    Mr. Barnhill has more than 20 years of experience in healthcare management, and Trans Health Management's management team has more than 155 years of combined experience in healthcare management.

3.    Trans Health Management's management team is a leader in the management of more than 115 long-term health care facilities throughout the United States, including skilled nursing facilities, specialty hospitals, assisted living facilities and outpatient centers.  This team includes Anthony Misitano, the company's CEO and President; Mr. Barnhill; Lisa McLean, the company's Senior Vice President of Development and Operations; Tom Kanavy, the company's

1



THI027213

Confidential

Senior Vice President of Operations; and Denny Barnett, the company's Chief Operating Officer.

    4.    The current members of THI Holdings, LLC are GTCR Fund VI, L.P. and certain affiliates of GTCR Fund VI, L.P.  GTCR Fund VI is managed by a private equity firm with $4 billion in funding.  THI Holdings was recently formed and the other owners of Trans Healthcare, Inc. stock are expected soon to exchange their stock of Trans Healthcare, Inc. (as GTCR Fund VI, L.P. and its affiliates already have done) for membership units of THI Holdings, LLC, so that after this exchange Trans Healthcare, Inc. will be a wholly-owned subsidiary of THI Holdings, LLC.

    5.    Once the exchange of stock for units is complete, THI Holdings will own 100% of not only Trans Health Management but also the various operating entities through which Trans Health Management manages every aspect of facility operations, including:  marketing, planning, financing, new business development, human resources, reimbursement, program development, quality assurance, payroll, management information systems, and other back-office services and support.

    6.    THI Holdings' net worth was $41.4 million as of May 31, 2003, and has not materially changed since that date.

    7.    THI Holdings' net revenue for the five months ended May 31, 2003 is $104.8 million, and its Net Income before Income Tax for that same period is $4.6 million.

    8.    On April 11, 2003, THI of Baltimore, Inc., entered into an Agreement to Lease with ABE Briarwood Corporation ("ABE").  THI of Baltimore is a wholly-owned subsidiary of THI Holdings, LLC.

    9.    Under the Agreement to Lease, subsidiaries of ABE will enter into leases and sub-

2

THI027214

Confidential

leases with operating entities wholly-owned directly or indirectly by THI of Baltimore.  These lessee and sub-lessee entities will be the licensed operators of the nursing homes and other health related facilities listed in Schedules 1A and 1B to the Agreement to Lease.  THI of Baltimore Management, LLC, a wholly-owned subsidiary of THI of Baltimore, Inc. will provide oversight management and back office services for these facilities.  THI of Baltimore Management, Inc. will in turn contract with Trans Health Management to provide such services on behalf of THI of Baltimore Management.

10.    It has also been discussed that THI of Baltimore Management would manage on behalf of ABE the remaining facilities ABE acquires from IHS until such time as a new tenant is identified.  Again, THI of Baltimore Management would contract with Trans Health Management to provide such services.

11.    THI Holdings, LLC is prohibited by its Limited Liability Company Agreement from entering into many business transactions, which transactions would include the assumption of the leases (the "RR Leases") relating to the facilities (the "RR Facilities") owned by the Ladera Health Care Company, Las Palomas Health Care Company, and Rio Rancho Health Care Company (the "RR Lessors").  Trans Healthcare, Inc. is prohibited by its loan agreements from entering into many business transactions, which transactions would include the assumption of the RR Leases.

12.    Accordingly, consistent with the facilities subject to the transaction between ABE and THI of Baltimore, Inc., there will be a separate assignee for each RR Lease.  The assignees will be THI of New Mexico at Ladera, LLC, THI of New Mexico at Las Palomas, LLC and THI of New Mexico at Rio Rancho, LLC (the "Assignees").  Each Assignee is a wholly-owned

3

Confidential

subsidiary of THI of New Mexico, LLC. THI of New Mexico, LLC is a wholly-owned subsidiary of THI of Baltimore, Inc.

13.    The RR Facilities will be managed by THI of Baltimore Management, LLC, and THI of Baltimore Management will contract with Trans Health Management to provide such management services, which is the same arrangement that will be in place with respect to the management of the facilities that subsidiaries of THI of Baltimore will lease or sub-lease from subsidiaries of ABE.

14.    The Trans Health Management personnel that will provide operational, management, and back-office support for THI of Baltimore Management in connection with the RR Facilities are the same personnel who would have provided such services even if the assignment could have been made directly to THI Holdings, LLC or to Trans Healthcare, Inc. Therefore, from a management and operations standpoint, there would not be any functional difference between the assignment of the RR Leases to THI Holdings, LLC, Trans Healthcare, Inc., or the Assignees.

15.    In addition to the support provided by Trans Health Management personnel on behalf of THI of Baltimore Management, the Assignees intend to substantially retain the employees at the RR Facilities. Indeed, because the employees are integral to a facility's ongoing operations, it has been Trans Health Management's typical practice to keep the employees in place when it takes over the operations of a facility to maintain continuity and reduce any fall-off in business.

16.    Trans Health Management's management team has many years of healthcare management experience, including consulting and management work in New Mexico where the

4

THI027216

Confidential

RR Facilities are located. Further, Trans Health Management's management team has substantial familiarity with both U.S. regulatory matters, including Medicare and Medicaid reimbursement, and the New Mexico regulatory structure. Indeed, Mr. Barnhill's own experience in New Mexico has focused primarily on consulting work relating to Medicare and Medicaid reimbursement. Moreover, other members of the Trans Health Management team have experience managing health care facilities in New Mexico.

17.    For more than 2.5 years, a separate THI Holdings operating subsidiary has leased and operated 16 properties in Ohio from a group that includes principals that are also principals in the RR Lessors. Trans Health Management is the oversight manager and provides back office services for each of these 16 facilities. This will include the same group of managers that will be used in managing the ABE facilities and the RR Facilities. Neither THI Holdings, LLC nor its subsidiaries ever has been notified that it has failed to substantially comply with any state or federal regulation governing any of those 16 Ohio facilities.

18.    Pursuant to the leases for these 16 Ohio facilities, THI Holdings' operating subsidiary pays an aggregate annual rent of approximately $7.5 million. There has never been a default under those 16 relating to operational or financial issues.

19.    Mr. Barnhill has reviewed the financial data and other performance metrics for the RR Facilities. Such data and information includes each facility's most recent cash flow statement, projections of each facility's future cash flows, and actual EBITDA through June 2003.

20.    Based on the present and future cash flow analyses Mr. Barnhill has reviewed, as well as the terms of the RR Leases, Mr. Barnhill has determined that the RR Facilities, collectively, can be operated on a cash flow positive basis without the need for additional

THI027217

Confidential

financing. Based on this information, Mr. Barnhill would testify that each Assignee has the financial wherewithal to satisfy its obligations under the RR Lease to be assigned to such Assignee.

21.     Moreover, Mr. Barnhill has reviewed the financial data and other performance metrics for each of the facilities to be assigned to subsidiaries of THI of Baltimore, Inc. pursuant to the Agreement to Lease. Such data and information includes each facility's most recent cash flow statement, projections of each facility's future cash flows, and actual EBITDA through June 2003. Based on the present and future cash flow analyses Mr. Barnhill has reviewed, as well as Mr. Barnhill's review of the terms of the relevant prime leases and forms of leases and sub-leases to be entered into pursuant to the Agreement to Lease, Mr. Barnhill has determined that the facilities, collectively, can be operated on a cash flow positive basis without the need for additional financing. Based on this information, Mr. Barnhill would testify that THI of Baltimore, Inc. has the financial wherewithal to satisfy any obligations to guarantee payment on the RR Leases assumed by the Assignees.

22.     Mr. Barnhill has reviewed the provision of Article XII, Section 12.01 ("Assignment and Subletting") of the RR Leases, as set forth in the Objection submitted to the Court by the RR Lessors. That provision contains no restrictions on subleasing or assignment whatsoever based on any criteria other than the sublessee's or assignee's ability to pay the rent. The provision contains no restriction, for example, based on any lack of regulatory experience or operating history in the State of New Mexico. As to the sole restrictions that appear in Section 12.01, as set forth in the Objections of the owners of the RR Facilities, THI of Baltimore, Inc. satisfies each of those criteria.

6

Confidential

23.     Furthermore, Mr. Barnhill would testify that, based on the actual aggregate EBITDA for the RR Facilities through June 30, 2003, the annualized aggregate EBITDA for the RR Facilities is approximately $1.0 million, and that, depending on the business climate, this may increase over time.

24.     The Court has approved the Debtors' engagement of Trans Health Management to provide consulting services to the Debtors.  These consulting services provided by Trans Health Management include providing advice regarding:  (1) the management of Integrated Health Services' healthcare facilities;  (2) personnel policies, including salary scales and employee benefits; (3) facilities management; and (4) purchasing policies relating to such things as food and beverage, medical, cleaning and other operational supplies, equipment and furnishings.

25.     In summary, Mr. Barnhill would testify that, based on his experience in financial and operational management of healthcare facilities, his knowledge of THI Holdings, its operating subsidiaries and the agreements relevant to the RR Facilities as well as the operating performance of the RR Facilities, the Assignees will be able to operate the RR Facilities at the same financial and operational levels at which they are presently being operated, or possibly even improved levels, without the need for additional financing.

26.     No representative of THI Holdings, LLC or its subsidiaries has been authorized to speak to Peak Medical Corporation personnel with respect to any transactions involving the RR Facilities between Peak Medical and THI Holdings or THI Holdings' subsidiaries.

27.     This concludes the proffer of Mr. Barnhill's direct examination.

7

THI027219

Confidential

1

1

.2          IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
3

4  JEFFREY A. BARNHILL, and        CIVIL ACTION
   H.C.M.B.C., INC.,
5
        Plaintiffs,
6
   v.
7
   TRANS HEALTHCARE INC., TRANS
8  HEALTH MANAGEMENT, INC., THI
   HOLDINGS, LLC, GTCR FUND VI,
9  LP, GTCR PARTNERS VI, LP, GTCR
   GOLDEN RAUNER, LLC, W. BRADLEY
10  BENNETT, Individually, EDGAR
    JANNOTTA, JR., Individually,    NO. 04-1858
11
        Defendants.
12  _____     Pages 1-114

13

14

15          Deposition of W. BRADLEY BENNETT

16               Towson, Maryland

17            Friday, November 4, 2005

18

19

20  Reported by:  Toni R. Thompson, RMR

21  Job No. 171086



2

1

2

3

4                    November 4, 2005

5                    10:10 a.m.

6

7

8    Deposition of W. BRADLEY BENNETT held at:

9

10

11              Venable, LLP

12              210 Allegheny Avenue

13              Towson, Maryland  21204

14

15

16   Pursuant to notice, before Toni R. Thompson, RMR, and

17   Notary Public.

18

19

20

21

3

1  APPEARANCES:

2  ON BEHALF OF THE PLAINTIFFS

3      THOMAS W. SCOTT, ESQUIRE

4      Killian & Gephart, LLP

5      218 Pine Street

6      Harrisburg, Pennsylvania 17108

7      (717) 232-1851

8  ON BEHALF OF THE DEFENDANTS

9      SHARI B. SCHNEIDER, ESQUIRE

10     Littler Mendelson, P.C.

11     Three Parkway

12     1601 Cherry Street, Suite 1400

13     Philadelphia, Pennsylvania 19102-1321

14     (267) 402-3000

15  ALSO PRESENT:

16     Jeffrey A. Barnhill

17

18

19

20

21

4

1          C O N T E N T S

2

3   EXAMINATION OF W. BRADLEY BENNETT      PAGE:

4   BY MR. SCOTT                    5

5

6

7

8   EXHIBITS:                  PAGE:

9   1  Notice of Deposition          8

10  2  2003: A Year of Transition       44

11  3  2004 A Trimmer Top 50         48

12  4  Trans Healthcare Web Page       54

13

14

15

16

17

18

19

20

21

5

1  THEREUPON,

2        W. BRADLEY BENNETT,

3  after having been duly sworn by the notary, was

4  examined and testified as follows:

5        EXAMINATION BY COUNSEL FOR PLAINTIFFS

6  BY MR. SCOTT:

7        Q.  Morning, Mr. Bennett.

8        A.  Morning.

9        Q.  For the record, would you please state

10  your full name and give your business address.

11       A.  William Bradley Bennett, 910 Ridgebrook

12  Road, Sparks, Maryland, 21152.

13       Q.  And by whom are you employed?

14       A.  THI Holdings, LLC.

15       Q.  How long have you been employed by THI

16  Holdings?

17       A.  Since September 2003.

18       Q.  What is your present position?

19       A.  I'm president and CEO.

20       Q.  Are there various operating components of

21  THI Holdings?

6

1    A.   Yes.

2    Q.   Would you identify them, please?

3    A.   Trans Healthcare, Inc., and THI

4  Baltimore, THI of Nevada II.  They're the three major

5  operating subsidiaries underneath THI Holdings.

6    Q.   And am I correct that the operations of

7  those three operating subsidiaries are consolidated

8  into a THI Holdings consolidated financial statement?

9    A.   Yes.

10    Q.   What's your educational background,

11  Mr. Bennett?

12    A.   I attended Loyola College in Maryland,

13  graduated in 1987 with an accounting degree, and then

14  obtained my CPA in 1998 -- in 1988.

15    Q.   And following your graduation from

16  college how have you been employed?

17    A.   I've worked for KPMG in their audit

18  practice in Baltimore.  I actually started interning

19  there my sophomore year in college, worked there

20  three years, then worked for four years after college

21  with KPMG.  Joined Integrated Health Care Services in

*[Handwritten annotation in right margin: a chart labeled "THI Holdings, L..." with branches to "Trans Healthcare, Inc.", "THI-Balt...", and "THI of Nevada II"]*

7

1  1991 as assistant corporate controller. From '91 to

2  I guess 2003 progressed from assistant controller to

3  controller to chief accounting officer to CFO of

4  long-term care division to CFO of the parent company.

5      Q.  What was the business of Integrated

6  Health Services?

7      A.  Diversified. It's long-term acute care

8  hospitals, skilled nursing facilities, home oxygen

9  and DME, home nursing, pharmacy, outpatient rehab,

10  inpatient rehab, hospice. I'm probably leaving a

11  couple out, but that's the bulk of it.

12     Q.  At the time you were first employed by

13  Trans Health Holdings in what capacity were you

14  employed there?

15     A.  Chief financial officer.

16     Q.  And when did that occur?

17     A.  In September, either last day in August

18  or September 2003, somewhere in that range.

19     Q.  And when did you become chief executive

20  officer?

21     A.  In June 2004.

8

1      Q.   When you left the CFO position at Trans

2   Health who became CFO?

3      A.   There wasn't a CFO immediately.  There

4   were three direct reports on the finance side:  Matt

5   Box, senior vice president, finance; Mark Fulchino,

6   senior vice president, taxes, payroll services; and

7   Shawn Nolan, senior vice president, chief accounting

8   officer.

9      Q.   Is there a CFO now?

10      A.   There is now.  Mark Fulchino was promoted

11   to the chief financial officer position. I don't

12   recall exactly what month subsequent to that.

13      Q.   During the time you served as the chief

14   financial officer of Trans Health, did you have

15   primary responsibility for the preparation of the

16   financial reports of the company?

17      A.   As chief financial, yes.

18      (Deposition Exhibit No. 1 was marked for

19   identification.)

20   BY MR. SCOTT:

21      Q.   Mr. Bennett, showing you a document we've

9

1   marked as Deposition Exhibit 1, it's the Notice of

2   Deposition that brings you here today and you could

3   say that it's the announcement of this party.  In the

4   deposition a number of documents are outlined as

5   requested.  I'm wondering if you brought any

6   documents with you today.

7        A.   I did not bring any with me today.

8        Q.   Have you been asked to secure the

9   documents that are identified in the deposition?

10        A.   I believe that Shawn Nolan and Mark

11   Fulchino are compiling documents.

12        MS. SCHNEIDER:  And I'd like to go on the

13   record and say that James Boudreau from Littler

14   Mendelson has responded to these requests, and I

15   guess you and him have been going back and forth and

16   I believe that we have made several objections as per

17   his. I forget the date of the letter.

18        MR. SCOTT:  I just wanted to determine

19   whether we have anything today to look at.

20   BY MR. SCOTT:

21        Q.   Mr. Bennett, when did you first come in

10

1  contact with Jeffrey Barnhill?

2     A.  During the, I guess, initial sale process

3  of Integrated Health Services.

4     Q.  And when approximately was that?

5     A.  The sale process began sometime in 2002,

6  so I would have probably -- I don't remember exactly

7  when, but it would have probably been somewhere

8  between mid-2002 and early 2003, maybe.

9     Q.  Okay.  And when you first came in contact

10  with Mr. Barnhill in what capacity did you see him?

11  You were at that point CFO of IHS; is that correct?

12     A.  Yes.

13     Q.  And what was Mr. Barnhill, how was he

14  introduced to you?

15     A.  Mr. Barnhill, I believe, introduced

16  himself as chief financial officer.

17     Q.  You indicated -- you made reference a

18  moment ago to the purchase of IHS.  Just so that we

19  have a common factual reference point, in general

20  terms would you outline what you understand to be the

21  purchase process of IHS by Trans Health.

11

1      A.   There were a number of parties.

2   Virtually everyone in the industry came through in

3   due diligence to Integrated Health Services.

4      Q.   Let me just back up one step.  At some

5   point Integrated Health Services filed for

6   bankruptcy; is that correct?

7      A.   Yeah. Integrated Health Services filed

8   for bankruptcy in February of 2000.  As a result of

9   the Balanced Budget Act. Medicare cuts. cut in cash

10   flow by of over $200 million. there was over $3.5

11   billion in debt and the cash flows weren't sufficient

12   to support the debt.  As a result there was a filing

13   in February of 2000.

14      Q.   If we could just stop there for a second.

15   At the time of the filing, in the world of long-term

16   health care providers where was IHS on the spectrum?

17      A.   It was in the top --

18         MS. SCHNEIDER:  Objection to form.

19         THE WITNESS:  Integrated Health Services

20   at that time was in. based on revenues would have

21   been one of the top five providers in the space.

12

1   BY MR. SCOTT:

2       Q.  So they filed for bankruptcy in February

3   of 2000?

4       A.  (Nods head up and down.)

5       Q.  But continued to operate?

6       A.  Continued to operate.

7       Q.  And then what happened?

8       A.  Basically after -- a restructuring firm

9   was brought in, Alvarez & Marsal, and the chief

10  executive officer was dismissed, and at some point in

11  I believe mid-2000, dates are foggy, Joe Bondi was

12  brought in as chief executive officer under Alvarez &

13  Marsal and they began to analyze, you know, what was

14  the best way to maximize value for the creditors.

15  Went through a process where besides the long-term

16  care division there was a division, Rotech, which was

17  home oxygen and DME, that wasn't the majority of the

18  value in the company --

19      Q.  DME is?

20      A.  Durable medical equipment.

21          -- the majority of the value in the

13

1   company, and that was spun out to shareholders in I

2   believe mid-'02 at the value of about north of a

3   billion dollars, a billion one to a billion two,

4   which left back in the company contract rehab

5   business and the long-term care business primarily.

6         A process then was begun to decide

7   whether this business should be operated as a

8   stand-alone enterprise, basically would come out of

9   the bankruptcy where the creditors would take stock

10   in the business, or whether the remainder of the

11   company should be sold. So they began a process of

12   marketing the company and entertaining offers for the

13   company.

14         In -- again, the dates aren't exact, but

15   sometime between mid-'02 and into early '03 the

16   process began where a number of financial and

17   strategic buyers came through the company in due

18   diligence, Trans Healthcare was one of them. Trans

19   Healthcare ultimately was the party that was selected

20   as the acquirer for the stock of Integrated Health

21   Services to be held out as a stalking horse in a bid

14

1    process.  It's a standard bankruptcy process where

2    you get a stalking horse bidder and then solicit

3    others.

4        Q.  Just one second.

5        A.  Sure.

6        Q.  In that selection process, were you

7    directly involved in the process of selecting THI as

8    a stalking horse or preferred bidder?

9        A.  There was a creditors' committee, there

10   was a -- we had the restructuring firm, there were

11   attorneys for both sides, there were attorneys for

12   bondholders.  It was a tremendously large group that

13   made the decision, and ultimately the creditors'

14   committee.

15       Q.  Did the -- in that process did the

16   entities that evaluated THI as a potential acquirer

17   evaluate the management team of THI?

18       A.  Some did, some didn't.

19       Q.  And would it be correct that at that time

20   as you knew it the management team consisted of

21   Anthony Misitano as CEO and Mr. Barnhill as CFO?

15

1      A.  I'm confused.  You were asking about did

2   they evaluate the management of IHS and then --

3      Q.  Yes.

4      A.  So now you're flipping over to --

5      Q.  I'm sorry, I misspoke.  Did they evaluate

6   the management -- let me just back up and run at it

7   again.

8          When the creditors' committee and the

9   attorneys for the restructuring firm and the group

10   that evaluated THI as a potential acquirer of the IHS

11   assets, did those entities evaluate the THI

12   management team as part of that inquiry?

13      A.  At the end of the day the sale was going

14   to be a cash sale.  They were more worried about the

15   capitalization of the company and the ability to

16   close.  The primary concerns were financial

17   resources, willingness and ability to close.  In

18   reality there was going to be no ongoing -- it wasn't

19   stock, it wasn't an ongoing situation where you have

20   an unearn (phonetic) at or anything, so it's more how

21   to get closed and get the cash.

16

1     Q.  Was the decision ultimately made that

2  Trans Health would acquire IHS assets?

3     A.  Yes.  Actually it's stock.

4     Q.  How was that transaction structured?

5     A.  As I recall, it was a sale of the stock

6  of the remaining long-term care, and I believe the

7  rehab entity was in that initial deal with Trans

8  Healthcare, Inc., the sale to Trans Healthcare, Inc.,

9  and that was basically a sale of the stock and

10  remaining components of the business.

11     Q.  Were there also facilities that were

12  covered by leases?

13     A.  Yes.  Well, they were all underneath

14  the -- if you bought the stock you got the leases.

15     Q.  At the time the -- is there a date that

16  sticks out in your mind as a closing date on that

17  transaction?

18     A.  Well, it never closed because there was a

19  bid process where they were, THI was held out as the

20  stalking horse and ABE Briarwood Corp. came in and

21  overbid Trans Healthcare, Inc.

17

1     Q.  Okay.  And then what happened?

2     A.  And again I wasn't privy to how this all

3  came to be, but Trans Healthcare, Inc., ended up in a

4  situation where a newly-formed entity, THI

5  Baltimore -- well, actually I guess at that point in

6  time, and again this is -- I wasn't involved in the

7  formation of this, this is --

8     Q.  I understand, just what you understand it

9  now.

10    A.  This is as I understand it now.  Trans

11  Healthcare, Inc., formed THI Holdings, LLC.  Trans

12  Healthcare, Inc., which had at that point contributed

13  I guess its equity units up to Holdings, for units in

14  Holdings, and the equity ownership percentages

15  remained the same, and there was a THI of Baltimore

16  entity formed underneath that ultimately became the

17  operator, entered into a lease transaction with ABE

18  Briarwood Corporation to lease the IHS assets, the

19  long-term care assets that were acquired by ABE

20  Briarwood Corp., and ABE Briarwood Corp. then sold

21  the contract rehab business to Leucadia

18

1  International.

2      Q.  If you know, did that transaction whereby

3  THI leased the IHS assets from ABE Briarwood, did

4  that transaction require approval by the bankruptcy

5  court?

6      A.  I don't recall exactly, but I believe it

7  did.

8      Q.  Now, at the time that that was all taking

9  place you were still in your position of CFO of IHS;

10  is that correct?

11     A.  Yes.

12     Q.  What was your personal involvement in all

13  of that?

14     A.  I don't understand the question.

15     Q.  Were you involved directly in

16  negotiations, did you provide information, were you

17  more involved in the transaction and sale that was

18  going on, or were you more involved in operating the

19  company until it was disposed of?

20     A.  Again, there was -- if you sat at any of

21  the meetings, which Jeff did, on our side of the

19

1    table we frequently had 15 people representing all

2    constituencies. So I provided information, I was

3    involved with running the ongoing business, and

4    pretty much -- you know, there were a number of

5    parties involved and as CFO of the company we

6    provided information to everyone. We have a lot of

7    cooks in the kitchen.

8        Q. From the -- there's a date that sticks

9    out in my mind from reviewing a lot of the documents.

10   I think it's August 27 of 2003, which identifies

11   perhaps a closing date. Is that a date that rings a

12   bell with you, or not?

13       A. I guess I always thought of the closing

14   date as August 29th, but somewhere in that relative

15   range of time. I don't recall exactly.

16       Q. End of August --

17       A. End of August.

18       Q. -- 2003?

19           From the first time you met Mr. Barnhill

20   up until that closing date of the sale of the IHS

21   assets, what would have been your frequency of

20

1   contact with him?

2       A.   Gosh, I don't recall from that period of

3   time.  I can tell you that I -- I don't recall the

4   frequency from that period, but I certainly had

5   conversations with Jeff about the acquisition, the

6   operations of the buildings.  We had to provide him

7   information so that he could make decisions on --

8   there were certain leases or other portfolios that

9   Trans Healthcare may or may not have wanted, so we

10  had to provide information so he could make those

11  decisions.

12      Q.   Just trying to get a sense of daily,

13  weekly, monthly, sporadically.

14      A.   I mean I would say maybe weekly, but

15  that's a guess.  I just really don't recollect that

16  point in time.

17      Q.   Was most of your contact with

18  Mr. Barnhill over the phone or via e-mail or in

19  person?

20      A.   Again, a lot of time has passed.  I would

21  say primarily by phone.

21

1      Q.  After the closing, if I understand your

2   answer, prior answer correctly at that point IHS was

3   out of business?

4      MS. SCHNEIDER:  Objection;

5   mischaracterizes his testimony.  I don't think he

6   said anything about that.

7   BY MR. SCOTT:

8      Q.  Well, okay.  After the closing I think

9   you said was going to be, this was going to be a cash

10  sale for stock and then the stock would -- the

11  creditors would take the cash?

12     A.  Yeah, the creditors -- we would basically

13  be a liquidating LLC that's in place where the cash

14  would go into the liquidating LLC and ultimately be

15  distributed to shareholders -- distributed to all of

16  the parties that had claims at the end of the day

17  once it was determined that all claims had been

18  accounted for.

19     Q.  And at that point in time did you seek

20  other employment, that point in time being the

21  closing?

22

1      A.  At the closing?

2      Q.  Yes, or right around that time.

3      A.  Well, I had a pretty good severance

4  package, so I certainly entertained over the course

5  of the prior year, you know.  I talked to head

6  hunters and looked for opportunities, but I did have

7  a pretty generous severance and bonus package at the

8  end.

9      Q.  Is the existence of a severance package

10  for a CFO common within the industry?

11      MS. SCHNEIDER:  Objection.

12  BY MR. SCOTT:

13      Q.  You may answer.

14      A.  I think it depends on the individual

15  circumstances.

16      Q.  What were the circumstances that you

17  understood within IHS that prompted them to provide

18  you with a good severance package?

19      A.  I was in a bankruptcy and they needed to

20  retain good people.  So there was retention pay and

21  contracts put in place to retain people throughout

23

1   the bankruptcy.

2      Q.  Was the severance package that you

3   ultimately -- was any portion of the severance

4   package that you had when you ultimately left IHS in

5   place at the time you became their CFO?

6      MS. SCHNEIDER:  Objection to form.  Can

7   we clarify whose CFO?

8      MR. SCOTT:  CFO of IHS.

9      THE WITNESS:  I'm just trying to --

10  employment contracts, there were employment contracts

11  that had been in place prior to IHS filing for

12  bankruptcy with all the senior management team, and

13  subsequent to the filing I guess there were certain

14  amendments made based on level of importance of the

15  individual within the organization, within the

16  bankruptcy.

17  BY MR. SCOTT:

18     Q.  How long was the gap between the

19  severance of your employment with IHS and your

20  reemployment with Trans Health?

21     A.  I don't remember exactly when my

24

1   employment started. I think it started pretty much

2   concurrent with the close of the deal, so it would

3   have been around the same time.

4       Q.   Essentially leave one job and move into

5   the next?

6       A.   Yeah.

7       Q.   Who employed you at Trans Health?

8          MS. SCHNEIDER:  Objection to the form.

9          THE WITNESS:  Which entity, or which --

10  BY MR. SCOTT:

11      Q.   I'm sorry.  That's a good question.

12         When you became an employee of the Trans

13  Health entities who was your -- who was the actual

14  employer, what entity employed you?

15      A.   I believe it was Trans Healthcare

16  Management, Inc., underneath of Trans Healthcare,

17  Inc.

18      Q.   So if I understand the corporate

19  structure correctly, Trans Health Management, Inc.,

20  is under Trans Health, Inc., and at that point Trans

21  Health, Inc., is a subsidiary of Trans Health

25

1   Holdings, LLC?

2       A.   Yes, sir.

3       Q.   Or maybe just THI Holdings.  I'm not sure

4   whether they use initials or the whole name.

5       A.   I think it's THI Holdings, LLC.

6       Q.   For our reference today and for the

7   purposes of this deposition, unless we're

8   specifically speaking of individual entities, I find

9   that I have used the terms THI and Trans Health

10  essentially interchangeably, and those terms

11  reference the parent company, which after it became

12  an LLC would be Trans Health, or THI Holdings, LLC.

13  If you have any question at any point about which

14  entity I'm talking about or I'm less than clear,

15  please --

16      A.   I'll keep asking.

17      Q.   -- keep asking.

18          MS. SCHNEIDER:  So I want to make sure I

19  understand.  So you're saying that any time you're

20  referring to Trans Health you're referring to

21  Holdings?

26

1          MR. SCOTT: If I am referring to Trans

2    Health before Holdings, LLC, was created I am

3    referring to Trans Healthcare, Inc., which I

4    understand to have been the parent company, the

5    company in which people owned interests, owned stock,

6    as opposed to a subsidiary. After Trans Healthcare,

7    Inc., was reconstituted as THI Holdings, LLC, my

8    references to THI or Trans Health would be to THI

9    Holdings, LLC, which again would be, as I understand

10   your testimony and the documentation, a parent

11   company in which ownership interests were held.

12          THE WITNESS: Subsequently, yes.

13   BY MR. SCOTT:

14      Q.  If you were to identify one individual

15   person as being your primary contact with THI before

16   you were hired with regard to your employment, who

17   would that person be?

18      A.  Tony Misitano.

19      Q.  At what point did you begin discussions

20   with Mr. Misitano concerning your potential

21   employment with THI?

27

1       A.  I don't remember the exact time.  There

2   were significant issues that Trans Healthcare, Inc.,

3   had with Ventas, one of its lenders.  Tony expressed

4   to me that he had issues dealing with that and that

5   they did not want to work with Jeff, and they

6   basically -- that he was probably going to need to

7   find a new CFO and began to make overtures.  I don't

8   remember exactly when that occurred.

9       Q.  Is it correct that the -- well.

10          Before THI acquired the IHS assets, was

11   THI larger or smaller than IHS?

12      A.  It was smaller in terms of revenue and

13   number of locations.

14      Q.  At what point in your discussions with

15   Mr. Misitano, if ever, did you engage in discussions

16   with Mr. Jannotta?

17          MS. SCHNEIDER:  Objection to form.

18   BY MR. SCOTT:

19      Q.  Did you ever engage in discussions with

20   Mr. Jannotta concerning your employment by THI?

21      A.  I had one meeting or conversation with

28

1   him at some point approaching I guess the closing of

2   the transaction where I guess he had to get

3   comfortable with me and met with me. That was it.

4   It was brief.

5        Q.   Okay. At the time of your employment by

6   THI as CFO, did you receive a written employment

7   agreement?

8        A.   No. I didn't.

9        Q.   Did you at that point receive a senior

10  management agreement?

11       A.   At some point during my CFO tenure, and

12  it wasn't immediately, I was given a draft form of

13  senior management agreement that was going to be the

14  template for I guess all senior managers, but that

15  was never completed.

16       Q.   At the time of your engagement as CFO by

17  THI, did you have discussions regarding securing an

18  equity position within the company?

19       A.   I spoke with Mr. Misitano and he told me

20  that I would have the opportunity to purchase 3

21  percent of the common equity in the company at a

29

1    determined price at some point in the future.

2        Q.   Was the ability to become an equity

3    participant in the company a factor in your

4    determination to take the position?

5        A.   It certainly was appealing at the time

6    before I realized how the company was doing.

7        Q.   Did Mr. Misitano at any point provide you

8    with -- you said at some point you received a draft

9    or a template of a senior management agreement?

10       A.   (Nods head up and down.)

11       Q.   Let me show you a document that was

12    previously marked as Jannotta Deposition Exhibit

13    No. 8.  This particular -- let me just ask you if

14    that format and form of documentation is familiar to

15    you.

16       MS. SCHNEIDER:  Objection to form.

17       THE WITNESS:  I don't recall the details

18    of the specific agreement, but this certainly appears

19    to be in the form of a senior management agreement.

20    I don't recall if this is one that I've seen or if

21    this is the standard form that's there, but it

30

1   certainly appears to be a senior management

2   agreement.

3   BY MR. SCOTT:

4       Q.   There's a date on this document. I think

5   it's January of 2004.  At that point in time were you

6   involved in the development of senior management

7   agreements for senior managers within THI?

8       MS. SCHNEIDER:  Objection to form.

9       THE WITNESS:  To be honest with you.

10  after joining the company -- this is going to be a

11  long answer -- in September of '03 it was made.

12  brought immediately to my attention that we were in

13  default on our covenants with Ventas.  I was

14  immediately put on the phone with Ventas in an

15  attempt to renegotiate these covenants.  At that

16  point we needed to go back and understand the

17  covenant levels versus historical financial results.

18  They did not want to speak with Mr. Barnhill.  He had

19  to sit in the back of the room and give us

20  information on the historical financials to be able

21  to negotiate.

31

1        As time developed we dug into the

2    financial statements.  Statements had been made to me

3    from Ventas saying your cash flow of your business

4    has never matched up with your EBITDA of your

5    business, where is the cash flow.  We began to dig

6    in.  We found that the bad debt reserves were

7    inadequate, IBNR reserves in health insurance were

8    inadequate, and ultimately began a process of

9    attempting to correct reserve levels on the financial

10   statements for the end of '03.

11       In all candor, this company, we ended up

12   taking down 100 percent of the EBITDA for 2003, I

13   believe we took it all down, somewhere in that range,

14   somewhere in the range of $30 million in adjustments

15   to the financial statements that were reviewed by

16   Ernst & Young on behalf of GTCR and were reviewed by

17   KPMG in the audit process.

18       To be completely honest with you, the

19   senior management agreements were folks -- we were

20   worried about keeping this company out of bankruptcy

21   and, you know, senior management agreements, we

32

1    wanted to retain staff but this was a firestorm. We

2    were in a firestorm and ultimately senior management

3    agreements we wanted to tie folks down, but at that

4    point in time I recollect mostly that we were trying

5    to figure out how to have this company survive.

6        Today we're on our ninth amended

7    forbearance agreement with our lenders. The business

8    needs $15 million probably minimum to be able to

9    survive and avoid a bankruptcy filing, this is Trans

10   Healthcare, Inc., and that's the state of this

11   company.

12   BY MR. SCOTT:

13       Q.  And the this company you're referring to

14   is Trans Healthcare, Inc.?

15       A.  Is Trans Healthcare, Inc.

16       Q.  How is Trans Healthcare Baltimore doing?

17       A.  THI of Baltimore has entered into a

18   non-standard lease. We have a lease arrangement that

19   has above-market escalators of 4 percent, it has as

20   an EBITDA sharing arrangement at 20 and 30 percent at

21   certain hurdle rates. It is -- it has no terminal

33

1   value. It has a lease that our landlord has

2   asserted, potentially there are defaults out there so

3   there is no ability to market or get liquid on the

4   business. And again, I encourage experts,

5   discussions with KPMG, discussions with Ernst &

6   Young, discussions with if you wanted to have an

7   expert come review all this information to understand

8   exactly where this company is today.

9        That's where we are. That's what I live

10  with every day, trying to fix this.

11       Q.   What was the most -- what is the most

12  recently available audited financial statement for

13  the THI Holdings, LLC?

14       A.   Their audits were not issued for 2003.

15  Drafts would be available, there would be a going

16  concern on Inc., and on Baltimore there were issues

17  with some leases. There may be able to be an audit

18  issued on Baltimore. But to the extent that we would

19  want to issue one on Holdings it would, I assume,

20  have to be a going concern in light of where we are

21  overall.

34

1    Q.  Am I correct that financial reports are

2  made by THI Holdings on a monthly basis to GTCR?

3    A.  Yes.

4    Q.  What's the most recent monthly reports

5  submitted by THI Holdings to GTCR?

6    A.  It would likely be -- I think September

7  is in there now, September '05.

8    Q.  To the best of the company's ability do

9  those financial reports accurately reflect the

10  financial status?

11    MS. SCHNEIDER:  Objection to form.

12    THE WITNESS:  Every month THI Holdings

13  submits financial statements to GTCR, and certainly

14  we believe they're accurate financial statements in

15  accordance with GAAP.

16  BY MR. SCOTT:

17    Q.  Has THI holdings ever failed to pay

18  interest when due on a GTCR loan?

19    A.  THI holdings, the two entities and the

20  two capital structures you really have to look at

21  them as Inc. and Baltimore.

35

1      Q.  For the purpose of this question let's

2   just combine the two.  In other words, Inc. may have

3   some loans, Baltimore may have some loans, but if I

4   understand the way it works correctly, and if I don't

5   then correct me, but my understanding is -- let's

6   just say that Inc. is down $10 and Baltimore is up

7   $20.  GTCR would get a report from Holdings that what

8   would say we're up $10 and then it would show the

9   detail?

10      A.  The way that it works is that there's

11   separate capital structures and separate financial

12   statements that are prepared, balance sheet, income

13   statements, cash flows for THI of Baltimore and its

14   respective constituencies and for Trans Healthcare,

15   Inc., and then those financial statements are

16   combined.  THI Holdings is only really combined for

17   GTCR to view, but really is not -- has no purpose for

18   any other entities.

19      Q.  So if I understand that answer correctly

20   the creditors, for example, of THI, Inc., would have

21   separate obligations with THI, Inc., that would not

36

1   be the same as --

2      A.   Baltimore.

3      Q.   -- THI Baltimore?

4      A.   Yes.

5      Q.   And vice versa?

6      A.   (Nods head up and down.)

7      Q.   So in terms of the outside world,

8   Baltimore and Inc. are separated?

9      A.   Yes.

10      Q.   But internally in terms of the ownership

11   structure they are combined?

12         MS. SCHNEIDER:  Objection to form.

13         THE WITNESS:  For GTCR we combine the

14   Trans Healthcare, Inc., financials and the THI of

15   Baltimore financial statements to show a consolidated

16   enterprise.  But because of the capital structures in

17   each and the different covenants, different lenders,

18   different landlords, different requirements they're

19   two separate and distinct entities.

20   BY MR. SCOTT:

21      Q.   And is it accurate that THI Baltimore is

37

1   essentially the IHS assets that were purchased out of

2   bankruptcy?

3       A.  THI of Baltimore is the lease entered

4   into with ABE Briarwood Corporation that are the old

5   IHS assets that ABE Briarwood owns, or are subleased

6   from third-party landlords.

7       Q.  And THI, Inc., is comprised of the assets

8   of THI. Inc., before the acquisition. before the IHS

9   deal was done?

10      A.  Yes.

11      Q.  Now, back to my question.  My question

12  is:  Has THI, Inc., failed to make payments on the

13  GTCR loan, interest payments on the GTCR loan when

14  due?

15      A.  GTCR had had a 50 percent pay provision

16  on one of its notes deferred, I can't remember

17  exactly.  But nothing's being paid to GTCR now as far

18  as interest.  So the answer would be yes under the

19  original terms.  To the extent that there were any

20  amounts that were due to be paid they are not being

21  paid.

38

1    Q.   And that's on THI, Inc., side?

2    A.   Yes.

3    Q.   If we focus on the THI Baltimore side --

4    A.   There are no loans from GTCR on the

5  Baltimore side.  It's only a revolving credit line

6  with CapitalSource.

7    Q.   Has THI Holdings failed to -- let me

8  revise that.

9        Does GTCR own preferred stock in THI

10  Holdings?

11    A.   Yes.

12    Q.   Under the preferred stock arrangement are

13  dividends due and payable to preferred stockholders

14  in preference to common stockholders?

15    A.   Yes, I believe.  I believe so.

16    Q.   Has THI Holdings paid dividends, oh,

17  let's just say since 2003, to GTCR under the

18  preferred stock?

19    A.   We're not paying anything now, and we

20  haven't been for a while.  I don't recall what was

21  being paid.  We'd have to go back and look that up.

39

1    Q.  When you came to THI as CFO what was your

2  organizational relationship to Mr. Barnhill?

3       MS. SCHNEIDER:  Objection to form.

4       THE WITNESS:  The finance group was set

5  up where Jeff was moved into a role where I believe

6  he was to work on Medicaid reimbursement and any

7  acquisitions and development.

8  BY MR. SCOTT:

9    Q.  Okay.  Who else was in the finance group

10  at that point?

11    A.  Matt Box, who was SVP treasurer -- same

12  group that I went through before; Mark Fulchino, SVP

13  tax, and Shawn Nolan, SVP chief accounting officer,

14  direct reports.

15    Q.  Mr. Barnhill obviously was a prior

16  existing THI employee.  How about Mr. Box,

17  Mr. Fulchino and Mr. Nolan?

18    A.  They were all former IHS employees.

19    Q.  When were they hired?

20    A.  Concurrent with the close of the deal.

21    Q.  What was the structure of the finance

40

1   group before the IHS acquisition?

2          MS. SCHNEIDER:  Can we -- are you talking

3   about IHS or are you talking about THI?

4          MR. SCOTT:  I'm talking about the IHS

5   acquisition -- the acquisition of IHS by THI.

6          THE WITNESS:  After THI entered into the

7   lease for the assets from ABE Briarwood Corporation,

8   I laid the structure out prior to that, while at IHS

9   I'd been chief financial officer and had the same

10  reporting structure, the three individuals less

11  Mr. Barnhill.

12  BY MR. SCOTT:

13      Q.  Okay.  And if you know what did the

14  finance group look like at THI before you came on

15  board?

16      A.  I don't know the exact reporting

17  structure that was there underneath Jeff.

18      Q.  When you became CFO did you make any

19  determinations as to whether or not THI had an

20  adequate finance group in place before you came on

21  board?

41

1      A.   The evaluations that I made were, one --

2   I had been told that this company was ready to go

3   public. I got in there and they were in default with

4   their lenders and their lenders wouldn't talk to the

5   finance person. I also knew that there was an

6   internal control letter in 2002 from KPMG that was

7   quite scathing as far as the quality of the internal

8   controls in the organization.

9        Again, these were all new facts that, you

10  know, I had a company that I thought was ready to go

11  public and it turned out that it was far from it. So

12  if you take those two factors, I would say that the

13  financial group was inadequate.

14     Q.   How many people were in senior management

15  positions within the finance group before the IHS

16  acquisition?

17     A.   I'm not sure exactly how they defined

18  everyone, but it was Jeff and maybe John Bauer. I

19  don't know if he was or wasn't at that point in time.

20     Q.   Who told you that the company was ready

21  to go public, where did you get that information?

42

1      A.  I guess I had heard it from Mr. Misitano

2   over time, and I guess it had been talked about

3   numerous times during the purchase process, the bid

4   process for IHS came up.  So I know I heard it

5   multiple times.

6      Q.  Did you at any point make a determination

7   or form the opinion that one reason there were the

8   problems that you identified was that the finance

9   group was understaffed at THI before you were --

10   before you came aboard?

11      A.  It's hard to say.  It wasn't a large

12   organization, so I mean I really more just reacted to

13   the facts that, you know, of the status of the

14   company.  I didn't really determine overstaffed,

15   understaffed.

16      Q.  At the beginning of your deposition you

17   indicated that there were some industry

18   considerations or events that had an impact on the

19   IHS bankruptcy.  What were those in general terms?

20      A.  The Balanced Budget Act I believe of 1997

21   really became fully implemented in, or began to be

43

1   implemented in mid-1999 and affected the long-term

2   care business of IHS, basically taking the payment

3   methodology from a cost-based system for Medicare to

4   a prospective payment system where you basically pay

5   by diagnosis, and ultimately took a lot of the profit

6   out of the higher acuity patients.  It was a phase

7   in.  Additionally there was a cap that was coming in

8   on annual rehab spending that put -- that affected

9   the rehab business, and I think all in all cash flows

10  dropped $200 million from '99 to 2000 based mainly on

11  those two areas.

12      Q.  Were those changes in financial

13  fundamentals ones that were industry wide?

14      A.  Yes.

15      Q.  And did most of the larger health care

16  providers during that period end up shrinking?

17      A.  I don't remember --

18      MS. SCHNEIDER:  Objection; speculation.

19      THE WITNESS:  I don't remember the, you

20  know, what the path was on each company.  I can tell

21  you that Genesis, you know, Vencor, IHS, Sun Health,

44

1   and then other smaller midsize chains were all forced

2   to file for Chapter 11 bankruptcy protection at

3   around that time frame.

4   BY MR. SCOTT:

5        Q.   And I guess it was because, among other

6   things, those companies were also in default to their

7   lenders?

8        MS. SCHNEIDER:  Objection: calls for

9   speculation.

10       THE WITNESS:  I don't think you can file

11   for bankruptcy without being in default to your

12   lenders, unless you got some really good terms.

13       Q.   So finding that THI had some issues with

14   its lenders wouldn't be surprising to you, would it?

15       A.   It would be surprising the fact that

16   there was no reimbursement problems.  This was years

17   after.  It's a completely different set of

18   circumstances.

19       MR. SCOTT:  Let's mark this as 2.

20       (Deposition Exhibit No. 2 was marked for

21   identification.)

45

1  BY MR. SCOTT:

2     Q.  Mr. Bennett. I'm not asking you to,

3  certainly not to vouch for every word or document or

4  number in this exhibit.  I represent to you that it's

5  an article that appeared in a trade journal called

6  Provider dated June 2004, and purports to be a review

7  of 2003 and then it lists the top 50 nursing facility

8  chains, at least as identified by this particular

9  entity.

10       Let me just ask you to review the first

11  couple of paragraphs there, and the question would be

12  from your perspective as a CFO in the industry was

13  that a fair characterization of what was going on in

14  the industry in 2003 at the macro level.

15       MS. SCHNEIDER:  Objection to form.  And

16  on the record it's a document that speaks for itself.

17       THE WITNESS:  I can't speak for every

18  company in the industry as far as what, you know,

19  what the impact of -- this is referencing the

20  Medicare cliff.  I can tell you that the Medicare

21  cliff in the IHS transaction was discussed for a

46

1   year, factored into the purchase price, and was not

2   of the severity that would cause a bankruptcy or, you

3   know, it's not to the level of what was experienced

4   again in 1999. No one filed for bankruptcy in 2003

5   of the big chains as a result of the Medicare cliff.

6   BY MR. SCOTT:

7        Q.  By 2003 the big chains were already in

8   bankruptcies.

9        A.  They had been out. Most had been out.

10       Q.  I just note the last sentence on the

11  article, right-hand column: Also notable was Trans

12  Healthcare's jump from No. 11 to No. 6 - after making

13  its first appearance in the Top 50 only last year.

14       Is it correct that Trans Health was the

15  only company of size that grew dramatically?

16       A.  I have no idea.

17       MS. SCHNEIDER:  Objection. Can we go off

18  the record for a second.

19       (Discussion off the record.)

20  BY MR. SCOTT:

21       Q.  If you know, am I correct that in 2001

47

1    Trans Healthcare, which at that point it would be

2    Trans Healthcare, Inc., was not even one of the top

3    50 health care, long-term health care providers?

4          MS. SCHNEIDER:  Objection.

5          MR. SCOTT:  If you know.

6          MS. SCHNEIDER:  That is not what this

7    article is about.  You're mischaracterizing even the

8    article.  Are we talking about on Page 42 where

9    ranking in terms of the number of beds?

10         MR. SCOTT:  No.

11         THE WITNESS:  All I have to say is

12   Counsel's quoting from an article that I have no idea

13   whether it is correct or not.  And he can continue to

14   quote from the article, I just have no idea if it's

15   correct or not.

16   BY MR. SCOTT:

17         Q.  So you have no idea whether or not Trans

18   Healthcare, Inc., was one of the fastest growing

19   health care providers from the period of 2001 to

20   2004?

21         A.  Based on what?

48

1      Q.  Based on beds.

2      A.  I don't know.  If you can provide some

3   other supporting data.  This is one article. I just

4   don't know the accuracy of the article.

5      Q.  Well, let's try another one.  Let's try

6   2004's report.  I'm not asking you to verify the

7   accuracy of the article.  I'm suggesting to you that

8   there is an article that makes this assertion, and

9   I'm asking whether as CFO and now CEO of the company

10   you are able to verify in general terms the

11   statements.

12        (Deposition Exhibit No. 3 was marked for

13   identification.)

14        MS. SCHNEIDER:  Same objection as to my

15   last.

16        THE WITNESS:  This is an article that

17   lists Trans Healthcare with 17,738 beds, which at the

18   time I don't know, it would be in a relative range, I

19   would assume, and ranks it compared to others in the

20   industry.  And again, I don't know the accuracy but

21   it ranks us with 17,738 beds.

49

1   BY MR. SCOTT:

2       Q.   Would it be accurate to state that at a

3   time when other large health care chains were

4   reducing the size of their beds Trans Healthcare was

5   increasing the number of its beds?

6       MS. SCHNEIDER:  Objection;

7   mischaracterizes these.  And what year are we talking

8   about?

9       MR. SCOTT:  2001 to 2004, through 2004.

10      MS. SCHNEIDER:  Okay.  These are 2003 and

11  2004, so.

12      THE WITNESS:  Let me answer your

13  question.  In the IHS bankruptcy we reduced the

14  number of beds from -- the number of facilities from

15  over 400 to the mid-100s, so it was a cleaned-up

16  portfolio that was ultimately being sold and had

17  gotten out of the markets taking into account the

18  Medicare cliff and the impact of the Balanced Budget

19  Act.  So that was a cleaned-up portfolio at that

20  point in time being marketed for sale.  So that's

21  probably the best way to answer.

50

1        I don't know for a fact or recollect what

2   every chain was doing at any point in time, whether

3   deals were done, weren't done, who was buying, who

4   wasn't buying.  But we did in IHS pare down the

5   portfolio during that bankruptcy process from

6   basically 2000 to 2003.

7   BY MR. SCOTT:

8        Q.   And so the portfolio that came out of

9   bankruptcy as part of the ABE Briarwood/THI deal was,

10   as you had referred to it, a cleaned-up portfolio?

11       A.   Yes.

12       Q.   And that portfolio is the one that's

13   still in Baltimore --

14       A.   It's a cleaned up --

15       Q.   -- THI Baltimore?

16       A.   Absolutely, but it's under an onerous

17   out-of-market lease.

18       Q.   Which was part of the bankruptcy

19   transaction; correct?

20       A.   No, it was separate, the transaction

21   between Trans Healthcare, Inc., and ABE Briarwood.

51

1      Q.   And that's a transaction that was entered

2   into as part of the acquisition?

3      A.   The acquisition was done by ABE

4   Briarwood, and then ABE Briarwood had entered into a

5   lease with Trans Healthcare, Inc., and Trans

6   Healthcare, Inc., didn't enter into anything with the

7   bankruptcy state.

8      Q.   Right.  And the decision to enter into

9   what you would consider to be an onerous -- was it

10   onerous out of market?

11      A.   Yes.

12      Q.   An onerous out-of-market lease was made

13   by the board of directors of THI, wasn't it?

14      A.   The company would have had to approve it.

15      Q.   And in your capacity as the CFO of IHS,

16   before that transition took place would it be correct

17   that the data, at least some of the data that that

18   board of directors would be relying upon would be

19   data that you provided?

20      A.   The lease between ABE Briarwood and Trans

21   Healthcare, Inc., I had no involvement with.  I also

52

1  had no involvement to any of the pro forma, any pro

2  forma adjustments that would have been made in order

3  to enter into the transaction. We would have

4  provided to all parties the same historical operating

5  data, that basically it was open kimono to all

6  parties. So I have no idea what other adjustments

7  were made to say that that lease would have made

8  sense. I do know that I've gone back over time and

9  looked at pro formas on acquisitions that were done

10  by Mr. Barnhill and his group that were rather

11  aggressive, so I assume that that may be the same

12  circumstance here.

13      Q.  Aggressive acquisition of facilities was

14  the business plan of THI, wasn't it?

15      A.  I don't know at that point in time what

16  they were attempting to do. I can only answer after

17  the fact what was being done. And that plan

18  immediately reverted to trying to keep the company

19  out of bankruptcy.

20      Q.  Are these statements correct: Founded in

21  1998, THI implemented an acquisition strategy that

53

1   was focused on searching out the right acquisition

2   partner, not just looking to grow, but to grow right.

3   As the strategy proved effective, THI went from

4   acquiring 23 health care facilities in two states in

5   1999, to the current operation which exceeds 220

6   health care centers in 20 states just four years

7   later.

8        MS. SCHNEIDER:  Objection.  First of all,

9   can you direct to the witness which exhibit you're

10   reading from?

11        MR. SCOTT:  I'm not reading from one of

12   the exhibits.  I'm asking him whether that statement

13   is correct based on his knowledge of the company he's

14   CEO of.

15        THE WITNESS:  I wasn't CEO at the time if

16   you're talking from '98 forward, and from the time

17   that I took over the company we've been trying to

18   keep the company out of bankruptcy and restructure

19   with our lenders, and we're on our ninth amended

20   forbearance agreement.

21        MR. SCOTT:  Mark this.

54

1          (Deposition Exhibit No. 4 was marked for

2   identification.)

3   BY MR. SCOTT:

4          Q.  THI has a website, don't they?

5          A.  (Nods head up and down.)

6          Q.  Is the information on that website put up

7   by the company as accurate?

8          A.  Obviously the company has had the same

9   ownership structure from 1998 forward.  I took over

10  the company in September 2003 -- or actually, excuse

11  me, in June 2004 -- and this fact set follows -- this

12  fact set obviously has been up there and would follow

13  through, so.

14         Q.  Is that a yes?  The document in your

15  hand, which is Deposition Exhibit 4, was pulled off a

16  THI website this morning, or yesterday, under the

17  heading of Growth, Acquisitions/Opportunities.  Would

18  you agree with me, Mr. Bennett, that there's nothing

19  in there that says we are scrambling to keep out of

20  bankruptcy?

21         MS. SCHNEIDER:  Objection to form.

55

1          THE WITNESS:  I don't argue that this

2    was, this was a strategy that was employed, you know.

3    It seems completely logical that a private equity

4    firm that invested in a company would employ this

5    strategy, and, you know, we're working to keep the

6    company out of bankruptcy and recapitalize it and

7    restructure it.  I hope that we can do that.

8    BY MR. SCOTT:

9        Q.  And just so I understand the industrial

10   playing field we're working on here, your prior

11   employer, IHS, was unable to stay out of bankruptcy;

12   correct?

13       A.  Yes.

14       Q.  And ultimately was liquidated through the

15   bankruptcy proceedings?

16       A.  Yes.

17       Q.  And all of the senior managers, including

18   yourself, of that company received significant

19   severance packages at the end of the day, didn't

20   they?

21          MS. SCHNEIDER:  Objection;

56

1   mischaracterizes his testimony.

2   BY MR. SCOTT:

3        Q.  You may answer.

4        A.  Certain individuals were paid retention

5   and severance pay to make sure that they stayed

6   through the bankruptcy.

7        Q.  You were one of them?

8        A.  Yes.

9        Q.  If we look at the time since you became

10   CEO of the company, which would go back to June 1 of

11   2004. have there been any significant financial --

12   strike that.

13          Have there been any acquisitions made by

14   the company?

15        A.  Since June of 2004?

16        Q.  Yes, since you've been CEO.

17        A.  We've made significant divestitures in

18   Trans Healthcare, Inc.  We divested a big portfolio

19   in North Carolina under THI of Baltimore.  I'm trying

20   to think what other divestitures were taken.  We

21   certainly have acquired no nursing homes, long-term

57

1   acute care hospitals or hospice operations.  There

2   could have been a new rehab location opened or a new

3   hospice location opened kind of organically.

4       Q.  Okay.  In the time since June 1 of 2004,

5   has THI restructured any of its major debt?

6       A.  We have not completed that yet.  We are

7   in the process of attempting to do so, but we're not

8   completed yet.

9       Q.  And can you provide me with the details

10  of that?  What debt is outstanding that you are

11  attempting to restructure. what are the terms that

12  you have and what are you trying to get?

13          MS. SCHNEIDER:  Objection.  Can we go off

14  the record for a second.

15          (Discussion off the record.)

16  BY MR. SCOTT:

17      Q.  You indicated that the company's in its

18  ninth forbearance agreement with a significant

19  creditor?

20      A.  With our creditors, all of the creditors

21  on Trans Healthcare, Inc.; CapitalSource, Ventas and

58

1   GE Capital.

2       Q.   And am I correct that the lenders have

3   continued to extend the forbearance because the

4   company has been performing well enough that they

5   don't pull the trigger?

6       MS. SCHNEIDER:  Objection to form.

7       THE WITNESS:  I can't speculate on why

8   we've received the forbearance agreements.

9   BY MR. SCOTT:

10      Q.   Do the lenders require regular financial

11  reports?

12      A.   We continue to provide monthly reports to

13  our lenders.

14      Q.   If I use the term thrown under the bus,

15  is that a term that's familiar to you?

16      A.   I've certainly heard that term before.

17      Q.   In what context, specifically with

18  related to THI, have you heard that term?

19      A.   I don't know what you're referring to.

20  Could you help me?

21      Q.   I see what you mean, Jeff, Tony just

59

1  threw me under the same bus he's been throwing you

2  under for years. Does that help you out?

3      A.  I certainly know that there were

4  instances where post filling the CFO role felt some

5  exposure in just how things were characterized for

6  certain.

7      Q.  Would it be accurate to state,

8  Mr. Bennett, that as you became more aware of the THI

9  financial situation after you were hired as the CFO

10  you identified Mr. Misitano as the primary decision

11  maker in the company?

12      MS. SCHNEIDER:  Objection to form.

13      THE WITNESS:  As CEO of any company the

14  CEO would be seen as the primary decision maker.  But

15  I just want to -- I'm under a confidentiality with

16  regard to Mr. Misitano on everything, so I just have

17  to check with my Counsel.  I don't believe I can

18  discuss Mr. Misitano.

19      MR. SCOTT:  I guess it's appropriate to

20  make certain that this is clear on the record.  It's

21  my understanding that at this point in time

60

1  Defendants' witnesses have been instructed by Counsel

2  not to provide testimony concerning either the

3  performance or the termination of Mr. Misitano; is

4  that correct?

5          MS. SCHNEIDER:  Not specifically.  I mean

6  you're talking about in general.  He can generally

7  talk to his termination, but any specifics of his

8  termination, specifics of his performance is covered

9  by the confidentiality agreement that I believe was

10  discussed when you deposed Mr. Misitano.

11          MR. SCOTT:  I understand.  And that's a

12  confidentiality agreement between Mr. Misitano and

13  Trans Health; is that correct?

14          MS. SCHNEIDER:  I am not aware.  I

15  personally have -- I mean I guess I've seen it, but I

16  don't know exactly what entity.  But yes, it is

17  between Defendants and the corporate Defendant,

18  whichever one is named on the separation agreement.

19  And it is a separation agreement that has

20  nondisclosure and confidentiality clauses in it.

21          MR. SCOTT:  Just so it's clear, that's

61

1  not a confidentiality agreement that the Plaintiffs

2  have entered into with anybody?

3       MS. SCHNEIDER: No. We have one of

4  those, too, though, between Plaintiffs and

5  Defendants.

6       MR. SCOTT: Well, I'm not -- we'll

7  discuss that.

8       MS. SCHNEIDER: Okay.

9       MR. SCOTT: In light of that, just so

10  that we're clear, it is our intention to -- if we

11  can't work out an appropriate arrangement for

12  disclosure of the Misitano termination package and

13  events surrounding the Misitano termination, it is

14  our intention to ask the Court to compel the

15  production of that information and responses to those

16  questions.

17       MS. SCHNEIDER: And I'm sure that you've

18  spoke to Jim about this, and that's okay. I mean

19  Misitano's termination, as we've said repeatedly, is

20  irrelevant, he's not a party to this action, and, you

21  know, if that's where you need to take it that's

62

1   where you need to take it.

2          MR. SCOTT:  Okay.  Just so we're clear.

3          MS. SCHNEIDER:  Absolutely.

4          MR. SCOTT:  I'll stay away from it, but

5   I --

6          MS. SCHNEIDER:  Okay.

7          MR. SCOTT:  There's no sense dabbling

8   around the edges if you can't get -- there's no sense

9   eating the crust of the pie if you can't eat the

10   fruit.  So we'll just leave the whole pie sit on the

11   shelf for now with respect to the Misitano

12   termination, reasons and agreement.

13          MS. SCHNEIDER:  Okay.

14   BY MR. SCOTT:

15      Q.  Am I correct that once you became CFO

16   Mr. Barnhill became a direct report to you?

17      A.  Yes, he did.

18      Q.  And you in essence were his supervisor?

19      A.  Yes, I was.

20      Q.  And at some level you were also his

21   replacement because some of the duties that he

63

1    formerly performed you then performed as CFO, would

2    that be also accurate?

3        MS. SCHNEIDER:  Objection to form.

4        THE WITNESS:  I did take over some of the

5    duties that Mr. Barnhill used to perform.

6    BY MR. SCOTT:

7        Q.  Was there discussion between you and

8    Mr. Barnhill that you can recall about your

9    assumption of the role of CFO and his accepting a

10   role as senior vice president in finance?

11       A.  I don't recall any specific

12   conversations.

13       Q.  Do you recall any conversations at all

14   where Mr. Barnhill, among other things, said he had

15   no desire to be the CFO of a publicly-traded company?

16       A.  I don't remember if it was said exactly

17   that way, but Jeff had made reference over time about

18   public companies and how tough the job was and

19   Sarbanes-Oxley, et cetera, et cetera.

20       Q.  Do you recall conversations with

21   Mr. Barnhill where one, or perhaps both, of you

64

1   indicated that your employment by the company, I'll

2   paraphrase here but in essence gave Jeff his life

3   back because it removed some of the responsibilities

4   that he had had?

5       A.   I think Jeff was happy to move out of the

6   role. But then again he really didn't have a choice,

7   because one of the key lenders wouldn't work with him

8   anymore.

9       Q.   He didn't receive a reduction in salary

10  as a result of that change in title, did he?

11      A.   No.

12      Q.   Was he still considered to be a senior

13  manager within the company?

14      A.   He retained the title, yes.

15      Q.   As you began to work with Ventas, did you

16  form an opinion as to whether Ventas' refusal to work

17  with Mr. Barnhill was a justified refusal or not?

18      A.   I certainly have that opinion having had

19  to go and amend the financial statements by $30

20  million, and the fact that the comments that they

21  made that the cash flows never matched up with the

65

1 EBITDA of the business look where we are today.

2    Q.  Well, I can't tell you where you are

3 today, Mr. Bennett, because everyone says it's bad

4 but no one's giving me the numbers, and no one's

5 selling it and no one's foreclosing on it, and in

6 this particular industry I guess that's a good thing.

7        MS. SCHNEIDER:  Can we go off the record

8 for a second.

9        (Discussion off the record.)

10       (Recess 11:30-11:37 a.m.)

11 BY MR. SCOTT:

12    Q.  Okay.  How would you describe your

13 working relationship with Mr. Barnhill during the

14 time you supervised him?  That would be from I guess

15 first of September of '03 until first of June of '04.

16    A.  Civil.  We had no real issues.

17    Q.  Did he receive any written reprimands

18 from you?

19    A.  No.

20    Q.  Any verbal reprimands?

21    A.  No.

66

1    Q.   What role did you play in the decision to

2    terminate Mr. Barnhill?

3       A.   We ended up in a situation where all that

4    Jeff was working on, Medicaid reimbursement, I'd be

5    getting phone calls from downstairs that they were

6    uncomfortable with some of the decisions that were

7    being made, and ultimately Jeff was getting put in a

8    box where he really didn't have a lot to do because

9    we ended up giving his duties to other folks.

10   Because we had no cash, you know, to go do

11   acquisitions or development there was no acquisition

12   or development work, and we had found out that the

13   Medicaid work was all getting farmed out to others in

14   the organization.

15       So at the end of the day, you know, it

16   just made sense, especially in light of the fact we

17   were trying to pare down the company and eliminate

18   some senior vice president positions, which we did

19   eliminate -- I don't remember the exact number, but

20   in mid-June probably 10 or 11 of 24 senior vice

21   president positions, I believe, were eliminated,

67

1   consolidated functions.

2       Q.   And I guess that's what -- your answer,

3   Mr. Bennett, I take it is somewhat of an editorial we

4   answer; in other words, speaking for the company

5   based upon how the company viewed the situation at

6   that time.  My question was actually a little more

7   personal in terms of your personal role: did you make

8   recommendations, who did you talk to, when did this

9   occur.

10       You were his immediate supervisor;

11   correct?

12       A.   (Nods head up and down.)

13       Q.   And coming into the company with your

14   three others that supported you in IHS; correct?

15       A.   Um-hum.

16       Q.   Would it be an accurate characterization

17   to say that under that circumstance the existing

18   senior vice president for finance would be in a

19   precarious situation?

20       MS. SCHNEIDER:  Objection; calls for

21   speculation.

68

1          THE WITNESS:  It depends on a

2    circumstance-by-circumstance basis.  Again, you have

3    to remember, this wasn't a normal situation.  The

4    numbers -- there was 30 million in EBITDA that was

5    reduced in 2003.  All the allowance accounts were

6    adjusted and basically agreed to by KPMG and Ernst &

7    Young.

8          So I think the instance -- the real

9    circumstance is that it took a while to figure out

10   exactly what was going on with the books and records

11   and the numbers, but by the time that you got into

12   '04, early, mid, you know, first quarter '04 and the

13   second quarter '04 you have an instance of folks that

14   are work in accounting in Medicaid that were

15   uncomfortable with working with Jeff for whatever

16   reason and they ended up doing the work themselves.

17   We weren't doing acquisitions so he had nothing to

18   do, and that's even before you go back and say that

19   there was a material weakness letter from 2002 on the

20   internal control structure, and then in 2003 we had

21   to take 30 million or so in adjustments to the

69

1   financial statements, which was about 100 percent of

2   the EBITDA or cash flow of the company.

3         Again, I just -- Ernst & Young and KPMG

4   both vetted those numbers.

5      Q.  You said we had no cash.  Had GTCR

6   exhausted its initial commitment of capital to the

7   company?

8      A.  I believe GTCR's initial quote commitment

9   was $80 million or so, and as you probably know with

10   any private equity firm that's a number -- any dollar

11   that gets invested in the company is basically

12   subject to whether that invested capital will meet a

13   return.

14      Q.  That wasn't my question.  My question was

15   the $80 million, that was the for publication in the

16   trade journals number at least; correct?

17      A.  The $80 million, just like any private

18   equity firm it has a number that they'll go up to,

19   but then each investment has to be evaluated in and

20   of itself.

21      Q.  How much of that 80 million did GTCR

70

1   actually invest?

2      A.  I believe 37 million is the give or take

3   into the business.

4      Q.  When did you have your first -- strike

5   that.

6         Did you ever have a discussion with

7   Mr. Jannotta about the termination of Mr. Misitano

8   prior to Mr. Misitano's termination?

9         MS. SCHNEIDER:  Objection.  I thought we

10  already discussed this on the record.

11  Confidentiality agreement, privacy, you know, he's

12  not going to answer.  Can we go off the record for a

13  second?

14        MR. SCOTT:  Sure.

15        (Discussion off the record.)

16  BY MR. SCOTT:

17     Q.  Mr. Bennett, did you play any role in the

18  decision making that led up to the termination of

19  Mr. Misitano?

20     A.  I was a subordinate to Mr. Misitano and I

21  wasn't on the board of directors, and ultimately the

71

1    board of directors terminated Mr. Misitano, I didn't.

2        Q.   When did you assume effective control of

3    the company?

4        A.   June of 2004.

5        Q.   I'd like you to think back to the first

6    meeting that you had with staff after you were

7    announced as the new CEO of the company.  Do you

8    recall that meeting?

9        A.   I recall speaking to the staff of the

10   company.

11       Q.   Do you recall at that time you also

12   announced -- that someone raised the question. Well,

13   if you're the CEO who's the new CFO?

14       A.   I don't recall the specific question.

15       Q.   Do you recall at that meeting announcing

16   that for the time being the CFO responsibilities

17   would be shared between Fulchino, Box and Nolan?

18       A.   I don't recall that question and answer

19   session.

20       Q.   Do you recall that at the end of that

21   meeting Mr. Barnhill asked to meet privately with

72

1  you?

2      A.   I don't recall that specific request.

3      Q.   What is your first recollection of a

4  discussion with Mr. Barnhill concerning his

5  termination?

6      A.   I guess it would have been sometime in --

7  again dates are foggy, but sometime probably in the

8  June 2004 time range.

9      Q.   And where do you recall that conversation

10  taking place?

11      A.   In the Sparks campus.

12      Q.   In your office or his, or somewhere else?

13      A.   Again, I guess there were several

14  discussions as we led up to the ultimate departure,

15  and again I can't recall exactly where I was for each

16  meeting.

17      Q.   I just want to focus on the first one.

18  My experience is we always -- you never forget your

19  first girl, you know.  The first conversation, the

20  last conversation sometimes stick out, the ones in

21  the middle get lost.

73

1       A.  I had lenders all over me.  I apologize,

2   this was not the highlight of my last year.  So in a

3   level of detail remembering there's been a lot of

4   other things that have gone on, so I apologize.

5       Q.  Would it be accurate to state that this

6   was your first CEO job?

7       A.  Yes, it is.

8       Q.  It would also be accurate to state that

9   this is the first time you told a senior manager, or

10   senior staffer that your services are no longer

11   needed?

12      A.  In my CFO role at IHS, which was an

13   executive vice president and essentially functioning

14   in the role as the front person selling the company

15   along with Alvarez & Marsal, you know, I had to

16   terminate other senior vice presidents in the company

17   previously.  So I had done that before.

18      Q.  Did you terminate anyone at THI prior to

19   Mr. Barnhill?

20      A.  I don't recall.

21      Q.  What do you recall from the meeting at

74

1   which you advised him that his services were no

2   longer necessary?

3         MS. SCHNEIDER: Objection. I don't

4   believe that the witness testified to that.

5   BY MR. SCOTT:

6       Q.  Did you ever have a meeting with Mr.

7   Barnhill where you told him his services were no

8   longer necessary?

9       A.  I did tell Mr. Barnhill his services were

10   no longer necessary.

11       Q.  What else can you recall from that

12   meeting in terms of what was said? What did you say,

13   what did he say?

14       A.  In general terms, again I don't remember

15   the specifics of each of these meetings --

16       Q.  Let's just stay with the first one. I

17   want to stay with that one if we can right now.

18       A.  Again, I can't tell what was the first,

19   second or third meeting, to be honest with you.

20   There was a series of discussions. I can give you

21   the general theme of what occurred, but I do not know

75

1  every detail of every discussion we had in that

2  period.

3      Q.  What reason did you give to Mr. Barnhill

4  when you told him his services were no longer

5  necessary?

6      A.  I don't recall.

7      Q.  When you told him his services were no

8  longer necessary did you in any way indicate that the

9  action was being taken because of poor performance or

10  bad performance or incompetent performance, or

11  anything that might be considered some flaw or

12  failure on his part?

13        MS. SCHNEIDER:  Objection; asked and

14  answered.

15        THE WITNESS:  Do you want to rephrase

16  that?

17  BY MR. SCOTT:

18      Q.  No, I think you can answer that.  In

19  other words, did you -- I asked you what reason did

20  you give, you said I don't recall.  My next question

21  is when you told him his services were no longer

76

1   necessary did any portion of what you say, what you

2   said, relate to bad, poor, inaccurate, incompetent

3   performance on his part.

4        A.   I don't recall.  I do recall that his

5   services were no longer required and as I explained

6   previously that, you know, his role had morphed into

7   a situation where there was nothing for him to do.

8        Q.   There's really no need for a buyer when

9   you stop buying things, is there?

10       A.   Yeah.

11       Q.   Okay.  What do you recall Mr. Barnhill

12   saying to you when you told him his services were no

13   longer necessary?

14       A.   He said that he had certain agreements

15   with the company that entitled him to severance

16   benefits and an equity stake in the company, and he

17   produced for me certain documents to exhibit, you

18   know, what he was owed, what he believed he was owed.

19       Q.   Do you recall the documents, what

20   documents he produced to you?

21       A.   No.  There was a series of documents,

77

1  some I think unsigned documents and letter

2  agreements. It was kind of a hodge-podge.

3      Q.  Let me just show you, give me a second

4  here to pull them out.

5      MS. SCHNEIDER:  I assume these are all

6  previously --

7      MR. SCOTT:  Yeah, these are the exhibits

8  to the complaint, and actually there are four

9  exhibits to the complaint that are relevant here.

10     MS. SCHNEIDER:  You know what, I think I

11  have a copy of mine so that we can look at them and

12  you can just give them to her.

13     MR. SCOTT:  I don't know that they need

14  to be marked. They've been previously marked in

15  other depositions and they are exhibits to the

16  complaint.

17  BY MR. SCOTT:

18     Q.  I've showed the witness four documents

19  which are Exhibits A, B, C and D to the complaint.

20  The first is the consulting agreement of February

21  2000; the second is a document that we've referred to

78

1   as the deal points, which is a March 2000 agreement;

2   the third is a copy of a senior management agreement

3   dated November 26, 2001; and the fourth is a letter

4   which has been referred to as the term sheet letter

5   dated, I believe it's December 31 of 2001.

6         My question to the witness is, as you

7   look at those documents are you able to identify

8   those as the documents that Mr. Barnhill produced for

9   you at the time you told him he was being terminated.

10      A.   Again, I don't recall the exact

11   agreements, but these very likely could be,

12   certainly.

13      Q.   Would it be accurate to state,

14   Mr. Bennett, that when Mr. Barnhill said I have

15   agreements with the company and rights vis-a-vis the

16   company at the time of my termination you were not

17   surprised to hear that?

18      A.   He had made mention over time of a senior

19   management agreement and unsigned documents that he

20   had a desire to get taken care of.

21      Q.   And in fact, would it be accurate to

79

1  state that you were aware that the company was in the

2  process of producing senior management agreements for

3  senior managers?

4      A.   Again, as I had said I received a

5  document that was a mock-up that would have

6  ultimately been the pro forma for the management

7  team, senior management team.

8      Q.   And do you know whether a similar mock-up

9  was prepared for Mr. Barnhill with his name on it?

10     A.   I do not know.

11     Q.   One of the documents that I showed you

12  earlier in fact is the --

13     A.   Okay.

14     Q.   -- is a Barnhill mock-up.

15     A.   Okay.

16     Q.   And my question is if you --

17         MS. SCHNEIDER:  Objection;

18  mischaracterizes the document.

19  BY MR. SCOTT:

20     Q.   Well, let's just call it by name.  It's a

21  senior management agreement, it's Jannotta Exhibit

80

1   No. 8.  It's a Kirkland & Ellis draft of January 14,

2   '04, senior management agreement between Trans Health

3   Management and Jeffrey Barnhill. it's a draft.

4       If I understand your answer correctly,

5   you were not responsible for directing the production

6   of that document?

7       A.  No, I was handed a -- like I said, I was

8   handed a draft, kind of a plain vanilla senior

9   management agreement for my review at one point.

10      Q.  Who gave you that document?

11      A.  Mr. Misitano.

12      Q.  Was there any conversation between you

13  and Mr. Misitano at that time that in addition to a

14  senior management agreement for you as CFO the

15  company was also in the process of generating senior

16  management agreements for other senior managers?

17      A.  Yeah. I was aware that there was a

18  template that was going to be utilized ultimately to

19  try and negotiate with the other senior managers'

20  agreements.

21      Q.  When you became CFO of the company and

81

1    Mr. Barnhill's supervisor, did you review his

2    personnel file as it existed at that time?

3        A.   I don't recall.

4        Q.   Do you recall whether or not you examined

5    documents that would establish terms and conditions

6    of employment for Mr. Barnhill?

7        A.   I don't recall.

8        Q.   And if I interpret that correctly, do you

9    recall whether you had ever reviewed any of the

10   documents Mr. Barnhill gave you before he gave them

11   to you?

12       A.   To the best of my recollection I believe

13   it was the first time that I had seen the majority of

14   those documents. The time frames are difficult.

15       Q.   Would it be an accurate characterization

16   to say that you knew that there was -- you knew there

17   were issues out there, but you had never focused on

18   them yourself?

19       MS. SCHNEIDER:  Objection to form.

20   BY MR. SCOTT:

21       Q.   And the issues -- I don't want to be

82

1   vague here.  The issues, you knew that there was some

2   issue with regard to the documentation of

3   Mr. Barnhill's status in the company, but that was

4   not your problem?

5        MS. SCHNEIDER:  Objection to form.

6        MR. SCOTT:  That's probably still two

7   questions.

8   BY MR. SCOTT:

9        Q.   Were you aware when Mr. -- when

10  Mr. Barnhill brought the issue to your attention,

11  would it be accurate to state that wasn't the first

12  time you knew that there was an issue out there?

13       A.   Mr. Barnhill had expressed to me at some

14  point, and again I don't remember the exact time,

15  that he had open agreements with Mr. Misitano that

16  were out there.

17       Q.   Okay.  What did you do after Mr. Barnhill

18  presented you with the documentation that you asked

19  him to give you?

20       A.   I don't remember the exact chain of

21  events, but I believe I provided them to Ron Lord,

83

1   the general counsel of the company at that time, and

2   they were forwarded to Kirkland & Ellis and

3   ultimately I guess GTCR.

4       Q.  Following the time when Mr. Barnhill's

5   services were terminated, or perhaps during the

6   couple of weeks that he may have worked after he knew

7   he was going to get terminated but before he actually

8   left the premises, did he continue to raise the issue

9   of his severance package with you?

10      A.  Certainly until we were done he wanted it

11  done, and I needed legal review and -- these weren't

12  documents that I had done anything with over time,

13  and I needed to get the appropriate legal review and

14  understand what these component pieces were.

15      Q.  Ultimately a severance package was

16  presented to Mr. Barnhill; correct?

17      A.  Yes, it was.

18      Q.  And I believe that severance package was

19  a payment of $50,000?

20      A.  I think it was six months' severance,

21  plus $50,000.  I think that's what it was.

84

1     Q.   Were you responsible for establishing the

2   terms of the severance package that was provided to

3   Mr. Barnhill?

4     A.   At the end of the day certainly a case

5   could have been made in light of where we were with

6   the banks and the condition of the company, so.

7     Q.   That's not my question.  My question was

8   were you responsible for establishing the terms of

9   the severance package that was provided to

10  Mr. Barnhill.

11    A.   I was involved.

12    Q.   You were involved?

13    A.   (Nods head up and down.)

14    Q.   Who made the decision that that's the

15  package we will offer?

16    A.   The decision would ultimately have been

17  signed off by GTCR/the board/K & E/the general

18  counsel.  It would have been a group effort

19  ultimately with the board determining that it was the

20  appropriate amount to offer.

21    Q.   Were you advised that the company owed

85

1   Mr. Barnhill an equity share?

2       A.   No.

3       Q.   Were you ever advised that the company

4   did not owe Mr. Barnhill an equity share?

5       A.   Mr. Barnhill, in our discussions as I can

6   best recollect, had said that he was owed 4 percent

7   of the company, 3 percent plus 1 percent, and I

8   worked through it with counsel, worked through it

9   with GTCR and they were ultimately never executed

10   documents and it was never acted upon.

11       Q.   Did anyone ever say to you everything was

12   done but the paperwork with respect to the issuance

13   of an equity position to Mr. Barnhill?

14       A.   I certainly don't remember that.

15       MR. SCOTT:  Off the record.

16       (Discussion off the record.)

17   BY MR. SCOTT:

18       Q.   At the time you became CEO of THI, did

19   you also get a seat on the board of directors?

20       A.   Subsequent to my employment, I think it

21   was a couple months later, I was actually appointed I

86

1   believe.

2       Q.  Who comprised the board of directors

3   after your appointment?

4       A.  Tom Erickson was the chairman, me, and

5   then Jannotta from GTCR.

6       Q.  What was Mr. Erickson's relationship to

7   the company?

8       A.  Mr. Erickson was brought to the board by

9   GTCR as chairman, as an outside chairman.

10      Q.  If you know did Mr. Erickson have any

11  preexisting relationships with GTCR?

12      A.  Yes, he did.

13      Q.  And what were they?

14      A.  He was interim chief executive and

15  chairman of Life Care Hospitals.

16      Q.  And what's Life Care Hospitals'

17  relationship to GTCR?

18      A.  It's an investment.

19      Q.  Similar to --

20      A.  Trans Health.

21      Q.  -- Trans Health?

87

1        If you know, was there ever a time when

2   Mr. Erickson's presence on the board of directors

3   would not have been possible?

4        A.   I don't think I understand the question.

5        Q.   Were you aware that prior to Mr. -- that

6   in an earlier iteration of the relationships between

7   the parties there was a provision in the

8   shareholders' agreement, which became the members'

9   agreement. that said that GTCR could not appoint a

10   member of the board who was an executive officer of a

11   company that could be considered competing in the

12   same industry?

13        A.   I don't recollect that.

14        Q.   Do you have any knowledge of changes that

15   were made to the members' agreement prior to your

16   appointment to the board?

17        A.   There was much going on, you know. at the

18   time with all the changes occurring and ultimately

19   getting better -- we had to get better corporate

20   formalities in place and there were changes and

21   things made, so changes did occur to that extent.

88

1 You know, I don't recall at this time, but they could

2 have.

3     Q.  What knowledge, if any, did you have of

4 minority member rights?  And by minority member

5 rights I mean those rights that would have been held

6 by the individuals who are non-GTCR stockholders in

7 the old THI and became non-GTCR members of THI

8 Holdings, LLC.

9     A.  Again, I would have deferred to counsel

10 for advice on any of those matters.  Again, we were

11 trying to keep the company out of bankruptcy, so I

12 didn't spend much time on that.

13     Q.  Would it be fair to say that I guess THI

14 was a better company than IHS because THI stayed out

15 of bankruptcy and IHS didn't?

16     A.  No.  Actually IHS went into bankruptcy

17 because of changes in regulation.

18     Q.  That THI survived?

19     A.  THI has not survived yet.  THI needs an

20 additional capital investment to survive in the range

21 north of 13 to $15 million, additional required

89

1   investment in order to have this company survive.

2      Q.  A number that's within the original

3   commitment of GTCR?

4      A.  Again, the original commitment of GTCR,

5   as with any private equity firm, is subject to

6   getting to a hurdle rate or return rate on their

7   investment.  So they would have to evaluate is there

8   a return on any additional investment up to the 80

9   million.

10     Q.  Part of that evaluation would involve

11  whether they're a hundred percent ownership interest,

12  or something less than a hundred percent, wouldn't

13  it?

14     MS. SCHNEIDER:  Objection; calls for

15  speculation.

16     THE WITNESS:  I don't understand that

17  question.

18  BY MR. SCOTT:

19     Q.  Well, you've been quite clear in saying

20  the factor that GTCR would consider would be the

21  return on investment that they would make; right?

90

1      A.  (Nods head up and down.)

2      Q.  Is it also correct that a component of

3   that return on investment is whether they have to

4   share profits with any other shareholders or whether

5   they are 100 percent shareholders?

6      A.  What they'd likely do is probably do a

7   rights offering where all of the existing

8   shareholders would have the ability to reinvest along

9   with them.  So the other. the minorities would be

10   able to decide yes or no whether they want to invest

11   alongside them or not.  So that would all go --

12   again. that would all kind of go into the view of the

13   new investment.

14      Q.  That's if they were making common stock

15   investments; right?

16      A.  If they're making common stock

17   investments.

18      Q.  That wouldn't pertain if they were making

19   preferred stock investments?

20      A.  Again, I believe some of the minority

21   holders did have preferred holdings, I'm not sure.

91

1    Again, I don't know all the terms so I apologize, but

2    I'd have to go back and reference that and consult

3    with Counsel.

4        MS. SCHNEIDER:  And I just want to

5    caution on the record, like he is not an officer of

6    GTCR, nor was he ever a stockholder that you're

7    referring to.  So I'd like us to limit -- you know,

8    you're asking him to speculate on, you know, what

9    GTCR might do and what they won't, and he's not a

10   stock investor.

11   BY MR. SCOTT:

12       Q.  Just before we move off this point, if I

13   understand your testimony correctly, it's your

14   testimony that you did not have direct knowledge of

15   what minority shareholders, minority member rights

16   may have existed prior to June 1, and that you didn't

17   have any real knowledge of what changes to minority

18   member rights may have occurred on or about June 1?

19       MS. SCHNEIDER:  Objection; compound

20   question.

21       THE WITNESS:  My answer was that around

92

1   June 1 as we were scrambling with the company a lot

2   went on.  There were a lot of changes in order to get

3   better corporate formalities put in place for the

4   board, and very likely it would make sense that

5   changes would have occurred relating to the other

6   equity holder documents.  So I don't want to say that

7   I didn't have knowledge at the time, but that at this

8   point in time I don't recall what those rights were

9   or what changes were made.

10  BY MR. SCOTT:

11      Q.  Okay.  This corporate formalities

12  business, am I correct that at least since 1998 GTCR

13  had two board members on the board, two or three?

14      A.  I don't know where they were from '98

15  until I joined the company.

16      Q.  Did you identify a problem as the new CEO

17  that there was a need to improve corporate

18  formalities?

19      A.  Actually Tom Erickson is very diligent

20  and proposed that we make sure that we follow as

21  strictly as possible corporate formalities.  He's

93

1   very diligent in those matters.

2       Q.   As we sit here today, are there any

3   current THI employees who have been told they will

4   receive senior management agreements who have not

5   received senior management agreements?

6       A.   Time frames?  What are we -- I'm not

7   clear on what we're --

8       Q.   You were -- am I correct that you were

9   aware that Mr. Barnhill had told you before he was

10  terminated that he was to receive a senior management

11  agreement?

12      A.   That was -- yes, that was his view.

13      Q.   And did you ever ask Mr. Misitano about

14  that, is Jeff entitled to a senior management

15  agreement?

16      A.   There were conversations with

17  Mr. Misitano.  I don't recollect the details of

18  those, but there were conversations.

19      Q.   Do you recall Mr. Misitano ever saying

20  anything that sounded like, Oh, no, he's not, he's

21  not entitled to that?

94

1      A.  I do -- again, I have vague recollections

2  of, you know, unsigned documents, not buying the

3  stock, et cetera.  But not specific conversations,

4  detailed specific conversations.

5      Q.  Why weren't those documents completed, if

6  you know?

7      A.  I don't know.

8        MR. SCOTT:  Let me take a couple minutes

9  to consult with my client.

10       (Recess 12:13-12:26 p.m.)

11       MR. SCOTT:  Mr. Bennett, I'd just like

12  you to hold onto it for a second.

13       MS. SCHNEIDER:  For the record --

14       MR. SCOTT:  -- Jannotta Exhibit No. 8.

15  BY MR. SCOTT:

16       Q.  From the beginning of your deposition

17  this morning, Mr. Bennett, and I would have to say

18  laced liberally throughout your testimony, has been

19  an underlying theme that THI Holdings, LLC, is a

20  company in difficult financial straits with little or

21  no value.  Would that be an accurate characterization

95

1   of your view of the status of the company?

2       A.   I would say that I will address it this

3   way, and I always will address Trans Healthcare,

4   Inc., and THI Baltimore separately.

5       Q.   I don't want to do that.  I'm not -- I'm

6   talking specifically about THI Holdings, LLC, because

7   that's the entity people own parts of.

8       A.   THI Holding, LLC. has no value at

9   present.  It has -- you need to put $15 million into

10  Trans Healthcare, Inc.. and there is nominal value on

11  THI Baltimore based on the onerous lease that's in

12  place and the fact that there's no terminal value of

13  that lease and the threats of defaults that have been

14  lobbied against us by the landlord.

15      Q.   Okay.  And as CEO of the company did you

16  understand that the management agreement Mr. Barnhill

17  was asking be delivered, and is now seeking to

18  enforce, would provide him with shares of stock, or

19  in this instance membership units in Trans Health

20  Holdings, LLC?

21          MS. SCHNEIDER:  Wait, I want to go off

96

1    the record for a second, please.

2            (Discussion off the record.)

3    BY MR. SCOTT:

4        Q.   Mr. Bennett, as a Defendant in this

5    litigation and as CEO of the company that is also a

6    Defendant in this litigation, THI Holdings, LLC, do

7    you understand that one of Mr. Barnhill's claims is

8    that he was entitled to a percentage ownership share?

9        A.   Certainly Mr. Barnhill has asserted that

10   he believes he's entitled to an ownership share.

11       Q.   And I believe a fair characterization of

12   your testimony today would be that it is your opinion

13   that a share of ownership in THI Holdings, LLC, has

14   little or no value?

15       A.   Yes.

16       Q.   Okay.  The document before you, which has

17   been marked as, I believe it's Jannotta Exhibit 8, is

18   a form of senior management agreement that was in

19   existence that was in the process of becoming, or at

20   least it's the last one that's shown up within the

21   company in January of '04.  Would you agree with me

97

1    that if you are correct and that there's little or no

2    value in the company, then Mr. Barnhill's claim to a

3    chunk of that little-or-no-value company also has

4    little or no value?

5        A.   Yes.

6        Q.   Would you also agree with me that the

7    senior management agreement that Mr. Barnhill is

8    seeking to enforce contains a provision for

9    establishing the value of the company?  I direct your

10   attention to Paragraph 11.

11          MS. SCHNEIDER:  Objection.  This is not

12   the agreement he's seeking to enforce.

13          MR. SCOTT:  Well, the same language is in

14   the old agreement.  If for the purposes of answering

15   that question you'd like him to refer to Exhibit C

16   that's fine, let me just see if it's the same

17   paragraph number.

18          MS. SCHNEIDER:  And for the record --

19          MR. SCOTT:  And this one is Paragraph 10

20   on Page 10 under Definitions, Fair Market Value, and

21   what we're referring to is the senior management

98

1   agreement, bears a date November 26th, 2001, it's

2   Exhibit C to the complaint.

3          My question is would you agree that,

4   acknowledge that the agreement Mr. Barnhill is

5   seeking to enforce contains a provision for

6   establishing fair market value of stock covered by

7   the agreement.

8          MS. SCHNEIDER:  Objection.  The document

9   is and the document speaks for itself.

10          THE WITNESS:  In referencing the section

11   of this agreement, again just for the record again I

12   wasn't party to the conversations or the promises,

13   wasn't involved in giving this agreement or don't

14   know the origin of this agreement, but --

15          MR. SCOTT:  Understood.

16          THE WITNESS:  -- what I read under Fair

17   Market Value would provide for a mechanism, an

18   appraisal and valuation process, fair market value

19   valuation process.

20   BY MR. SCOTT:

21          Q.  And ultimately that process would produce

99

1   a valuation that I believe it says would be final and

2   binding upon all parties; correct?

3       A.   That's what this says.

4       Q.   I'm referencing you to Jannotta Exhibit

5   No. 8, which is the form of the senior management

6   agreement that was floating around while you were CFO

7   in January of 2004.  In this instance it's still in

8   Paragraph 10, but it shows up on Page 11 of this

9   agreement.  Would you agree with me that the 2004

10  iteration of the senior management agreement contains

11  the same definition of fair market value and the same

12  valuation process?

13      MS. SCHNEIDER:  Objection.  The document

14  speaks for itself.

15      THE WITNESS:  And not matching it word

16  for word, but the concepts are certainly the same.

17  BY MR. SCOTT:

18      Q.   Okay.  In light of the fact that it is

19  the company's position that a share of stock has

20  little or no value, can you indicate why the company

21  has refused to engage the market valuation process

100

1    set forth in the senior management agreement?

2        A.   I'm not sure I understand the question.

3        Q.   Since the -- your testimony is that there

4    is little or no value in this company.

5    Mr. Barnhill's claim as to an equity share is for

6    stock or percentage under an agreement that

7    establishes value.  In light of the fact that it's

8    the company's position that there is no value, my

9    question is why hasn't the -- why has the company

10   refused to engage the valuation mechanism set forth

11   in the senior management agreement.

12       MS. SCHNEIDER:  Objection.  I think we're

13   delving into some attorney/client privileges as -- I

14   don't even know if Mr. Bennett is aware that the

15   company has refused, but this is a litigation

16   concerning whether that's a valid agreement.  So

17   therefore the issue of whether it's a valid agreement

18   is prior to whether there's any kind of valuation

19   going on.

20       So I think we're delving into if the

21   company has disputed allowing that to happen that

101

1   would all be part of attorney/client privileged

2   conversations.

3          MR. SCOTT:  If your response is you're

4   directing him not to answer based on attorney/client

5   privilege, then I'll ask the next question.

6          MS. SCHNEIDER:  Yes.

7   BY MR. SCOTT:

8          Q.   Am I correct that the -- at or about the

9   time you were having your discussions with

10  Mr. Barnhill concerning his severance package, were

11  you aware that Mr. Barnhill was claiming an

12  entitlement to one year of salary, plus 18 months of

13  paid benefits?

14         A.   Those terms sound familiar, in the

15  ballpark.

16         Q.   Do you recall what his salary was at that

17  time?

18         A.   I don't.

19         Q.   Would $200,000 be at or very close to it?

20         A.   Probably in the high single digit, you

21  know, high 185, 200, would probably make sense.

102

1        Q.  Did you provide that information to

2    anyone in conjunction with the determination made

3    with regard to Mr. Barnhill, with regard to what his

4    severance offer would be?

5        A.  Our discussions on the severance offer

6    with -- and again it's multiple conversations.

7    Again, I can give you the general theme, I don't

8    remember all the specifics of the discussions. but if

9    you listened to the lenders of Ventas they would have

10   said terminate Jeff for cause because of the

11   restatement of the financials, the amendment of the

12   financial statements.

13           You know, again, the attorneys and GTCR

14   certainly had their views on what conversations had

15   occurred with regards to these documents themselves,

16   I wasn't privy to what happened along the time.  But

17   I recommended, you know, to give Jeff -- you know, we

18   should give him something, and, you know, rather than

19   terminate him, you know, for cause let's give him

20   something, just to not be vindictive.

21       Q.  Is Ventas a creditor?

103

1    A.  They're a creditor.

2    Q.  They're not in any way, shape or form

3  part of your management structure, are they?

4    A.  No.

5    Q.  In many instances they've sort of been an

6  adversary to the company, haven't they?

7    A.  No, I think they actually are acting

8  appropriately in light of the financial situation of

9  the company.

10    Q.  Well, they glom onto your receivables and

11  tell you how much money you can spend after they take

12  what they want, isn't that about the way it works?

13    A.  They have documents that were negotiated

14  when Mr. Barnhill was there and we're living by those

15  terms.  Certainly they're not market terms and I

16  would have not negotiated them myself.

17    Q.  And isn't it a fact that you said to

18  Mr. Barnhill on more than one occasion:  I understand

19  now what you mean when you said Tony forced you to

20  take bad terms with Ventas because he wants to do the

21  same thing to me, in words or substance?  You had

104

1   discussions with -- let me strike that.

2        You had discussions with Mr. Barnhill

3   about the Ventas loans, didn't you?

4        A.   Certainly I've had discussions about the

5   Ventas loans with Mr. Barnhill.

6        Q.   And isn't it correct that during those

7   conversations he said to you there are provisions in

8   here that I never wanted to agree to that Tony

9   insisted upon?

10       A.   He certainly on -- again, I don't

11  remember the specifics, but he certainly has stated

12  in documents over time that were signed by the

13  company that there were items he would not have

14  agreed to but where he was forced to agree to.  Yes,

15  he did make that statement, those statements.

16       Q.   And they were -- that forcing to agree to

17  came from Mr. Misitano who was a member of the board

18  of directors; correct?

19       A.   That is what Mr. Barnhill asserted, yes.

20       Q.   And isn't it also correct that once you

21  became CFO you felt the same pressure at times from

105

1   Mr. Misitano to agree to things that you didn't think

2   were appropriate?

3       A.   Again, I'm governed obviously by the

4   confidentiality provisions with regard to

5   Mr. Misitano.  What I can tell you is after I took

6   over certainly we were trying to work our way through

7   financial statement issues and there were pressures

8   on a lot of different levels from a lot of different

9   people.

10      Q.   With all due respect, Mr. Bennett, let me

11   suggest that the company having made its peace with

12   Mr. Misitano, whatever that may be, is now seeking to

13   exact the cost of that from Mr. Barnhill who had very

14   little to do with those decisions.

15          MS. SCHNEIDER:  Objection.  I don't even

16   understand where you're going with any of that or

17   what that statement was for on the record, and I

18   actually will request that you strike it.  That

19   wasn't a question, that was your opinion, and very

20   inappropriate, Tom.

21   BY MR. SCOTT:

106

1      Q.  You mentioned firing for cause.  Firing

2   for cause is a defined term, isn't it, under these

3   management agreements?

4      A.  I would assume that it is.  Again, I have

5   never executed one, so I'm not that familiar with it.

6      Q.  Would it be accurate to state that at no

7   time did you make an analysis as to whether you could

8   terminate Mr. Barnhill for cause as defined in the

9   senior management agreement?

10      MS. SCHNEIDER:  Objection.  There is no

11   senior management agreement.  If you're asking my

12   client --

13   BY MR. SCOTT:

14      Q.  I'm not saying Mr. Barnhill's senior

15   management agreement, the company's senior management

16   agreement.

17      A.  All I was stating was that lenders had

18   made comments over time that we should consider

19   terminating him for cause in light of the condition

20   of the company.  That was what I was stating.  I did

21   not refer to any of the internal conversations that

107

1   we had had.

2        Q.   I am going to hazard a guess that the

3   lender has made lots of recommendations as to what

4   you should do with the company; correct?

5        A.   Absolutely.

6        Q.   And those recommendations are generally

7   driven by what the lender thinks is best for the

8   lender; correct?

9        A.   Based on their rights.

10       Q.   And would it also be correct to say that

11   in your capacity as CFO, and now as CEO, you don't

12   always take their recommendations?

13       A.   Right now on Trans Healthcare, Inc.,

14   since we're in the zone of insolvency we have to put

15   the creditors at equal footing with the equity

16   owners, so they are considered.  And, you know,

17   back -- now that the numbers have been restated

18   obviously we were in the zone of insolvency on Trans

19   Healthcare, Inc., at that point in time as well.  So

20   you have to consider equity and debt in the same

21   terms.

108

1    Q.  Was THI Holdings, LLC, ever in the zone

2  of insolvency?

3    A.  I've not done the full valuation, but you

4  certainly could make a case at times, yes.

5    Q.  That's not something you would do as the

6  CEO of the company, though, is it?

7    A.  Pardon.

8    Q.  Ordinarily you wouldn't go out and make a

9  case that your company was in the zone of insolvency?

10    A.  We are constantly trying to work on both

11  sides of this business right now to make sure that

12  it's an ongoing enterprise.  We're working day in and

13  day out with our creditors and with our board and our

14  banks, so that's what we're doing.

15    Q.  What's your current annual salary?

16    A.  $450,000.

17    Q.  What bonus did you receive last year?

18    A.  I received no bonus.  None of my

19  executive management team received bonuses because

20  the lenders would not allow it.

21    Q.  If the lenders had allowed it what was

109

1    the proposal made by the equity partners?

2            MS. SCHNEIDER:  Objection; irrelevant.

3            THE WITNESS:  We have no -- there is no

4    bonuses to be paid right now.  We need to effect the

5    restructuring of Trans Healthcare, Inc., because all

6    the employees are employees of Management, Inc.,

7    which are underneath the subsidiary that's in the

8    zone of insolvency.  So it's a moot point right now.

9    BY MR. SCOTT:

10       Q.  Would it be accurate to state that if

11   you're able to get the executives out of Trans

12   Healthcare, Inc., and make them direct either of THI

13   Holdings, LLC, or perhaps THI Baltimore, then those

14   compensation restrictions may be removed?

15       A.  It can't be done.

16           MS. SCHNEIDER:  I didn't even get to

17   object.

18           MR. SCOTT:  I have no further questions.

19           MS. SCHNEIDER:  I don't have any

20   questions.

21           (Whereupon, signature having not been

110

1   waived, the deposition concluded at 12:50 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

111

1

2      ACKNOWLEDGMENT OF DEPONENT

3

4          I, W. BRADLEY BENNETT, do hereby acknowledge

5    I have read and examined the foregoing pages of

6    testimony, and the same is a true, correct and

7    complete transcription of the testimony given by

8    me, and any changes or corrections, if any, appear

9    in the attached errata sheet signed by me.

10

11

12    _____    _____

13    Date          W. Bradley Bennett

14

15

16

17

18

19

20

21

112

1      CERTIFICATE OF NOTARY PUBLIC

2

3          I, Toni R. Thompson, the officer before

4    whom the foregoing deposition was taken, do hereby

5    certify that the witness whose testimony appears

6    in the foregoing deposition was duly sworn by me;

7    that the testimony of said witness was taken by me

8    in shorthand and thereafter reduced to

9    computerized transcription under my direction;

10   that said deposition is a true record of the

11   testimony given by said witness; that I am neither

12   counsel for, related to, nor employed by any of

13   the parties to the action in which this deposition

14   was taken; and further, that I am not a relative

15   or employee of any attorney or counsel employed by

16   the parties hereto, nor financially or otherwise

17   interested in the outcome of the action.

18

19   _____

        Notary Public
20

21   My commission expires:  January 1, 2009.

113

1   Shari B. Schneider, Esq.
    1601 Cherry Street, Suite 1400
2   Philadelphia, Pennsylvania 19102

3
    IN RE: Barnhill v. Trans Healthcare
4

5   Dear Ms. Schneider:

6   Enclosed please find your copy of the deposition of W.
    BRADLEY BENNETT, along with the original signature
7   page. As agreed, you will be responsible for
    contacting the witness regarding reading and signing
8   the transcript.

9   Within 30 days of receipt, please forward errata sheet
    and original signature page signed to counsel for
10  Plaintiffs, Thomas W. Scott.

11  If you would like to change this procedure or if you
    have any questions, please do not hesitate to call.
12  Thank you.

13  Yours,

14

15  Toni R. Thompson
    Reporter/Notary
16

17  cc: Thomas W. Scott, Esq.

18

19

20

21

114

1  Esquire Deposition Services
   1020 19th Street, N.W., Suite 620
2  Washington, D.C.  20036

3         ERRATA SHEET

4  Case Name:  Barnhill v. Trans Healthcare
   Witness Name:  W. BRADLEY BENNETT
5  Deposition Date:  November 4, 2005

6  Page No.  Line No.  Change

7

8

9

10

11

12

13

14

15

16

17

18

19

20  _____        _____

21  Signature              Date

FILED: NEW YORK COUNTY CLERK 08/05/2010

NYSCEF DOC. NO. 40

INDEX NO. 650702/2010

RECEIVED NYSCEF: 08/05/2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

RUBIN SCHRON, CAM-ELM COMPANY, LLC,
SMV PROPERTY HOLDINGS LLC,
SWC PROPERTY HOLDINGS LLC, SWC SPECIAL
HOLDINGS, LLC, SMV SPECIAL HOLDINGS,
LLC, CAMMEBY'S EQUITY HOLDINGS LLC,
CAMMEBY'S FUNDING LLC, CAMMEBY'S
FUNDING II LLC, CAMMEBY'S FUNDING III
LLC, CAMFIVE HOLDINGS, LLC, CAMMEBY'S
MANAGEMENT CO. LLC, and CAMMEBY'S
INTERNATIONAL, LTD.,

Index No. 650702/10
Hon. James A. Yates

                    Plaintiffs,

          vs.

LEONARD GRUNSTEIN, MURRAY FORMAN,
TROUTMAN SANDERS LLP, CANYON SUDAR
PARTNERS LLC, SVCARE HOLDINGS, LLC,
SAVASENIORCARE LLC, FUNDAMENTAL
LONG TERM CARE HOLDINGS, LLC, THI OF
BALTIMORE, INC., NATIONAL SENIOR CARE,
INC., MARINER HEALTH CARE, INC., METCAP
SECURITIES, LLC, METCAP HOLDING, LLC,
METCAP ADVISORY SERVICES, LLC, HARRY
GRUNSTEIN, and LAWRENCE LEVINSON,

                    Defendants.

## AMENDED VERIFIED COMPLAINT



EXHIBIT
D



## Table of Contents

Nature Of The Case ................................................................................................ 1

Jurisdiction And Venue........................................................................................... 13

The Parties ............................................................................................................. 14

    A.    Plaintiffs.................................................................................................. 14

    B.    Defendants ............................................................................................. 16

Background .............................................................................................................. 20

    A.    Schron's Relationship With Grunstein ................................................. 20

    B.    The IHS Transaction .............................................................................. 22

        1.    ABE's Acquisition of IHS Subsidiaries.................................... 24

        2.    Division of IHS's Real Estate Interests ................................... 25

        3.    Grunstein's and His Law Partners' Lack of Accountability ..... 26

        4.    MetCap's Role in the IHS Transaction..................................... 27

        5.    Grunstein and Forman Ignore Conflicts .................................. 28

    C.    The Mariner Transaction........................................................................ 29

        1.    The Structure of the Mariner Acquisition................................. 30

        2.    Grunstein, Levinson and Jenkens & Gilchrist
            Acted as Lead Counsel for Schron and SMV ......................... 32

        3.    MetCap's Role in the Mariner Transaction .............................. 33

        4.    Grunstein Creates Additional Direct Conflicts of Interest........ 34

            a.    Grunstein creates a conflict with NSC........................ 34

            b.    Grunstein creates a conflict with Sava......................... 36

    D.    Grunstein's Improper Acquisition Of THI ........................................... 40

    E.    The 2006 SMV/SWC Refinancing ....................................................... 42

    F.    Grunstein's Malpractice In Connection With The MMS Transaction.... 45

        1.    Background to the MMS Transaction......................................... 46

        2.    The Sale of MMS to Omnicare.................................................. 46

        3.    Grunstein, Forman, and Levinson Fail
            Adequately to Protect the Interests of Schron and SMV .......... 47

    G.    Grunstein And Troutman Sanders Provide
        Conflicted Advice On The Sava Master Lease........................................ 49

        1.    The Bogus Lease Advice ........................................................... 49

        2.    The Citibank Swap..................................................................... 53



H.    Grunstein's Fraudulent Revised Opinion Of The Amended SVCARE Option.... 57

I.    Grunstein's Sleight of Hand To Avoid Repayment Of The SVCARE Loan ....... 60

J.    Grunstein/Troutman Sanders's Improper Bills And Unprofessional Conduct..... 63

 1.    Invoices for Services Performed for Grunstein-Controlled Entities......... 63

 2.    Invoices for Unauthorized Services ....................................................... 65

 3.    Invoices for Services that were Never Performed ................................... 67

 4.    Troutman Sanders's Disingenuous Attorneys' Lien............................... 67

 5.    Grunstein's Abusive Behavior Towards Schron........................... 68

K.    The Attempted Fraud On The Formation Deal ......................................... 69

L.    Grunstein, Forman And H. Grunstein Misappropriate Properties From SWC..... 71

 1.    SWC's Purchase of the New Mexico Properties ..................................... 72

 2.    Grunstein Purchases the Landlord's
  Interests in the New Mexico Properties ................................................. 72

M.    Grunstein Files A Spurious Lawsuit Against His Former Client, Schron ........... 74

First Cause of Action (Breach of Fiduciary Duty)................................................... 75

Second Cause of Action (Aiding & Abetting a Breach of Fiduciary Duty) .............. 78

Third Cause of Action (Fraud)............................................................................... 79

Fourth Cause of Action (Aiding & Abetting Fraud)................................................. 81

Fifth Cause of Action (Legal Malpractice) ............................................................. 82

Sixth Cause of Action (Conversion)....................................................................... 84

Seventh Cause of Action (Aiding & Abetting Conversion) ...................................... 85

Eighth Cause of Action (Professional Negligence) ................................................. 86

Ninth Cause of Action (Unjust Enrichment) ........................................................... 87

Tenth Cause of Action (Breach of Contract) ........................................................... 88

Eleventh Cause of Action (Breach of Contract) ...................................................... 88

Twelfth Cause of Action (Breach of Contract)......................................................... 89

Thirteenth Cause of Action (Defamation) ............................................................... 89

Fourteenth Cause of Action (Accounting & Constructive Trust).............................. 90

Fifteenth Cause of Action (Breach of Contract)...................................................... 92

Plaintiffs Rubin Schron, Cam-Elm Company, LLC, SMV Property Holdings LLC, SWC Property Holdings LLC, SWC Special Holdings, LLC, SMV Special Holdings, LLC, Cammeby's Equity Holdings LLC, Cammeby's Funding LLC, Cammeby's Funding II LLC, Cammeby's Funding III LLC, CAMFIVE Holdings, LLC, Cammeby's Management Co. LLC, and Cammeby's International, Ltd. (collectively, "Plaintiffs"), by their attorneys, Dechert LLP, as and for their Verified Complaint against Defendants Leonard Grunstein, Murray Forman, Troutman Sanders LLP, Canyon Sudar Partners LLC, SVCARE Holdings LLC, SavaSeniorCare LLC, Fundamental Long Term Care Holdings, LLC, THI of Baltimore, Inc., National Senior Care, Inc., Mariner Health Care, Inc., MetCap Securities, LLC, MetCap Holding, LLC, MetCap Advisory Services, LLC, Harry Grunstein, and Lawrence Levinson (collectively, "Defendants"), allege, upon knowledge as to their own conduct and information and belief as to the conduct of others, as follows:

## Nature Of The Case

1.      This case is about the systemic exploitation by self-interested attorneys and bankers of clients who entrusted them to devise and implement the terms of complex business deals that these defendants arranged and advocated for their clients. Rather than vindicating their clients' trust or abiding by the terms of agreements they drafted, attorney Leonard Grunstein ("Grunstein"), his longtime business partner, Murray Forman ("Forman"), and certain of their colleagues, including law firms of which Grunstein was a partner and businesses that Grunstein and Forman controlled, have repeatedly breached their fiduciary duties in order to advantage themselves at their clients' expense. This egregious course of conduct has caused *hundreds of millions of dollars* of damages to Grunstein's and Forman's longstanding client,

1

Rubin Schron ("Schron"), and various entities controlled by the Schron family (collectively, the "Schron Entities").

2.      Grunstein is a New York real estate attorney who, since 2005, has been a partner at the law firm of defendant Troutman Sanders LLP ("Troutman Sanders"), and the head of its real estate practice.  Grunstein was placed on administrative leave in November 2009 as a result of some of the events described in this Complaint.  He no longer appears listed as a partner on the Troutman Sanders website, although he works out of offices on the same floor on which he worked while a partner at Troutman.  Prior to being a partner at Troutman Sanders, Grunstein was a senior real estate partner at the now defunct law firm of Jenkens & Gilchrist Parker Chapin LLP ("Jenkens & Gilchrist").

3.      Grunstein's rise to prominence as a real estate lawyer was aided by his relationship with Schron, a successful New York real estate investor.  Schron first retained Grunstein in the 1980s and over time placed an increased amount of trust in Grunstein as his attorney and counselor.  Indeed, Grunstein has referred to himself as the "general counsel" to Schron and the Schron Entities.  Grunstein represented Schron and the Schron Entities in connection with numerous real estate and other transactions until Schron became aware of Grunstein's schemes and severed the relationship in the fall of 2009.

4.      Although Grunstein achieved considerable professional success and material wealth by serving as Schron's attorney, that was not enough for him.  Beginning at least in 2002, Grunstein decided to leverage his position as an attorney and a trusted fiduciary of Schron and his family into material equity interests for himself and his co-conspirators (the "Grunstein Conspirators") in deals that he brought to Schron's attention.  The Grunstein Conspirators then expanded their appetite from fractional equity in Schron Entities to outright ownership and

2

control of a series of operating companies that were tenants or other counterparties of the Schron

Entities -- entities with interests clearly adverse to those of Grunstein's clients.  (As explained

below, the "Grunstein Conspirators" consist of Grunstein; Grunstein's business partner, Forman;

Grunstein's brother, Harry Grunstein; Grunstein's law partner, Lawrence Levinson ("Levinson");

a series of entities they own and control, namely, Defendants MetCap Securities, LLC ("MetCap

Securities"), MetCap Holding, LLC ("MetCap Holdings"), MetCap Advisory Services, LLC

("MetCap Advisory," collectively with MetCap Securities and MetCap Holding, "MetCap");

Canyon Sudar Partners, LLC ("Canyon Sudar"); National Senior Care, Inc. ("NSC");

Fundamental Long Term Care Holdings, LLC ("Fundamental"); and Troutman Sanders.)

     5.      Indeed, in the last seven years alone, Grunstein and Forman's exploitation of their

roles as attorney and advisor, respectively, has resulted in their emerging as owner, director,

officer, member and shareholder in a series of companies that are part of a nursing home empire

operating more than 300 nursing homes in the United States.  The operators of these facilities are

defendants Fundamental, SavaSeniorCare LLC ("Sava") and THI of Baltimore, Inc. ("THI").

Much of Grunstein's and Forman's recent "success" as a health-care operator is the result of a

broad scheme, described herein, to take improper advantage of Schron in connection with the

acquisition and operation of complex real estate and healthcare businesses worth more than $2

billion.

     6.      The launch point of the scheme was Grunstein and Forman's presentation to

Schron of opportunities to purchase two large nursing home and healthcare businesses.  At

Grunstein and Forman's prodding, Schron agreed to finance the purchase of these businesses,

albeit based on deal terms that Schron deemed fair and consistent with the level of risk that he

assumed.  As detailed in the allegations below, rather than abiding by those deal terms, Grunstein

3

utilized his skill and position as the Schrons' trusted transactional lawyer, and Forman used his position as the Schrons' trusted investment banker and financial advisor, to structure, operate and, in certain instances, misappropriate a series of complex investments and economic opportunities in ways that benefited themselves and the Grunstein Conspirators at the Schrons' expense.

7.      Grunstein's conspiracy also drew in the law firms where he was a partner, both Troutman Sanders and, before that, Jenkens & Gilchrist.  Grunstein facilitated his tortious conduct by his association with these firms.  Grunstein frequently used their letterhead for his schemes, and he was assisted by the active complicity of several partners, including defendant Levinson.  In reward for facilitating Grunstein's misdeeds, these law firms received tens of millions of dollars in legal fees from Schron and the Schron Entities.  But that was not enough as Grunstein and his firms regularly and purposefully billed Plaintiffs for work that was not performed or for work that was performed on behalf of Grunstein-controlled entities with interests adverse to those of the Schron Entities.

8.      The common thread in the transactions devised by the Grunstein Conspirators is that, although they were financed by Schron, who bore the risk of the transactions, each one resulted in his attorney, Grunstein, and his investment banker, Forman, receiving extremely valuable ownership interests (often in ways directly adverse to Schron) despite contributing no cash and accepting no risk.  Not content with such outsized and risk-free ownership interests, the Grunstein Conspirators orchestrated the transactions and operated the businesses so as to deny Schron and the Schron Entities major benefits of the economic bargain they struck, stealing for themselves tens of millions of dollars of value, properties and rights that actually belong to Schron and the Schron Entities.

4

9.     In some instances, the Grunstein Conspirators made fraudulent or misleading statements to induce Schron to enter into these transactions.  In addition, whenever Schron sought to exercise his legal rights in ways that were adverse to the interests of Grunstein and the Grunstein Conspirators, they would lie to Schron or dissuade him from exercising his rights by providing self-serving and misleading legal advice.  The brazenness of defendants' unethical and conflicted conduct is simply shocking.

10.     In violation of their ethical obligations, Grunstein and his firms repeatedly acted in derogation of material conflicts of interest created by Grunstein's serving, on the one hand, as Schron's attorney in structuring and drafting these complex transactions and, on the other hand, as actually possessing an ownership interest in, or operating as a beneficiary of, the adverse parties standing on the other side of these transactions.  Not only did Grunstein and his firms fail to obtain effective waivers and decline to act in non-waivable conflict situations, they shamelessly charged the Schron Entities for "advice" that completely and disingenuously favored themselves at their clients' expense.

11.     Plaintiffs do not know the full scope of wrongdoing perpetrated by the Grunstein Conspirators because, exploiting their roles as attorneys and advisors, they have withheld legal and financial documents, providing themselves with the opportunity to conceal their wrongdoing and even alter or destroy critical documents.  Notably, although Schron and the Schron Entities finally severed their relationship with Grunstein in the fall of 2009, Troutman Sanders to this very day has refused to provide the documents in its possession, claiming a specious right to an "attorneys' lien" over these documents.

12.     What Plaintiffs do know, however, is that the egregious and continuing course of conduct engaged in by Grunstein and his cohorts involved breaches of fiduciary duty, breaches

of contract, conversion, extortionate threats, legal malpractice and outright fraud. As detailed

below, Grunstein and his conspirators repeatedly breached their fiduciary duties, misled and

intimidated their clients and engaged in other wrongful acts, which included, but are not limited

to, the following specific actions:

13.   The Mariner Transaction. Grunstein and Forman proposed to the Schrons a

complex transaction (the "Mariner Transaction") in which the Schrons would buy the assets of

Mariner Health Care, Inc. ("Mariner"), a large nursing home company. The Schrons made clear

to Grunstein and Forman that they were not interested in operating nursing homes and would

move forward with the transaction only if they could own the real estate and receive a steady and

favorable rental payment. Grunstein and Forman thus proposed that the Schrons would retain

the equity of the company created to hold the real estate, and receive as rent substantial cash flow

generated by a separate company created to operate the homes. Because the Schrons paid for the

entire business and assumed all of the risk, the transaction was designed to ensure, among other

things, that rental payments paid by the operating company would be adjusted upwards if interest

rates rose and that the Schrons would have an option to buy the operating company.

14.   Conflicts began to arise -- and to be ignored -- from virtually the outset. While

the Grunstein Conspirators initially were awarded a fractional interest in the Schrons' property

company (SMV Property Holdings LLC ("SMV")), in short order they took for themselves all of

the equity in the operating company that would lease and operate the facilities. Indeed,

Grunstein originally provided that his brother, Harry Grunstein would own the operating

company, but within two months of the closing of the Mariner Transaction, his brother sold the

operating company to Grunstein and Forman for a nominal sum. Because the allocation of

economics between the property company and the operating company is largely a zero-sum

6

game, the Grunstein Conspirators had ample incentive to subordinate the economic interests of the property company -- their client -- to the operating company that they owned in whole.

15.     As detailed below, the Grunstein Conspirators blatantly and corruptly exploited this opportunity at the Schrons' expense.  In particular, the Grunstein Conspirators patently breached their fiduciary duties, misled Schron about the terms of the deal and the meaning of the agreements, and caused Schron hundreds of millions of dollars in damages.  Through this course of unethical and unlawful conduct, the Grunstein Conspirators, in essence, caused Schron to guarantee the debt of their operating company, accept reduced rental payments, and forego his contractual right to acquire the operating company.  As a consequence, the Grunstein Conspirators were able to misappropriate many millions of dollars from their clients while depriving them of the economic upside to which they were entitled pursuant to contracts drafted by Grunstein and Troutman Sanders. *See infra* ¶¶ 121-146, 188-243.

16.     <u>The Seizure of THI</u>.  While purporting to represent Schron and the Schron Entities, Grunstein informed a nursing home operator (THI), which had leased facilities owned by subsidiaries of a Schron Entity (SWC Property Holdings LLC ("SWC")), that it was in default on those leases.  The agreement between THI and SWC provided for specific remedies designed to protect SWC in the event of THI's breach.  However, notwithstanding the contract and his clients' clear interests, Grunstein told THI's principals they could sidestep the default by selling THI to an entity (Fundamental) owned by ***Grunstein and Forman***.  In other words, Grunstein, as SWC's lawyer and fiduciary, threatened to exercise his client's (SWC's) legal rights against THI, not to benefit SWC, but to seize THI's assets for himself and Forman at a below market price. *See infra* ¶¶ 147-154.

7