17. The Bogus "Legal Advice" on the Sava Master Lease. In perhaps one of Grunstein's most brazen acts, he and one of his partners at Troutman Sanders, defendant Levinson, provided false, misleading and self-serving legal advice to dissuade Schron, as manager of SMV, from invoking SMV's legal right to pass on mortgage interest-rate increases by raising the rent under SMV's lease with Sava, the operating company owned by Grunstein and Forman. This lease, the "Sava Master Lease," was drafted by Levinson and others at Jenkens & Gilchrist. In order to ensure steady cash flow to SMV, the Sava Master Lease required Sava to pay additional rent in an amount equal to the additional debt service that might be incurred by SMV on its floating rate loan. When the Sava Master Lease was drawn, Grunstein and his co-conspirators expressly advised Plaintiffs that the Sava Master Lease protected the Schron Entities from increasing financing costs on a dollar for dollar basis -- a provision that was central to Schron's willingness to purchase the Mariner assets and lease the facilities to Sava.

18. Subsequently, however, upon learning of Schron's intent to exercise SMV's right to increase the rent, Grunstein plotted to escape the contract terms he drafted. Grunstein provided Schron with two attorney-client memoranda from Troutman Sanders purporting to "advise" Schron that the Sava Master Lease did not mean what it said or what Grunstein had previously advised Schron that it meant, and that SMV had no right to increase the rent. This so-called "legal advice" was fraudulent and offered in bad faith. Although Schron believed he was receiving his lawyer's candid legal advice, in fact, these memoranda represented shameless advocacy pieces from his conflicted lawyer-tenant.

19. In direct reliance on Grunstein's and Levinson's misleading advice, SMV abandoned its intention to raise the rent under the Sava Master Lease if interest rates on SMV's

mortgage increased. Instead, with the active participation and counseling of Grunstein and Forman, SMV engaged in an interest-rate swap with Citibank that ultimately resulted in losses of approximately $50-60 million (the "Citibank Swap"). Even though Grunstein, Forman and Troutman Sanders represented Schron and the Schron Entities with regard to the Citibank Swap (charging them $350,000 for their services), and even though Grunstein and Forman shared directly in the benefits that the Citibank Swap initially generated, Grunstein and Forman falsely claimed in a recent lawsuit that the Citibank Swap had nothing to do with SMV, but rather relates to some "private" investment of the Schrons. *See infra* ¶¶ 188-220.

20. The Bogus "Legal Advice" on the Amended SVCARE Option. Grunstein similarly provided Schron with self-serving and fraudulent legal advice in seeking to dissuade his client from exercising another legal right key to the transaction -- Schron's option to acquire from Grunstein and Forman SVCARE Holdings, LLC ("SVCARE"), which owns Sava. Because the Schron Entities alone contributed investment capital and assumed risk, Schron conditioned the deal on his ability to acquire the operating company for no more than $100 million. Accordingly, when the Mariner Transaction was capitalized and documented, Cam Equity, a Schron Entity, received an express option to purchase SVCARE. However, after Schron informed Grunstein of his intent to exercise the contractual option, the Grunstein Conspirators pretended that the Amended SVCARE Option, which Grunstein and Troutman Sanders drafted at the Schrons' request, was somehow worthless and ineffective, and that Schron could use the option agreement "as toilet paper". Grunstein's fraudulent advice was directly in conflict with numerous certificates and opinions he and certain conspirators authored stating that the option was valid and outstanding, documents which Grunstein and Forman had previously presented to lenders in order to induce them to make loans to SMV and SWC. Again, in reliance

on his attorney's false and misleading advice, Schron did not, at that time, exercise the amended SVCARE Option. *See infra* ¶¶ 221-233.

21. The Breach of Duty regarding the SVCARE Loan. While purporting to represent Schron and the Schron Entities, the Grunstein Conspirators documented at least $120 million in loans that Schron and the Schron Entities made to SVCARE, an entity that the Grunstein Conspirators controlled. Subsequently, Grunstein took the position that these loans from his clients need never be repaid or did not exist. Specifically, under the loan terms devised by Grunstein, SVCARE was obliged to pay back the loan to the Schron Entities only after SVCARE paid down a separate $100 million loan to another creditor. After SVCARE paid down nearly $98 million on the other loan, the Grunstein Conspirators negotiated terms with the other lender to defer final repayment of that loan and allow a *de minimis* portion of that loan to remain open. Based on that ruse, the Grunstein Conspirators told Schron that the Schron Entities' loans need never be repaid. More recently, Grunstein and Forman have taken to denying the existence of the SVCARE loan obligation entirely -- even though they prepared and executed comprehensive loan documentation and signed numerous certificates and opinions, including to lenders, representing that the loan was funded, valid and outstanding in order to induce those lenders to make loans to SMV and SWC. *See infra* ¶¶ 234-243.

22. The Breach of Duty Regarding the Formation Deal. In the summer of 2009, as their relationship began to sour, Schron urged Grunstein and Forman to engage with Formation Capital LLC ("Formation") as a potential buyer for SVCARE and Sava. Grunstein saw this as an additional opportunity to fleece his client, potentially for his biggest score. Although Schron expressed no interest in personally purchasing the operating company, Grunstein and Levinson drafted a deliberately complicated sales agreement (which Troutman Sanders billed to SMV) that

would make Schron and certain of the Schron Entities the virtual guarantor of Formation's purchase of SVCare and Sava.

23. Specifically, the draft agreement granted Canyon Sudar (a Grunstein and Forman entity) the right to purchase ***SMV*** for a fraction of its value if the Formation deal did not close for any reason, ***and*** further provided Canyon Sudar a right of first refusal to acquire Cam-Elm Company, LLC ("Cam-Elm"), a Schron Entity holding other Schron family assets that had little connection to the proposed Formation deal. The right of first refusal would have given Grunstein a foothold from which he could attempt to take control of other Schron family assets. Grunstein did not discuss these provisions with Schron, but simply presented Schron the draft agreement for his signature, making believe that Troutman Sanders was merely the "scrivener" for ***Schron's*** purported plan. Because by this point Schron's patience and trust in Grunstein had worn out, he closely reviewed the agreement before acceding to Grunstein's request for signatures, and fired Grunstein and Troutman Sanders for their continuing breaches of fiduciary duty. *See infra* ¶¶ 269-277.

24. The Misappropriation of the New Mexico Leaseholds. As part of the 2003 transaction in which properties and healthcare businesses were purchased out of the Integrated Health Services, Inc. ("IHS") bankruptcy (the "IHS Transaction"), a Schron Entity ("SWC") acquired leasehold interests relating to three nursing homes in New Mexico. SWC acquired these leaseholds from ABE Briarwood Corp. ("ABE"), which originally purchased the entities owning the leases from IHS.

25. Since that time, the Grunstein Conspirators have wrested control of ABE and have asserted (despite directly contrary documents they created or adopted) that ABE never conveyed those three leases to SWC and thus SWC never acquired the right of first refusal to

purchase the underlying real estate. In January 2010, asserting ownership of the leaseholds and the right of first refusal to purchase the underlying properties, the Grunstein Conspirators, assisted by Troutman Sanders, purchased the fee interests in the New Mexico properties and other leaseholds through another entity, disregarding the property rights that they knew belonged to, and were stolen from, the Schron Entities. *See infra* ¶¶ 278-290.

26. The Mariner "Kickback" Malpractice. While purporting to represent Schron and the Schron Entities in connection with the Mariner Transaction, Grunstein and his law partners negligently undertook a transaction that exposed Schron to a Department of Justice ("DOJ") investigation, and ultimately led to DOJ filing a civil suit against Schron, Grunstein and Forman. DOJ's complaint alleged that the sale of one of Mariner's businesses to Omnicare, Inc. ("Omnicare") in exchange for a long-term pharmacy contract between Omnicare and Sava constituted a "kickback" in violation of the Medicare Anti-Kickback Statute. As a direct result of Grunstein's and Levinson's negligence, Schron and the Schron Entities incurred substantial reputational damage and paid millions of dollars to settle the case against the Government and several million more dollars in legal fees. *See infra* ¶¶ 170-187.

27. The Troutman Sanders Overbilling Conspiracy. In addition to the complex misdeeds perpetrated by the Grunstein Conspirators to deprive Schron and the Schron Entities of their contractual and economic rights, Grunstein and Troutman Sanders engaged in the more mundane fraud of overbilling their clients (a) for work not performed, and (b) for work performed for entities owned and controlled by the Grunstein Conspirators (often where their interests were actually adverse to those of the Schron Entities). For instance, in connection with the seizure of THI, described above, Troutman Sanders invoiced a Schron Entity for more than 160 hours of work performed for the Grunstein and Forman entity called Canyon Sudar, even

though the underlying transactions robbed SWC of a valuable corporate opportunity, and amounted to Grunstein and Forman acquiring for themselves the entity holding SWC's nursing home leases. *See infra* ¶¶ 244-260.

28. For all of these reasons, and for the reasons explained in more detail below, Plaintiffs bring this action against Defendants for numerous breaches of fiduciary duty and acts of conversion, breaches of contract, fraud and legal malpractice. Plaintiffs seek recompense for damages caused by Defendants' course of illegal and unethical conduct. Plaintiffs' damages include, among other things, (i) hundreds of millions of dollars in assets (including businesses and real estate interests) misappropriated by Grunstein and the Grunstein Conspirators through their exploitation of their fiduciary relationships with Schron and the Schron Entities, (ii) more than $100 million owed to Schron Entities by Grunstein-controlled entities under multiple loan agreements, (iii) tens of millions of dollars in legal and professional fees paid to Grunstein's firms and MetCap for services that were conflicted, fraudulent and/or negligently performed, (iv) at least $50 million in losses arising from the Citibank Swap, (v) millions of dollars in lost rent as a result of conflicted and self-serving legal advice concerning the Sava Master Lease, and (vi) more than $14 million in damages related to Grunstein and Levinson's malpractice in structuring the sale of a Mariner asset to Omnicare.

**Jurisdiction And Venue**

29. This Court has jurisdiction over this matter pursuant to Article 3 of the New York Civil Practice Law and Rules ("NYCPLR"). Venue is proper in this County pursuant to Section 503 of the NYCPLR. The principal offices of all of the corporate Plaintiffs are in New York, New York and many of Defendants' illegal acts occurred in New York, New York.

## The Parties

### A. Plaintiffs

30. Rubin Schron is a resident of Brooklyn, New York. Over a career spanning more than four decades, Schron has been a successful real estate investor. His investments typically are held in various entities controlled by him and/or members of his family.

31. Cam-Elm is a New York limited liability company with its principal place of business at 45 Broadway, New York, New York. Cam-Elm is 100% owned by members of the Schron family. It holds the Schron family's interests in numerous real estate and other investments.

32. SWC is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. SWC owns or controls certain real estate properties and leasehold interests acquired in the IHS Transaction, described below. Schron is the sole manager of SWC. Cam-Elm holds an 83% ownership interest in SWC. The remaining 17% is owned by Mada Holdings, LLC ("Mada") (4.5%), Cada Holdings, LLC ("Cada") (4.5%), Mich Holdings, LLC ("Mich") (2.5%) and Seeva Holdings, LLC ("Seeva") (5.5%). Mich and Seeva are majority-owned by defendants Grunstein and Forman. Levinson and another Troutman Sanders partner each owns a minority interest in Seeva.

33. SMV is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. SMV owns or controls certain real estate properties acquired in the Mariner Transaction, described below. Schron is the sole manager of SMV. Cam-Elm currently holds a 69.615% ownership interest in SMV. The remaining 30.385% is owned by Mada (3.4425%), Cada (3.4425%), Mich II Holdings LLC ("Mich II") (2.25%), Seeva II Holdings LLC ("Seeva II") (11.25%), Sam Domb (5%) and Ulo Barad (5%). Mich II and

Seeva II are majority-owned by Grunstein and Forman. Defendant Levinson and another Troutman Sanders partner each owns a minority interest in Seeva II.

34. SWC Special Holdings, LLC ("SWC Special Holdings") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. SWC Special Holdings is owned by Cam-Elm (83%), Mada (4.5%), Cada (4.5%), Mich (2.5%) and Seeva (5.5%). SWC Special Holdings was formed to act as the sole equity member of a number of limited liability companies and limited partnerships that own fee interests and leasehold interests associated with nursing home or long-term care facilities.

35. SMV Special Holdings, LLC ("SMV Special Holdings") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. SMV Special Holdings is owned by Cam-Elm (77.35%) Mada (3.825%), Cada (3.825%), Mich II (2.5%) and Seeva II (12.5%). SMV Special Holdings was formed to act as the sole equity member of limited liability companies and limited partnerships which own fee interests and leasehold interests associated with nursing home or long term care facilities and, to hold directly or through affiliates other assets, contract rights and service and product opportunities relating to certain entities.

36. Cammeby's Equity Holdings LLC ("Cam Equity") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. Cam Equity is owned by Cam-Elm (77.35%), Mada (3.825%), Cada (3.825%), Mich II (2.5%) and Seeva II (12.5%). Cam Equity was created to hold various option rights arising from the Mariner Transaction, including the Amended SVCARE Option discussed below.

37. Cammeby's Funding LLC ("Cam Funding") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. Cam

Funding is owned by Cam-Elm (83%), Mada (4.5%), Cada (4.5%), Mich (2.5%) and Seeva (5.5%). Cam Funding was created to serve as a funding entity in the IHS Transaction.

38. Cammeby's Funding II LLC ("Cam Funding II") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. Cam Funding II is owned by Cam-Elm (77.35%), Mada (3.825%), Cada (3.825%), Mich II (2.5%) and Seeva II (12.5%). Cam Funding II was created to serve as a funding entity in the Mariner Transaction.

39. Cammeby's Funding III LLC ("Cam Funding III") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. Cam Funding III is owned by Cam-Elm (77.35%), Mada (3.825%), Cada (3.825%), Mich II (2.5%) and Seeva II (12.5%). Cam Funding III was created to serve as a funding entity in the Mariner Transaction.

40. CAMFIVE Holdings, LLC ("CAMFIVE") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. CAMFIVE is owned by Cam-Elm (77.35%), Mada (3.825%), Cada (3.825%), Mich II (2.5%) and Seeva II (12.5%). CAMFIVE was created to serve as a funding entity in the 2006 SMV/SWC refinancing, discussed below.

41. Cammeby's Management Co. LLC ("Cam Mgmt.") is a New York limited liability company with its principal place of business at 45 Broadway, New York, New York.

42. Cammeby's International, Ltd. ("Cam Int'l") is an entity with its principal place of business at 45 Broadway, New York, New York.

**B. <u>Defendants</u>**

43. Leonard Grunstein is a resident of Bergen County, New Jersey. At all relevant times, Grunstein has been a practicing attorney in New York and a member of the New York

State Bar, who specializes in real estate transactions. Up until April 2002, Grunstein was a partner at a prior New York law firm. In or about April 2002, Grunstein abruptly left that firm and joined Jenkens & Gilchrist as a partner. Subsequently, on or about March 2005, Grunstein left Jenkens & Gilchrist to become a partner in the New York office of Troutman Sanders. By 2009, Grunstein was the leader of Troutman Sanders's real estate capital markets and investments practice groups. In or about November 2009, Troutman Sanders required Grunstein to take a leave of absence from the firm apparently because of certain of the events described below.

44. At all relevant times, Grunstein has also been a principal of defendant MetCap Holdings, the parent company of defendants MetCap Securities and MetCap Advisory.

45. Murray Forman is a resident of Nassau County, New York. At all relevant times, Forman has been a principal and manager of defendants MetCap Securities, MetCap Holdings and MetCap Advisory. Forman acts as an investment advisor and investment banker through the MetCap entities and holds numerous FINRA securities licenses, including Series 7, Series 25 and Series 66 licenses.

46. Troutman Sanders is a limited liability partnership with its principal place of business in Atlanta, Georgia. Since at least March 2005, Troutman Sanders has maintained a sizeable office in New York City. Troutman Sanders's New York office, where Grunstein is a partner, currently has more than 100 attorneys, and it was the site of many of the misdeeds described below. Troutman Sanders's Real Estate Capital Markets Group ("Real Estate Group") publicly claims that it strives to provide clients with the highest quality legal services in structuring, documenting and closing real estate financing transactions, in a manner intended both to protect the client's interests and to consummate each transaction in accordance with the

fundamental business arrangements between the parties. The Real Estate Group purports to be aware of the sensitive nature of the cost of legal services, and it claims to render services in a cost-efficient manner.

47. Canyon Sudar is a Delaware limited liability company with its principal place of business at 291 Ocean Avenue, Lawrence, New York. It is the sole member of SVCARE. Grunstein and Forman are Canyon Sudar's Managing Members and sole owners.

48. SVCARE is a Delaware limited liability company with its principal place of business at 291 Ocean Avenue, Lawrence, New York. It is 100% owned by Canyon Sudar, and Grunstein and/or Forman are its Managers. SVCARE is a holding company that directly owns Sava and, through Sava, holds numerous nursing home operating entities.

49. Sava is a Delaware limited liability company with its principal place of business at One Ravinia Drive, Suite 1500, Atlanta, Georgia. It is 100% owned by SVCARE. Grunstein and Forman serve as Directors of Sava; Grunstein is the Chairman of the Board. Sava is one of the largest providers of short-term and long-term health care services in the United States.

50. Fundamental is a Delaware limited liability company with its principal place of business at The Highlands, 920 Ridgebrook Road, Sparks, Maryland. Grunstein and Forman are the sole owners of Fundamental. Fundamental operates nursing homes, independent living centers, intermediate and acute care facilities, continuing care retirement and life care communities and assisted living centers.

51. THI is a Delaware limited liability company with its principal place of business at The Highlands, 920 Ridgebrook Road, Sparks, Maryland. It is 100% owned by Fundamental. THI is a large operator of nursing home facilities.

52. NSC is a Delaware corporation with its principal place of business at The Highlands, 920 Ridgebrook Road, Sparks, Maryland. Defendant Harry Grunstein is the supposed sole shareholder of NSC.

53. Mariner Health Care, Inc. ("Mariner" pre-December 10, 2004, or "New Mariner" on or after December 10, 2004) is a Delaware corporation with its principal place of business at One Ravinia Drive, Suite 1500, Atlanta, Georgia. NSC is the sole shareholder of Mariner. New Mariner owns and operates long-term nursing and other healthcare assets.

54. MetCap Holding is a New York limited liability company with its principal place of business at 405 Lexington Avenue, New York, New York. Each of Grunstein, Forman, Levinson and another Troutman Sanders partner own 25% of MetCap Holding, which serves as a holding company for the various MetCap entities. MetCap Holding and MetCap Securities share offices with Troutman Sanders. MetCap Holding is responsible for the conduct of its alter egos, MetCap Securities and MetCap Advisory.

55. MetCap Securities is a New York limited liability company with its principal place of business at 405 Lexington Avenue, New York, New York. MetCap Securities is a wholly-owned subsidiary of MetCap Holding and is registered with the Securities and Exchange Commission, and with the states of California, Connecticut, New Jersey and New York as a broker-dealer.

56. MetCap Advisory is a New York limited liability company with its principal place of business at 805 Third Avenue, New York, New York. MetCap Advisory is a wholly-owned subsidiary of MetCap Holding.

57. Harry Grunstein ("H. Grunstein") is Grunstein's brother. H. Grunstein currently resides in Israel.

58. Lawrence Levinson is a resident of Roslyn, New York. At all relevant times, Levinson has been a practicing attorney in New York and a member of the New York State Bar, who specializes in corporate transactional work. Levinson is currently a partner in the New York office of Troutman Sanders. Levinson has long been a partner of Grunstein in representing Schron and Schron Entities. Levinson followed Grunstein from a prior firm to Jenkens & Gilchrist in April 2002, and then followed him from Jenkens & Gilchrist to Troutman Sanders in or about March 2005. At all these firms, Levinson worked closely with Grunstein on numerous matters, including the transactions at issue in this complaint, and had a leading role in drafting many of the critical documents relevant to this case.

**Background**

A. **Schron's Relationship With Grunstein**

59. Over the course of decades, Schron has engaged in a significant number of purchases and sales of real estate. In the process, he has become a well-known and well-regarded real estate investor in New York. The relative complexity of many of Schron's investments necessitate the retention and faithful assistance of knowledgeable and experienced real estate attorneys and, at times, investment advisors.

60. During the 1980s, Schron met Grunstein, who then was a partner at a prior firm, when Grunstein represented one of Schron's co-investors in a particular real estate transaction.

61. Schron retained Grunstein thereafter to represent him in another real estate transaction, and over the next several years, Schron hired Grunstein to act as his attorney for various real estate investments and transactions.

62. By the mid-1990s, Schron had started to rely upon Grunstein and his prior law firm as legal counsel for most of his real estate investments and transactions. Additional attorneys at that firm, including Levinson, assisted Grunstein in providing legal advice to Schron

and the Schron Entities during this time. Levinson in particular took a leading role in creating documents and at least one memorandum critical to this case.

63. Over a period of years, Grunstein and his colleagues won Schron's utmost confidence. Schron and Grunstein spoke almost every day about various aspects of Schron's real estate business. Schron and Grunstein's relationship eventually extended beyond business. Grunstein attended the weddings of a number of Schron's children, and Schron, at Grunstein's urging, eventually hired Grunstein's daughter-in-law as the Chief Financial Officer of SMV and SWC.

64. Grunstein leveraged the fact that he was "Rubin Schron's lawyer" to establish himself as a major player in the New York real estate world. Over time, Grunstein and his colleagues, including Levinson and Forman, insinuated themselves directly into Schron's business dealings and relationships.

65. In or about April 2002, Grunstein left his prior firm and joined Jenkens & Gilchrist. Levinson and other attorneys at the prior firm who had provided legal services to Schron and his companies moved with Grunstein to Jenkens & Gilchrist. Because of Schron's longstanding relationship with, and loyalty to, Grunstein, Schron began using Jenkens & Gilchrist as legal counsel for most of his real estate investments and transactions.

66. In or about March 2005, Grunstein again switched law firms, this time moving to Troutman Sanders. Again, Levinson and other Jenkens & Gilchrist attorneys moved with Grunstein to Troutman Sanders. Schron continued to retain and rely upon Grunstein, Levinson and their partners, and thus began employing Troutman Sanders as his primary counsel.

67. Schron's confidence in Grunstein and his partners was badly misplaced: Between at least 2002 and 2009, the Grunstein Conspirators, aided by others at Grunstein's law firms,

took advantage of the trust that Schron and the Schron Entities placed in their legal counsel and financial advisors by conducting a wide-ranging scheme to misappropriate not just tens of millions of dollars in legal and other fees, but also hundreds of millions of dollars in various assets and loan proceeds.

68. Beginning at least in 2002, Grunstein and his co-conspirators set out to exploit Schron's faith and confidence in Grunstein. Grunstein and the Grunstein Conspirators persuaded Schron to enter into a series of complex transactions, and then structured aspects of those transactions to promote their own financial interests and thereafter managed the businesses to take further advantage of their clients.

69. Defendants' scheme arises predominantly from transactions involving two large nursing home companies: (i) the IHS Transaction in January 2003; and (ii) the acquisition of Mariner in December 2004. In each case, Grunstein and Forman persuaded Schron to finance the transaction based on stated economic parameters that would recompense Schron for his investment and risk.

70. As detailed below, no sooner did the transactions close than the Grunstein Conspirators disregarded the deal terms and their fiduciary duties to their clients, and launched a brazen, long-running scheme to enrich themselves at the expense of their clients, including through numerous breaches of fiduciary duty, outright theft, legal malpractice and acts of fraud and other malfeasance.

**B. <u>The IHS Transaction</u>**

71. In or about February 2000, IHS and its subsidiaries filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware. At the time, IHS was one of the country's largest operators of nursing homes.

72. Schron had no background in healthcare services and no interest in owning the operations of nursing home facilities or other healthcare providers. Grunstein, however, persuaded Schron that the transaction could be structured so that Schron would acquire from a third-party IHS's real estate holdings and earn rent on the properties by leasing them to a company that would operate the nursing homes. In certain cases, IHS's real estate holdings comprised outright fee interests in nursing homes and other healthcare facilities. In other cases, IHS owned leasehold interests to nursing homes and other healthcare facilities, often with a right of first refusal to acquire the underlying real property in the event that the fee holder of the real property elected to sell.

73. Cognizant of Schron's parameters, Grunstein proposed an "opco/propco" acquisition structure that would separate the operating companies from the property companies holding the real estate assets. Under the structure, Schron, through a newly-formed Schron Entity, SWC, would eventually acquire the large bulk of IHS's real estate holdings, including fee and leasehold titles, and an unrelated third-party operating company, defendant THI, would be engaged to operate the nursing home facilities and make rental and other payments to SWC.

74. Grunstein, working with Levinson and their partners at Jenkens & Gilchrist, managed the financing for the sale of IHS assets to SWC. Grunstein worked on this transaction with his business partner, Forman, who, with Grunstein and Levinson, were principals at their small investment firm, MetCap. In addition to receiving multi-million dollar fees, Grunstein, Forman, Levinson and another Jenkens & Gilchrist lawyer received a promotional equity ownership interest in SWC as a part of this transaction. Moreover, Jenkens & Gilchrist and MetCap charged the Schrons millions of dollars in fees for alleged transactional post-closing

services, and MetCap charged the Schrons and SWC millions of dollars in ongoing fees and brokerage commissions.

75. Schron and the Schron Entities, including SWC, relied upon Grunstein and Forman to help arrange SWC's acquisition of assets in a manner that would best serve the interests of the Schron Entities. The Schrons' reliance was misplaced, for reasons set forth below.

1. **ABE's Acquisition of IHS Subsidiaries**

76. The overall structure of the IHS transaction involved the simultaneous execution of various steps that allowed the acquiring companies to finance the transaction, in part, through the proceeds generated by downstream sales. Beyond those initial proceeds, Schron and certain Schron Entities provided cash and financing for the IHS deal, supported by the mortgages on the acquired fee interest properties.

77. First, an entity known as ABE Briarwood Corp. ("ABE") purchased from IHS its two corporate subsidiaries, IHS Long Term Care, Inc. ("IHSLTC"), which held the nursing home subsidiaries, and IHS Therapy, Inc., which held certain therapy-related companies.

78. ABE was owned originally by an individual, Uri Kaufman ("Kaufman"), who was unaffiliated with Schron or Grunstein. (As described below, in furtherance of their scheme, the Grunstein Conspirators would later improperly wrest control of ABE.)

79. On or about January 28, 2003, a Stock Purchase Agreement was signed between ABE and IHS. Under the Stock Purchase Agreement, all of the capital stock of IHSLTC and IHS Therapy, Inc. was transferred to ABE.

80. At the time of the transaction, IHS's assets included approximately 175 nursing homes: The fee-owned real estate underneath 40 of these homes and long-term leases to an additional 135 homes.

81. THI at the time was an independent operator of nursing homes. THI either remained the operator of, or later became the operator of, certain of the former IHS nursing homes. (Also in furtherance of their scheme and as described below, the Grunstein Conspirators would later seize control of THI.)

82. Despite receiving promotional interests in SWC, neither Grunstein, Forman, nor Levinson (nor any entity owned or controlled by these individuals) paid or personally borrowed any money in connection with the purchase of the IHS subsidiaries. Rather, Schron and Schron Entities financed or obtained financing for these transactions.

**2. <u>Division of IHS's Real Estate Interests</u>**

83. On January 28, 2003, SWC also entered into an agreement with ABE to acquire certain of the real estate and leasehold assets that the latter had acquired from IHS (the "SWC Master Purchase Agreement"). This transaction closed on or about August 29, 2003.

84. On April 11, 2003, ABE entered into an Agreement to Lease with THI (the "Agreement to Lease"), whereby THI, through its subsidiaries, became the lessee of some real estate assets that were shortly thereafter sold to SWC, as well as operators of the health care facilities on those properties.

85. The Agreement to Lease provided that ABE would lease the assets to THI, retaining ownership of the real estate and the leases to the properties, but receiving rent from THI as the tenant and the operator of the facilities. The Agreement to Lease also reserved to ABE special rights to ensure that THI could not exploit its position and knowledge of the assets to trump ABE's control over the properties. Specifically, as to leaseholds, the Agreement to Lease provided that THI would have no right to purchase the underlying real estate directly from the third-party owners or to enter into a lease directly with them. Rather, ABE alone -- and not THI -- would have those rights.

86. Upon the closing of the SWC Master Purchase Agreement, and pursuant to the agreement's express terms, conditions and covenants, ABE was obliged to transfer all interests in the subject assets to SWC (the "SWC Acquisition"). Accordingly, the leases between IHS/ABE and the operating companies owned by THI and its subsidiaries should have been amended to reflect that SWC was assuming all of ABE's ownership rights, including those rights under the covenant precluding THI from directly purchasing real estate from or entering into leases with third-party owners.

87. Notwithstanding the clear language of the aforementioned agreements and the Schron's express instructions, the Grunstein Conspirators (who subsequently took control of THI, as described below) wrongfully converted SWC's property rights regarding at least three IHS properties located in New Mexico. *See infra* ¶¶ 278-290.

### 3. Grunstein's and His Law <u>Partners' Lack of Accountability</u>

88. Grunstein and Jenkens & Gilchrist took more than $3.8 million in legal fees for their services in connection with the IHS Transaction by transferring to themselves monies from an escrow account established for the transaction. Jenkens & Gilchrist paid these fees to itself without providing any detailed back-up to Schron or the Schron Entities regarding the services they performed in the IHS Transaction.

89. Moreover, neither Grunstein nor anyone at Jenkens & Gilchrist, nor later, at Troutman Sanders, ever provided a copy of the closing binder documents for the SWC Acquisition to Schron or any of the Schron Entities.

90. It is now apparent that Grunstein intentionally withheld the closing binder from Schron and the Schron Entities to allow the Grunstein Conspirators to remain in control of the details of this complex transaction. By keeping these documents from their clients, the Grunstein

Conspirators, and their law firms, created an opportunity to exploit their clients' trust and lack of information.

91. After the closing of the SWC Acquisition and until the fall of 2009, Grunstein, Levinson and their law firms (first Jenkens & Gilchrist, then Troutman Sanders) continued to represent Schron, SWC and other Schron Entities for all matters related to the IHS Transaction and those holdings.

92. Unbeknownst to Plaintiffs, and as described below, Grunstein and his law partners exploited their fiduciary positions and the trust placed in them by Schron and the Schron Entities to benefit themselves financially, to the detriment of their clients.

4. **<u>MetCap's Role in the IHS Transaction</u>**

93. At Grunstein's suggestion, Schron and the Schron Entities employed MetCap and Forman as their investment banker in the IHS Transaction. Grunstein had previously introduced Schron to Forman in or around 2002.

94. MetCap acted as a broker in this transaction. MetCap's role in the transaction included, *inter alia*, assisting in the financing of the SWC Acquisition, negotiating business terms, conducting financial analyses concerning the transaction, overseeing the investment in general, and otherwise purporting to further Schron's and the Schron Entities' best interests in the transaction.

95. At all relevant times, Grunstein (along with his business partner, Forman, and two law partners, including Levinson) has been a principal in MetCap Holdings.

96. MetCap was paid millions of dollars for the investment banking and brokerage services it allegedly performed in connection with the IHS Transaction. Grunstein, Forman and Levinson, as principals of MetCap, benefited financially from these payments.

5. **Grunstein and Forman Ignore Conflicts**

97. Grunstein's interest in MetCap created a conflict of interest between himself (and Jenkens & Gilchrist) and Plaintiffs. This would be just the first of numerous conflicts of interests between Grunstein and Plaintiffs that would arise over the course of the next seven years.

98. Grunstein and his law firms (Jenkens & Gilchrist and Troutman Sanders) ignored this conflict, and virtually all of the subsequent conflicts described below, in violation of their unambiguous ethical duties as lawyers.

99. In many instances, the Defendants' conflicts simply could not be waived. In addition, Grunstein and his law firms, including Troutman Sanders, repeatedly failed to comply with New York's canons of legal ethics in seeking an effective waiver of those conflicts that could have been waived. Among other things, they never explained to Schron or the Schron Entities the consequences and implications of the multiple conflicts of interest that arose from Grunstein, Jenkens & Gilchrist and Troutman Sanders representing Schron, SWC, SMV and other Schron Entities in the various matters described below despite Grunstein's and Forman's ownership of counterparties with directly contrary interests. In order to mask these conflicts, Grunstein and his law partners often asked Schron to execute complicated documents at the last minute without explaining the conflicts and various terms of the agreement, and without providing Schron the opportunity to review carefully the documents. Nor did Grunstein or his law partners ensure that sophisticated independent counsel understand and review such conflicts and the complex deal documents with, and for the benefit of, Schron and the Schron Entities.

100. Similarly, Forman and MetCap violated their duty of fair dealing and the rules of fair practice governing licensed broker-dealers and investment advisors, including the duties they owed to their clients, by acting as an investment advisor and investment banker to Schron

Entities despite the numerous clear conflicts of interest between the principals and Schron and the Schron Entities, as described further herein.

C. **The Mariner Transaction**

101. Mariner was a publicly traded company that owned and operated nursing homes and other healthcare businesses throughout the United States, and which had sought bankruptcy protection. In 2004, Grunstein and Forman proposed to Schron that he acquire the assets of Mariner as well.

102. Grunstein and Forman wanted to acquire Mariner but, as relative unknowns without any capital or financing of their own, they could not proceed with the deal without Schron's participation. Grunstein and Forman were persistent in their efforts to enlist Schron (and his assets and reputation) into the deal. Even so, Schron was reluctant to participate in another, even larger nursing home transaction.

103. Ultimately, Grunstein and Forman persuaded Schron to participate in the Mariner deal. Among other things, they advised Schron that the transaction could be structured so as to protect Schron's ownership of the underlying real estate assets, among other things, from any interest-rate movements adversely affecting the anticipated floating rate financing and from any default by the nursing home tenant-operator. Grunstein and Forman also promised Schron he would have an option to acquire the operating company if that ultimately turned out to be valuable.

104. At Grunstein's urging, Schron retained Grunstein and his law firm, along with Forman and MetCap, to represent him and the Schron Entities in negotiating the acquisition of the Mariner real estate assets. In addition to Grunstein, Levinson also played a prominent role in representing Schron and the Schron Entities in the Mariner transaction.

105. Grunstein, Forman, Levinson and another partner received a promotional equity ownership interest in SMV, the Schron Entity that was formed to acquire certain of Mariner's real estate interests.

106. At the time of the transaction, Mariner's assets included approximately 170 skilled nursing facilities that it owned and operated, 80 skilled nursing facilities for which it held leasehold intersts, 11 long-term acute care hospitals, a hospice care business, and Mariner Medical Supply ("MMS"), a medical supply business.

1. **<u>The Structure of the Mariner Acquisition</u>**

107. Grunstein, Levinson, Forman and MetCap, together with other attorneys at Jenkens & Gilchrist, developed the deal structure for the Mariner Transaction: (i) a wholly-owned subsidiary of NSC merged with Mariner, thereby acquiring all of its assets; (ii) Mariner's real estate fee properties were sold to SMV, which was formed to acquire these interests; (iii) Sava, a newly-formed nursing home operator, assumed the operations of the owned skilled nursing facilities under a triple net master lease between SMV subsidiaries and SSC Equity Holdings LLC ("SSC"), as master tenant; (iv) certain non-real estate assets were sold to other third-parties; and (v) the remaining real estate interests (mainly leasehold interests) were retained in NSC through its ownership of New Mariner, which survived the acquisition and operated these facilities.

108. The nursing homes that Mariner originally leased from third parties were operated by New Mariner post-acquisition. In addition, Sava eventually entered into a master lease with New Mariner as well.

109. Under the transaction structured by Grunstein, Forman, Levinson, Jenkens & Gilchrist and MetCap, SMV became the owner of real property formerly owned by Mariner. While the operation of the facilities was outsourced to Sava, a new entity formed by Grunstein

and Forman, neither Sava nor its principals contributed any capital to the deal. Accordingly, the intention behind Sava's creation was to operate and service the facilities and ensure the timely payment of the rent to SMV; it was not to create unlimited upside for operators who, in addition to receiving a large promotional interest, were handed the operations of the facilities for nothing.

110. This intention was reflected in the deal documents. For example, the triple net master lease between SMV and Sava was designed to ensure that rent always exceeded debt service relating to the real estate. Specifically, SMV's senior mortgage contained a floating interest rate rather than a fixed rate. As Grunstein and Forman well understood, such a financing could endanger Schron's investment in the event that interest rates rose. To eliminate this possibility, Grunstein and Forman advised Schron that they would structure the lease with Sava so that, in the event his financing costs rose, the lease between Sava and SMV would require the leasehold rent to increase in an amount equal to the increase in financing costs. Similarly, if the operations proved profitable over time, the deal documents granted a Schron Entity the option to acquire Sava at an effective price of $100 million.

111. On or about June 29, 2004, a Merger Agreement between Mariner, NSC's wholly-owned subsidiary, NCARE Acquisition Corp. ("NCARE"), and NSC was signed. Upon the eventual closing of the transaction in December of 2004, Mariner and NCARE merged and New Mariner became a wholly-owned subsidiary of NSC.

112. On December 9, 2004, NSC and SMV entered into a Master Purchase Agreement ("MPA"), which provided that SMV would buy the land and buildings of former Mariner-owned nursing home facilities. The MPA sale closed at the time of the Mariner-NCARE merger.

113. The value of the entire Mariner Transaction, including all fees, transactional costs and loans, was in excess of $1.35 billion. The acquisition was paid through capital contributions

made by all members of SMV except Mich II and Seeva II (Grunstein's and Forman's entities), financing provided and arranged by Column Financial (an affiliate of Credit Suisse First Boston) and loans extended by certain Schron Entities.

114. As noted, one of Mariner's assets was MMS, a feeding tube supply business. On or about December 10, 2004, MMS was sold to Omnicare, a large provider of pharmaceutical and other services to the elderly, through an entity, HSA Equipment LLC ("HSA"), which was affiliated with SMV. Grunstein, Levinson and their law firm negligently structured that sale, leading to the Mariner "kickback" malpractice discussed below. *See infra* ¶¶ 170-187.

**2. Grunstein, Levinson and Jenkens & Gilchrist <u>Acted as Lead Counsel for Schron and SMV</u>**

115. Grunstein, Levinson and Jenkens & Gilchrist acted as lead counsel for Schron and the Schron Entities, including SMV, in the Mariner Transaction.

116. Grunstein, Levinson and Jenkens & Gilchrist (along with Forman and MetCap) structured the transaction, performed most buyer-side legal services concerning the financing and the acquisition, and drafted all of the primary documents, including the Sava Master Lease, the SVCARE Loan Agreement, the SVCARE Option and the Mariner Option Agreement, as those terms are defined below.

117. Grunstein and Jenkens & Gilchrist took millions of dollars in legal fees for their purported services in connection with the Mariner acquisition by transferring to themselves monies from an escrow account established for the transaction. Jenkens & Gilchrist obtained its fees without providing any detailed back-up to Schron or the Schron Entities regarding the services they performed in the Mariner Transaction.

118. Despite drafting all of the primary transactional documents for the Mariner Transaction and charging Schron and Schron Entities, including SMV, for preparing such

documents, neither Levinson, Grunstein, nor anyone at Jenkens & Gilchrist or, later, Troutman Sanders, ever provided a copy of the closing binder for the Mariner Transaction to Schron or any of the Schron Entities.

119. Grunstein intentionally withheld a closing binder from Schron and the Schron Entities in order to facilitate the Grunstein Conspirators' control over Schron and the Schron Entities involved in the transaction, as well as the opportunity to take advantage of their clients' lack of information.

120. After the closing of the Mariner Transaction and until September 2009, Grunstein, Levinson, and their law firms (Jenkens & Gilchrist and later Troutman Sanders), continued to act as general counsel to Schron, SMV and other Schron Entities for matters related to Mariner, including all matters related to SMV.

### 3. <u>MetCap's Role in the Mariner Transaction</u>

121. As with the SWC Acquisition, MetCap and Forman served as Schron's and the Schron Entities' investment banker in the Mariner Transaction.

122. As part of its role in the transaction, MetCap was, *inter alia*, supposed to guide its clients through the intricacies of Mariner's healthcare business structures, assist in the financing of the transaction, negotiate business terms, conduct financial analyses, and oversee the investment in general. At all times, MetCap was obligated to further Schron's and the Schron Entities' best interests in the transaction.

123. Schron, through one of the Schron Entities, paid $14 million to MetCap for the investment banking services it supposedly performed in connection with the Mariner Transaction and as a brokerage commission. Grunstein, Forman and Levinson, as principals of MetCap and/or MetCap Holdings, benefited financially from these payments.

124. Schron and Schron Entities, including SMV, trusted and relied upon Grunstein, Levinson, Jenkens & Gilchrist, MetCap and Forman to structure the Mariner Transaction in a manner that would comply in all respects with existing laws, rules and regulations and best serve the interests of Schron and the Schron Entities. This included, without limitation, making decisions regarding the structure, composition, capitalization and function of various entities; drafting appropriate transaction documents fully to protect the Schron Entities' interests as a purchaser, borrower, landlord and lender; advising Schron and the Schron Entities on all issues related to financing, the acquisition landlord-tenant matters, and lending and credit-granting matters; advising Schron and the Schron Entities of any facts or issues that could create potential liability or affect their interests; and determining the various specialized legal counsel required to implement and effectuate all of the foregoing in a lawful manner.

125. From the very beginning of the Mariner Transaction, Grunstein, Forman, Levinson, Jenkens & Gilchrist and MetCap continuously took advantage of their fiduciary positions and the trust placed in them by Schron and the Schron Entities to benefit themselves financially, to the detriment of their clients.

4. **Grunstein Creates Additional Direct Conflicts of Interest**

126. From the outset of the Mariner Transaction, Grunstein exacerbated myriad conflicts of interest between himself and Schron and the Schron Entities by giving himself, his brother, Forman and other Grunstein-related parties ownership interests in numerous business entities that had interests adverse to the interests of Schron and the Schron Entities.

a. **Grunstein creates a conflict with NSC**

127. In the SWC Acquisition, Grunstein, Forman, Levinson and another Jenkens & Gilchrist partner took an 8% promotional equity interest in SWC as a "commission" without investing any of their own capital. In the Mariner Transaction, Grunstein and Forman, who were

obliged to protect, and negotiate solely on behalf of, Schron and the Schron Entities as their counsel and fiduciaries, instead demanded a 15% ownership stake in SMV. (They subsequently agreed to dilute their SMV interest to 13.5%, upon capital contributions in SMV by certain other investors.) As in the SWC Acquisition, none of Grunstein, Forman, Levinson or their colleague (or any entity controlled by any of these individuals) contributed any capital to SMV or towards the costs associated with acquiring Mariner; nor did they provide loans to the company or any personal guarantees as to any debt.

128. Grunstein created more serious and direct conflicts of interest by installing his brother, H. Grunstein, as the sole owner of NSC. This created a direct conflict between Grunstein, on the one hand, and Schron and the Schron Entities, including SMV, on the other hand, when Grunstein advised Schron and SMV on how to divide up Mariner real estate assets between SMV and NSC.

129. Although H. Grunstein, who lives in Israel, is nominally the sole owner of NSC and its subsidiaries, including New Mariner, Grunstein effectively controls these entities.

130. Neither Grunstein, H. Grunstein, nor any entity controlled by them contributed capital to NSC or New Mariner. Rather, as part of the purchase funding, one of the Schron Entities, Cam Funding II, loaned $25 million to New Mariner at the closing to pay transactional expenses. New Mariner never repaid this loan. Cam Funding II also made available to NSC and New Mariner credit facilities to fund capital contributions.

131. In conjunction with these loans and credit facilities, NSC and New Mariner entered into a Stock Option Purchase Agreement, dated December 10, 2004 (the "Mariner Option Agreement") with Cam Equity (a Schron Entity created for the purpose of holding this

and other options granted as part of the Mariner Transaction). The Mariner Option Agreement granted Cam Equity the option to purchase two-thirds of the shares of New Mariner.

132. Despite Grunstein's clear conflict of interest, Grunstein, Levinson and their colleagues drafted the various loan and credit facility documents and the Mariner Option Agreement and dictated the option price. Somehow, Grunstein purported to represent both sides in the option and loan transactions, representing Schron, Cam Funding II and Cam Equity, on the one hand, and NSC and New Mariner, on the other hand. Schron, Cam Funding II and Cam Equity relied completely upon Grunstein and Jenkens & Gilchrist as to all aspects of the option and loan transactions, for which Jenkens & Gilchrist charged the Schrons millions of dollars in legal fees.

**b. <u>Grunstein creates a conflict with Sava</u>**

133. Notwithstanding the large size of his promotional interest, this was not enough for Grunstein. Accordingly, at the closing of the Mariner Transaction, Grunstein also installed H. Grunstein as the owner of SVCARE, the parent company of Sava, which Grunstein had created to operate the Sava-owned nursing homes. From the start, however, Grunstein had every intention of owning SVCARE and Sava himself. Thus, in February 2005 (just two months after the Mariner Transaction closed), Canyon Sudar, an entity owned and controlled by Grunstein and Forman, purchased 100% of SVCARE from H. Grunstein for the nominal sum of $10.

134. At the time of the Mariner Transaction, Grunstein had recommended to Schron and SMV that his brother H. Grunstein own and operate New Mariner and Sava. Schron, SMV and the Schron Entities relied on their counsel, Grunstein and Jenkens & Gilchrist, in consenting to have H. Grunstein own SVCARE/Sava and NSC/New Mariner, two parties on the other side of the Mariner Transaction. In persuading Schron to accept this structure, Grunstein told his client that he would have an easily exercisable option to acquire SVCARE if Schron decided it

would be in his interests to do so. (As noted, this SVCARE option was designed to protect Schron and the Schron Entities in other ways as well.)

135. Grunstein, Forman and H. Grunstein's ownership of SVCARE and Sava created numerous direct adverse conflicts of interest between Grunstein, on the one hand, and Schron and Schron Entities, including SMV, on the other hand. Most obviously, the terms of the leases with Sava were zero-sum; a higher price on one end directly subtracted from the profits on the other end. As explained below, Grunstein repeatedly took advantage of this conflict for his personal gain.

136. Immediately following the closing of the Mariner Transaction on December 10, 2004, SMV leased the acquired Mariner nursing homes to Sava through a Master Lease with the SMV subsidiaries owning the nursing home buildings, as landlord, and SSC, which is wholly-owned by Sava, as tenant; dated December 7, 2004 (the "Sava Master Lease"). Sava and its subsidiaries thus were the tenants of buildings owned by SMV and operated those buildings as nursing homes.

137. Despite Grunstein's glaring conflict based on his and his brother's interests in Sava, Grunstein and Jenkens & Gilchrist drafted the Sava Master Lease and purported to represent Schron, SMV, SVCARE, SSC, Sava and Sava's subsidiaries in the lease transaction. Schron and Schron Entities, including SMV, relied completely upon Grunstein, Forman, Levinson, Jenkens & Gilchrist and MetCap as to all aspects of the lease. The lease transaction was closely tied to SMV's overall financing of the Mariner Transaction (through a loan from Column Financial) insofar as Sava, as the Tenant, had a duty to maintain the covenants in the Column Financial loan agreement or else SMV, as the Borrower/Landlord, would be in default.

In other words, a default by the tenant would be considered a default by the borrower/landlord under the loan agreement.

138. In addition, in conjunction with the Mariner Transaction, Cam Funding III arranged a $100 million loan for SVCARE to capitalize SVCARE and Sava (the "SVCARE Loan"). The SVCARE Loan, which was memorialized in a Term Loan and Credit Facility Agreement, dated December 10, 2004 (the "SVCARE Loan Agreement") and is reflected in closing documentation, allowed SVCARE to obtain financing from CapitalSource Finance LLC ("CapSource").

139. Not only did a Schron Entity finance SVCARE and enable it to obtain the CapSource financing, but Grunstein and Forman structured the deal so that Schron also effectively guaranteed SVCARE's debt to CapSource. Specifically, Grunstein and Jenkens & Gilchrist drafted a "put" option agreement that gave SVCARE the right to sell its equity to a Schron Entity for $100 million. In conjunction with the CapSource line of credit, SVCARE assigned this "put" to CapSource as collateral and security, which allowed CapSource to sell SVCARE's equity to a Schron Entity for the full amount of its loan to SVCARE.

140. As previously noted, Cam Equity, a Schron Entity, received an option to purchase SVCARE as part of the Mariner Transaction. A Unit Purchase Option Agreement, dated December 10, 2004, entered into between SVCARE, H. Grunstein and Cam Equity (the "SVCARE Option"), granted Cam Equity the option and right to acquire 9,999,900 membership units of SVCARE or such greater amount equal to 99.9999% of all such units. (The SVCARE Option is separate from, and independent of, the "put" option agreement described above.) The purchase price was $100 million, all or a portion of which, at Cam Equity's (or its designee's)

option, could be paid in cash or through the assumption by Cam Equity of debt of SVCARE or its subsidiaries and the release of such obligors.

141. Consistent with Schron's requirements and Grunstein's representations to Schron, the SVCARE Option (along with other option agreements entered into at the time of the closing of the Mariner Transaction) provided Schron with critical protection in return for his capitalization and financing of the Mariner Transaction. In other words, in return for capitalizing and financing the Mariner Transaction, Schron, through Cam Equity, would have the ability to easily acquire SVCARE if Schron thought doing so was in his best interests or in the best interests of the Schron Entities. There were numerous reasons why Schron might want to acquire SVCARE. For example, Schron, through Cam Equity, could designate another healthcare operator to own and take control of SVCARE. Likewise, Schron would have the ability to sell Sava to another operator or as part of a sale that included SMV's assets.

142. The SVCARE Option also furnished Schron and the Schron Entities with the potential to benefit from Sava's appreciation -- as reasonably would be expected insofar as Schron and his affiliates financed the transaction and took on all of the corresponding risk. Specifically, the SVCARE Option gave Schron, through Cam Equity, the opportunity to buy or designate a buyer for Sava at a price of $100 million in the event that Sava ultimately appreciated to a value in excess of $100 million.

143. Notably, Sava's records indicate that there have been large recent distributions to its equity holders, including Grunstein and Forman, of more than $74 million.

144. Grunstein had a clear conflict of interest in connection with the SVCARE Option because of (i) H. Grunstein's interest in SVCARE and Sava, and (ii) Grunstein's plan to purchase SVCARE and Sava from his brother after the Mariner Transaction closed. In addition,

Grunstein and Jenkens & Gilchrist had a conflict arising from the fact that they purported to represent all parties to the transaction.

145. Despite these glaring conflicts, Grunstein, Levinson and Jenkens & Gilchrist drafted all the documents related to the SVCARE Loan (including the SVCARE Loan Agreement) and the SVCARE Option, and purported to represent Schron, SMV, Cam Equity, Cam Funding, SVCARE, SSC, Sava and Sava's subsidiaries in the SVCARE Loan and the SVCARE Option transactions. Schron and the Schron Entities relied completely on Grunstein, Levinson, Forman, Jenkens & Gilchrist and MetCap as to all aspects of these transactions.

146. Grunstein and Forman's ownership interests in SVCARE and Sava also resulted in a clear conflict of interest for MetCap and Forman. MetCap and Forman assumed a duty to act as fiduciaries in providing investment banking and advisory services on behalf of Schron, SMV, and the Schron Entities, in return for which they were paid $14 million in fees and brokerage commissions. None of NSC, New Mariner or Sava paid any portion of the MetCap fees and commissions. Yet MetCap and Forman took advantage of their fiduciary role and the trust and reliance placed in them by Plaintiffs to promote the interests of Grunstein and Forman in derogation of the interests of Schron and the Schron Entities.

**D. <u>Grunstein's Improper Acquisition Of THI</u>**

147. At the conclusion of the Mariner Transaction, Grunstein, Forman and H. Grunstein, through their ownership interests in SMV, Sava and New Mariner, had succeeded in acquiring what proved to be hundreds of millions of dollars in healthcare assets, all without taking on any risk or providing any capital of their own. Next, Grunstein and Forman concocted a scheme to gain control of the former IHS nursing home operators too, using Fundamental for this purpose.

148. At some point in early 2005, after having moved to Troutman Sanders, Grunstein informed THI that it was in default on its leases with SWC's subsidiaries. Grunstein was the attorney and fiduciary for SWC in matters relating to the THI leases, and he approached THI with the apparent authority of SWC behind him; indeed, that was the only basis on which he could threaten THI. Yet rather than acting on behalf of his principals' interests, as he was obligated to do, Grunstein informed THI's owners that they should sell the company to Grunstein and Forman's company, Fundamental, or be defaulted. At no time prior to this was the situation or potential opportunity to acquire THI or otherwise exercise SWC's remedies discussed with SWC, Defendants' client.

149. Apparently intimidated by the threatened default, THI sold itself to Fundamental at a discount to its true value. The deal closed on or about February 28, 2006.

150. When Grunstein told Schron that Fundamental was taking over the operations from THI, he characteristically whitewashed his breach of duty. He assured Schron that the THI operations were not valuable and that Schron would not have wanted them anyway. He did agree, however, to give the Schrons an option to buy one-third of Fundamental for a nominal amount (the "Fundamental Option") so Schron would be able to benefit from this transaction if Schron ever elected to exercise the option.

151. Once again, Grunstein and Levinson purported to represent both sides in connection with the drafting and execution of the Fundamental Option in a situation in which his economic and legal interests were directly adverse to his clients.

152. Grunstein and Forman's acquisition of THI, and Grunstein's drafting of the Fundamental Option for his client, was a blatant breach of their (and Troutman Sanders's) ethical and fiduciary duties to Schron and the Schron Entities. To make matters worse, as described

below, Grunstein and Troutman Sanders actually billed a Schron Entity for work related to Fundamental's acquisition of THI.

153. Grunstein's assumption of an ownership interest in THI (the tenant in certain lease arrangements with SWC) created a direct adverse conflict of interest between Grunstein and Troutman Sanders, on the one hand, and Schron and Schron Entities, including SWC, on the other hand. This is the same type of conflict that was engendered by Grunstein's ownership interest in Sava.

154. Despite this clear and ongoing conflict, Grunstein and Troutman Sanders continued to act as general counsel to Schron, SWC and other Schron Entities for matters related to IHS, including all matters related to SWC and the Fundamental Option.

**E. <u>The 2006 SMV/SWC Refinancing</u>**

155. In 2006, SMV and SWC entered into a $1 billion refinancing transaction with Column Financial primarily related to the SMV-Sava portfolio.

156. Schron, SWC, SMV and the Schron Entities again relied on Grunstein and Troutman Sanders, along with Forman and MetCap, to represent them in connection with all aspects of the refinancing transaction.

157. For their work on the refinancing transaction, Troutman Sanders was paid approximately $3.7 million by Schron Entities, and MetCap was also paid millions of dollars by Schron Entities in advisory and brokerage commissions. However, Troutman Sanders never provided detailed back-up to Schron or the Schron Entities detailing the services they allegedly performed in the refinancing.

158. Grunstein, Levinson and Forman schemed to use the opportunity of the refinancing to alter to their own advantage certain agreements involving SVCARE, Sava and THI.

159. Indeed, in light of the refinancing, a number of agreements involving SWC and SMV needed to be adjusted, including the Sava Master Lease and the SVCARE Option. In reviewing and executing these complex agreements, Schron and the Schron Entities necessarily relied upon their longtime advisers. Grunstein and Forman took full advantage of this opportunity to modify other provisions of these agreements that the clients did not ask to be changed but that Grunstein, Forman and the Grunstein Conspirators wanted rewritten to advance their personal interests at the expense of their clients.

160. Notwithstanding the manifest conflict between Grunstein's interests and those of Schron as a result of Grunstein's ownership interests in SVCARE, Sava and THI, defendants Grunstein, Levinson and Troutman Sanders drafted all documents related to the 2006 SWC/SMV refinancing, including the amended Sava Master Lease, and purported to represent Schron, SWC, SMV, Cam Equity, Cam Funding III, THI, SVCARE, Sava and Sava's subsidiaries in the refinancing transaction and the related amended lease.

161. Neither with respect to the Sava Master Lease amendment nor the refinancing documentation did SMV and the Schron Entities have the benefit of independent counsel to review these major transactions solely from SMV and the Schron Entities' perspective.

162. Also included among the amended agreements drafted by Grunstein and Troutman Sanders was the Amended and Restated Term Loan and Credit Facility Agreement, dated June 9, 2006 (the "Amended SVCARE Loan Agreement"), which amended the SVCARE Loan Agreement in conjunction with the refinancing.

163. Similarly, Forman and MetCap purported to provide investment banking and advisory advice to Schron, SWC, SMV and other Schron Entities despite Grunstein's, Levinson's and Forman's clear conflicts of interest. In addition, at the closing of the Mariner

Transaction, Grunstein and Forman controlled all the movement of funds and the application of financing proceeds.

164. In conjunction with the 2006 refinancing, on or about June 9, 2006, SVCARE, Canyon Sudar and Cam Equity entered into the Amended and Restated Unit Purchase Option Agreement ("Amended SVCARE Option"). The Amended SVCARE Option reaffirmed Cam Equity's right to acquire 9,999,900 membership units of SVCARE for $100,000,000, "all or a portion of which may be paid through assumption by [Cam Equity] of debt of [SVCARE or SVCARE subsidiaries] and the release of such obligor(s)."

165. However, while amending the SVCARE Option, Grunstein, Levinson and Troutman Sanders altered without need and without authority certain terms in the original SVCARE Option in ways that harmed their client, Cam Equity, but benefited the Grunstein Conspirators. For example, Grunstein, Levinson and Troutman Sanders reduced Cam Equity's resale gain, should SVCARE be acquired by a third party, to $400 million from the $500 million set forth in the original SVCARE Option.

166. Grunstein and Troutman Sanders also used the 2006 SMV/SWC refinancing as a means to misappropriate for themselves and for MetCap additional monies belonging to Schron and the Schron Entities.

167. Grunstein and Troutman Sanders transferred an additional $4 million to MetCap from an escrow account that was established for the refinancing and was funded by CAMFIVE, even though the Schrons had already paid MetCap an agreed upon $10 million brokerage commission and advisory fee for MetCap's purported services in connection with the Mariner Transaction. Grunstein and Forman deceptively arranged this additional payment at their clients' expense.

168. In 2005, Grunstein and Forman had told Schron that this additional payment to MetCap (as well as other payments) would be made from loan proceeds to be received in 2006 from Formation. Formation had purchased certain Mariner properties in Florida in return, *inter alia*, for a note to Mariner for more than $13 million. Formation made its final payment on the note (more than $10 million) in January 2006. However, rather than use the Formation note proceeds to make the $4 million MetCap payment and other payments, as they had promised Schron they would do, the Grunstein Conspirators kept the $10 million in proceeds from Formation and grabbed still more money for MetCap out of the refinancing escrow account. No accounting was ever provided to Schron or the Schron Entities of the application of the Formation note proceeds, which the Grunstein Conspirators simply kept for themselves.

169. In addition, only recently, after inexplicably holding for more than four years the portion of CAMFIVE's money still remaining in the escrow account set up for the Mariner Transaction, Troutman Sanders finally returned to Schron, at his request, the more than $400,000 still remaining in the account.

**F. Grunstein's Malpractice In Connection With The MMS Transaction**

170. As described above, at the time of the Mariner Transaction, Mariner owned a feeding tube supply business called MMS. On December 10, 2004, MMS was sold to Omnicare, a large provider of pharmaceutical and other services to the elderly, through HSA, an entity affiliated with SMV that Grunstein and Jenkens & Gilchrist advised should be created for this purpose.

171. Schron and Schron Entities, including SMV, relied entirely upon Grunstein, Forman, Levinson, Jenkens & Gilchrist and MetCap for all aspects of the MMS transaction.

172. Grunstein, Forman, Levinson, Jenkens & Gilchrist, and MetCap negligently structured and implemented the MMS transaction, leading in 2006 to a government investigation

and a civil complaint alleging that the sale of the MMS business was a "kickback" for purposes of the Medicare Anti-Kickback Statute.

1. **Background to the MMS Transaction**

173. As of early 2004, Omnicare provided pharmacy services to all of the nursing homes operated by Mariner pursuant to a pharmacy contract.

174. In late November 2004, at the direction of Grunstein and Forman, Mariner's General Counsel informed Omnicare's CEO of the pending Mariner acquisition and stated that the new owners (Sava and New Mariner) intended to terminate the existing pharmacy contracts with Omnicare.

175. After receiving the foregoing letter, Omnicare's CEO met with Grunstein and Forman on or about December 2, 2004, to discuss the proposed termination of the existing pharmacy contracts. Schron was not present at this meeting or at any other meeting with Omnicare representatives. At the meeting, Omnicare agreed to enter into 15-year pharmacy contracts with Sava and New Mariner that would cover all of the nursing homes and provide Sava and New Mariner most favorable pricing and credit terms on pharmaceutical products.

2. **The Sale of MMS to Omnicare**

176. At the December 2, 2004 meeting, Grunstein and Forman discussed with Omnicare's CEO other Mariner assets, including MMS, that would be sold as part of the transaction. Omnicare's CEO expressed interest in purchasing MMS and placed a call to his outside healthcare regulatory counsel. Two days later, Omnicare's corporate counsel conveyed Omnicare's offer to purchase MMS for $50 million, $40 million of which would be paid at the closing and $10 million of which would be paid six months thereafter. The parties subsequently agreed that the $40 million initial payment would be made at the signing of the Asset Purchase Agreement, instead of at the closing.

177. On December 5, 2004, Grunstein and Forman met with Omnicare's CEO and Omnicare's counsel (both corporate counsel and regulatory counsel) to discuss the MMS transaction. Schron was not present at this meeting. At the meeting, the parties agreed in principle to the MMS acquisition.

### 3. **Grunstein, Forman, and Levinson Fail <u>Adequately to Protect the Interests of Schron and SMV</u>**

178. After the December 5, 2004 meeting, counsel for the various entities, including Jenkens & Gilchrist attorneys working under Grunstein's and Levinson's supervision, began drafting the documents necessary to execute the sale of MMS, the pharmacy agreements between Omnicare and the new nursing home operators, and other documents related to the Mariner Transaction.

179. E-mails containing drafts of the documents and addressing open issues were sent among the various outside counsel, some of which copied Omnicare's CEO. None of these e-mails was sent to Schron.

180. Grunstein, Levinson, and other Jenkens & Gilchrist attorneys sent e-mails among each other addressing issues and concerns relating to these transactions. Although Grunstein informed Forman of some of these issues, Schron was not copied on any of these e-mails and Grunstein and his colleagues did not advise Schron of any legal risks.

181. E-mails from a Jenkens & Gilchrist corporate partner who was not a healthcare regulatory lawyer, sent prior to the closing of the MMS transaction and copied to Grunstein, Levinson and others at the firm, questioned whether there could be liability under federal healthcare laws for "tying" the MMS sale with the new pharmacy services agreement. For example, on December 8, 2004, this corporate partner wrote to Forman:

> "[Is] the issue just that, if noticed and investigated by the regulators, we'll have to defend against the possible allegation that

> the [MMS] sale and Pharmacy deals are tied together and part of the consideration for each other? I understand that the back-to-back signing of [agreements], regardless of the delay between closings, creates a calculated risk, in the event that OIG investigates the transaction...He [a Jenkens & Gilchrist associate] thinks that three or four months delay between the closings...would be better, but a closing at the end of February (subject to checking with Tom Fox again) but might be OK -- not safe, but assuming that no one at OIG is really watching closely."

182. Schron was never informed of the concerns expressed in the above e-mail by Grunstein, Forman, Levinson, or any Jenkens & Gilchrist attorney or MetCap employee. Schron was never advised at any time prior to the MMS closing that he or SMV could face potential liability if Omnicare's simultaneous entry into the 15-year pharmacy contracts and Omnicare's purchase of MMS were viewed by the U.S. Government to be "tied" together.

183. Grunstein, Forman, Levinson, Jenkens & Gilchrist and MetCap never retained an experienced independent legal expert in healthcare regulatory matters in order to give needed and unconflicted advice to Schron or SMV regarding the healthcare regulatory issues that related to Omnicare's execution of long-term pharmacy contracts contemporaneous with its purchase of MMS.

184. On November 2, 2009, the U.S. Government unsealed a civil complaint against Omnicare, Schron, Grunstein, Forman, New Mariner, and Sava (the "Government Complaint"). The Government Complaint alleged generally that Omnicare's payment of $50 million for the MMS business was a "kickback" for purposes of the Medicare Anti-Kickback Statute, in that Omnicare made the payment in exchange for receipt of the 15-year contract for pharmacy services, and that the defendants thereby violated the False Claims Act.

185. The parties settled the Government's civil action in February 2010. Schron and SMV paid substantial amounts in legal fees to defend the Government's investigation. SMV, as indemnitor, also paid substantial amounts of money in connection with the settlement.

186. But for the negligence of Grunstein, Forman, Levinson and MetCap, Schron and SMV would not have had to expend these substantial amounts of money.

187. Grunstein also participated in the settlement of the government's civil complaint by causing New Mariner to pay millions of dollars on his behalf. Nonetheless, Grunstein, in a press release issued through a Sava subsidiary, misleadingly stated that he had paid nothing to settle the action when, in truth, he paid the settlement through an entity he controlled. Troutman Sanders, also knowing the truth, supported Grunstein's misleading statement in its own public statement.

## G. Grunstein And Troutman Sanders Provide Conflicted Advice On The Sava Master Lease

### 1. The Bogus Lease Advice

188. A flagrant example of Grunstein's arrogant and systematic abuse of his ethical obligations and position of trust is the purported legal advice he, Levinson and Troutman Sanders provided to Schron and SMV in January 2008 concerning the Sava Master Lease.

189. The Sava Master Lease, as amended, controlled the leasing relationship between SMV, as the owner of real estate interests, and Sava and its subsidiaries, which leased the properties and operated the nursing homes. As discussed above, Grunstein, Levinson, and their partners at Jenkens & Gilchrist drafted the Sava Master Lease and Grunstein, Levinson and Troutman Sanders drafted its amendments, and Grunstein, Levinson and their law partners purported to represent Schron, SMV, SVCARE, Sava and Sava's subsidiaries in all matters related to the lease, despite clear conflicts of interest between Grunstein, Levinson, and their partners, on the one hand, and Schron and SMV, on the other hand.

190. SMV's acquisition of the Mariner real estate interests was financed in large part by a substantial loan with a floating interest rate. Schron required that the lease with Sava ensure

that SMV derive lease income from the properties acquired in the Mariner Transaction in an amount that would exceed the debt service obligations relating to the purchase of that property.

191. Grunstein and Levinson purported to have fulfilled Schron's requirements. At the time the Sava Master Lease was executed, Grunstein advised Schron that, under the terms of the Sava Master Lease, should SMV's financing costs increase under its floating rate loans, the rents paid to SMV by the Sava entities would increase by the same measure.

192. Grunstein's advice to Schron appeared to be set forth in the language of the Sava Master Lease. Article A, Section 3(d) of the Sava Master Lease states, "The 'Escalation Percentage' during the initial Term and each Renewal Term (as defined below) shall be one hundred and four percent (104%) per annum. In addition, if there is a refinancing or other event which increases the interest rates imposed by the Mortgagee (as defined herein), then there shall be a dollar increase in the Base Rent to reflect the necessary interest cost coverage of the Mortgagee and provide for a debt service coverage ratio of at least 1.1 to 1.0, all as directed by the Mortgagee." Article A, Section 3(d) of the Sava Master Lease is referred to hereinafter as the "Rent Escalation Provision."

193. Schron and SMV, relying on the advice of their longtime attorneys and advisors Grunstein, Forman, Levinson, Jenkens & Gilchrist, Troutman Sanders and MetCap (which advice was consistent with the terms of the Sava Master Lease), reasonably believed that if SMV's financing costs were to rise due to rising interest rates, rents would correspondingly rise as well.

194. In or about late 2007 or early 2008, Schron became concerned with rising interest rates and the corresponding increase in SMV's financing costs. Schron expressed this concern to Grunstein and Forman, and informed them in advance about the prospective need to increase

Sava's rent if interest rates escalated. Schron and the Schron Entities had paid or provided, through financing, the capital necessary to complete the SMV property acquisition as part of the Mariner Transaction, and Schron was concerned not only about the relative profitability of the transaction but also about protecting his capital investment in an uncertain interest-rate environment.

195. Although Grunstein, Levinson and Troutman Sanders were the lawyers for Schron and for SMV (the landlord and borrower), Grunstein was also an owner of Sava (the tenant), which would be required to pay the rent increase under the terms of the Master Lease. Following his discussion with Schron about Sava's obligation to pay increased rent to offset higher debt service, Grunstein authored a memorandum to Schron, dated January 30, 2008. The memorandum was written on Troutman Sanders letterhead, marked "Privileged and Confidential," and provided Grunstein and Troutman Sanders's purported "advice" as Schron and SMV's attorneys concerning the Rent Escalation Provision.

196. Grunstein's legal "advice" was nothing of the sort. Rather, it was a self-serving and mendacious document designed to dissuade Schron, as manager of SMV, from exercising a vested legal right. With increased financing costs becoming increasingly more likely, and facing a hit to his own bottom-line, Grunstein abandoned his previous advice to Schron concerning the Sava Master Lease and selfishly and wrongfully advised Schron that the Rent Escalation Provision did ***not*** give him the right to increase rents from Grunstein's Sava entities.

197. Grunstein's memorandum attached another memorandum drafted by his partner, Levinson, also dated January 30, 2008, as supposed support for his "interpretation" of the Rent Escalation Provision. Levinson's memorandum was also on Troutman Sanders letterhead and

marked "Privileged and Confidential," and provided his and Troutman Sanders's purported "advice" concerning the Rent Escalation Provision as Schron and SMV's attorneys.

198. Both the Grunstein and the Levinson memoranda purported to explain away the language of the Rent Escalation Provision and the legal advice Grunstein had previously given Schron and SMV that the Sava Master Lease did, in fact, ensure increased rent to offset a rise in debt costs.

199. Nowhere in either memorandum does Grunstein or Levinson make any attempt to advise Schron as to potential arguments undermining their conflicted interpretation of the Rent Escalation Provision. Indeed, neither memorandum makes any attempt to further the interests of Schron and SMV at all, despite Levinson's assertion in his memorandum that the language that he had drafted purportedly to protect Schron and the Schron Entities was ambiguous.

200. Moreover, neither Grunstein nor Levinson suggest anywhere in their respective memoranda that Schron seek advice on the Rent Escalation Provision from independent third-party counsel. To the contrary, the memoranda are designed to discourage Schron from making any further inquiry.

201. Grunstein's memorandum reads as if it were a correspondence from an adverse party, which in fact it was. For example, after "interpreting" the terms of the Sava Master Lease, Grunstein went so far as to threaten Schron ***(his own client)*** with legal action if Schron did not accept Grunstein's conflicted and bogus legal advice, stating: "At a time when we need [senior management] more than ever, whether to sell the portfolio or stay the course, do you want to destroy any relationship of trust by making a claim that everyone knows is an overreach. ***Ruby, please also remember, if there is any claim present it is more likely one by Sava against SMV***

***and you***. You are liable to provoke the very opposite of what you seek. I urge you therefore to reconsider taking this kind of an approach under the circumstances." (emphasis added).

202. Grunstein's and Levinson's so-called legal advice financially benefited Grunstein and Forman to the detriment of Schron and SMV, and was clearly contrary to Grunstein's prior advice and to Troutman Sanders's clients' interests. Moreover, Troutman Sanders shamelessly charged Schron and the Schron Entities for this conflicted, misleading advice.

203. Grunstein's and Levinson's representations regarding the Rent Escalation Provision in their January 30, 2008 memoranda were false, and Grunstein and Levinson knew their representations were false when they made them.

204. By making these misrepresentations, Grunstein and Levinson intended for Schron, as Manager of SMV, to rely on their supposed legal advice, as expressed in the memoranda, and to refrain from attempting to enforce the Rent Escalation Provision if interest rates were to rise.

205. In fact, as a longtime client and a non-lawyer who trusted Grunstein's legal advice, Schron justifiably relied on Grunstein's and Levinson's representations regarding the meaning of the Rent Escalation Provision, and, as Manager of SMV, did not seek to enforce the Rent Escalation Provision when interest rates rose.

**2. <u>The Citibank Swap</u>**

206. In reliance on Grunstein's and Levinson's false and conflicted legal advice, and with the approval of Grunstein and Forman, Schron sought to protect SMV from the prospect of rising interest rates by entering into an interest-rate swap transaction with Citibank (the "Citibank Swap"). Had Grunstein and Levinson not misrepresented the Rent Escalation Provision, Schron would not have entered into the Citibank Swap, which proved to be financially disastrous for Schron and the Schron Entities.

207. SMV was responsible for paying the mortgage on the properties acquired in the Mariner Transaction. SMV sought to purchase the Citibank Swap, but Citibank concluded that SMV had insufficient credit to do so. Schron thus was required to become a principal in the transaction and so assumed the obligation on behalf of SMV (and SWC, which was a co-borrower under the underlying financing).

208. Grunstein knew that Schron had sought to have SMV be the counterparty to the Citibank Swap based on, *inter alia*, a conference call in which Grunstein, acting in his capacity as attorney for Schron and the Schron Entities, participated with Citibank representatives and others. As the advisers to Schron and the Schron Entities, Grunstein and Forman approved Schron entering into the Citibank Swap on SMV/SWC's behalf.

209. In or about September of 2008, Schron, on behalf of SMV/SWC, entered into an interest-rate swap with Citibank in the notional amount of $1 billion with a Fixed Rate of 3.68%. The basic collateral required for the transaction was $10 million. The premise of the swap was that, assuming Sava did not default on its payment obligations under the Sava Master Lease, the rental payments would be sufficient to pay on the swap if interest rates moved against Schron and SMV/SWC. However, collateral was required to assure the swap counterparty that it would be paid should Sava default on its rent payments.

210. The Citibank Swap protected SMV/SWC from rising interest rates but created a risk to Schron on behalf of SMV/SWC if interest rates fell. SMV/SWC and Schron would not have assumed this risk if Grunstein, Troutman Sanders and Forman had properly and faithfully advised their clients about the terms of the Sava Master Lease. In addition, had Defendants properly and completely advised Schron and SMV/SWC, they would have advised Schron and SMV/SWC also to hedge the risk of a decrease in rates.

211. Grunstein, Forman and Troutman Sanders represented Schron and SMV/SWC in entering into the Citibank Swap and provided substantial advice and assistance related to Schron's purchase of the Citibank Swap on behalf of SMV/SWC. Grunstein, Forman and Troutman Sanders reviewed, revised and approved all relevant documentation in the Citibank Swap transaction.

212. At first, the Citibank Swap was profitable. Interest rates rose, and Schron received and deposited over $800,000 into SMV's bank account. The returns were then distributed to SMV's owners, including Grunstein, Levinson and Forman.

213. However, the Citibank Swap soon became a financial disaster as interest rates dropped. When that happened, Citibank issued margin calls and Schron was forced, on behalf of SMV/SWC, to provide Citibank with approximately $50-$60 million of his own funds as collateral.

214. Grunstein and Forman knew that Schron could appropriately recoup from SMV his expenditures from the Citibank Swap, because they knew that Schron had entered into the swap on SMV/SWC's behalf. Indeed, Schron had previously distributed the positive proceeds of the swap to SMV and its owners, including Grunstein, Forman, and Levinson. Accordingly, Schron recouped his expenditure from SMV, as directed by Grunstein and Forman.

215. On or about November 24, 2008, Grunstein and Forman themselves sent Citibank checks in the amount of $5 million in response to Citibank's margin call. However, the bank rejected their deposits because they were sent "under protest."

216. For Troutman Sanders's work on the Citibank Swap and for related work performed prior to the time that the Citibank Swap was consummated, Grunstein and Troutman

Sanders billed SMV -- not Schron individually -- for hundreds of thousands of dollars in legal fees.

217. By providing self-interested and dishonest "legal" advice as to the Rent Escalation Provision of the Sava Master Lease, failing to advise their clients to seek independent legal review, and then compounding Schron's and SMV/SWC's injury by providing incompetent legal and advisory services as to the subsequent Citibank Swap, Grunstein, Levinson, Forman and Troutman Sanders caused Schron and SMV/SWC to lose more than $50 million because of the Citibank Swap. Grunstein, Levinson and Troutman Sanders's self-interested and false "legal" advice also has caused SMV to lose the additional rent that it was entitled to receive from Sava and its subsidiaries when interest rates were higher.

218. Not content simply to have deceived his client and caused him to suffer a massive financial loss, Grunstein has recently exacerbated Schron's injury by falsely representing to SMV's principals and others that Schron ***stole*** money from SMV in order to reimburse himself for the Citibank Swap losses. These statements are intentionally false and defamatory, especially since (i) Grunstein and Forman were Schron's and SMV/SWC's legal and financial advisers in connection with the Citibank Swap, (ii) Grunstein and Forman knew of, approved and facilitated the Citibank Swap, and (iii) Grunstein and Forman received distributions from SMV reflecting the initial gains from the transaction.

219. Moreover, Grunstein's accusations are inconsistent with financial reports created by SMV's and SWC's Chief Financial Officer, Grunstein's daughter-in-law, which reflect the Citibank Swap as an SMV/SWC obligation. Grunstein's daughter-in-law provided Grunstein and Forman with regular financial reports for all SMV and SWC matters. Regular meetings

were held in which she presented this information to them. No major financial decision for SMV or SWC was ever made without the participation and concurrence of Grunstein and Forman.

220. Grunstein and Forman since have brought a spurious lawsuit (described in more detail below) against Schron making the same intentionally false representations and again omitting both Grunstein's and Forman's knowledge and approval of, and participation in, the Citibank Swap and subsequent SMV reimbursements.

**H. <u>Grunstein's Fraudulent Revised Opinion Of The Amended SVCARE Option</u>**

221. In 2008, Schron began to consider exercising the Amended SVCARE Option. By this point, Schron started to understand that the economics of the deal structured by Grunstein and Forman failed to reflect his express intent. Given the below market rent papered by Grunstein, coupled with his position that additional debt service could not be passed on to the tenant, it became apparent that Schron could not realize the upside of the transaction solely as the landlord under the Master Lease, as interpreted by Grunstein. Schron also had begun to grow concerned about Grunstein, including how he was treating Schron and his family. Accordingly, Schron informed Grunstein that Cam Equity was considering exercising the Amended SVCARE Option, which would effectively remove Grunstein and Forman from the nursing home operations.

222. After launching a verbal tirade against Schron, Grunstein characteristically resorted to dispensing bogus and conflicted legal advice in an effort to intimidate Schron to forego his legal rights. Grunstein informed Schron that the Amended SVCARE Option (which he and Troutman Sanders had drafted and had opined gave Schron the protection that he requested) was now worthless and not effective. Among other things, Grunstein claimed that the Amended SVCARE Option, which by its terms provided Cam Equity an option to purchase SVCARE, was merely a financing device that could not be exercised by Cam Equity.

223. This assertion flies in the face of certificates and opinions Grunstein, Forman and Troutman Sanders issued in 2005 and 2006 (including as part of the 2006 SMV/SWC refinancing) to lenders disclosing, acknowledging and attesting to the existence and validity of the SVCARE Option.

224. In a subsequent conversation with Schron about the Amended SVCARE Option, Grunstein misrepresented to his client, Schron, that the Amended SVCARE Option (which he and his law firm, Troutman Sanders, drafted) is "nothing anyway. . . . That's the God honest truth too . . . The God honest truth is that it is not enforceable. . . . The answer is that it is not a real option. It is an enforcement device under the loan. . . ."

225. In still another conversation on this topic, Grunstein again verbally abused Schron and other stake holders in SMV; Grunstein told them that they could use the Amended SVCARE Option "as toilet paper." Grunstein thus sought to intimidate and mislead his longtime client for Defendants' improper advantage.

226. At no point in this or in any other conversation, did Grunstein offer Schron advice as to how the option could be exercised. Rather, Grunstein, acting contrary to the plain language of the option and contrary to his ethical obligations and the interests of his client, pretended that the option he drafted on his client's behalf is somehow unenforceable.

227. In a blatant breach of his fiduciary duties, Grunstein offered this legal "advice" to his clients in order to dissuade Schron and Cam Equity from exercising the Amended SVCARE Option to Grunstein's detriment.

228. The enforceability of the Amended SVCARE Option is plain on its face. But even if Grunstein had any argument that the option was legally ineffective, it would mean that Grunstein, Levinson and Troutman Sanders negligently failed to exercise the ordinary skill and

knowledge commonly possessed by members of the legal profession when they drafted the Amended SVCARE Option on behalf of their clients, Schron and Cam Equity.

229. Perhaps realizing that his position regarding the Amended SVCARE Option is not sustainable (and, at best, would prove that he committed malpractice), Grunstein now has offered a new explanation for his view that Cam Equity cannot exercise the option: As alleged in the lawsuit he recently filed against Schron, Grunstein now asserts that the Amended SVCARE Option is unenforceable because Cam Funding III supposedly never funded the SVCARE Loan.

230. Grunstein's assertion that Cam Funding III never advanced the $100 million promised under the SVCARE Loan, and an additional $20 million advanced at the time of the 2006 refinancing, is contradicted by the company's financial documents prepared by Grunstein's own daughter-in-law, the Mariner Transaction financial closing statement prepared by SMV accountants, Sava financial statements and tax returns, as well as many other documents (a number of which were drafted by Grunstein, Levinson, Jenkens & Gilchrist and Troutman Sanders) that acknowledge or establish the funding and continued existence of the SVCARE Loan. In particular, Grunstein, Forman and Troutman Sanders prepared and presented certificates and opinions to lenders in 2005 and 2006 (as part of the SMV/SWC refinancing) stating that the loan was funded, valid and outstanding.

231. For example, on August 1, 2005, Grunstein wrote a letter to Credit Suisse First Boston stating, among other things, that "[Sava] was established through $100 million of funding provided by another affiliate of Rubin Schron." In addition, on September 27, 2005, Grunstein wrote to two groups of lenders and provided his legal opinion that "SVCARE obtained a $100M term loan from CAM III to fund SVCARE's equity contribution of like amount to [Sava] at the Closing . . ." Moreover, the Amended SVCARE Loan Agreement clearly acknowledges the

existence of the Cam Funding III loan. The amended loan agreement refers to "the Existing Loan Agreement . . . pursuant to which the Lender made a $100,000,0000 term loan . . . which is ***still outstanding***" (emphasis added) and states that the parties undertake to amend the terms of that loan for various purposes.

232. Moreover, in addition to conflicting with his prior representations, Grunstein's position is a legal non sequitur, providing no justification for his advice to Schron or for his current position. Whether Cam Funding III met its obligations under the SVCARE Loan (and it undeniably did) has no bearing on whether Cam Equity, a separate Schron Entity, acquired an effective right under the Amended SVCARE Option. The SVCARE Option and the SVCARE Loan are not interdependent, and the terms of the Amended SVCARE Option are in no way contingent upon Cam Funding's advancing the funds obligated under the SVCARE Loan. Rather, under the Amended SVCARE Option, Cam Equity can offset all or part of the option payment with any outstanding indebtedness.

233. Grunstein's fraudulent and self-serving attempts to dissuade Schron and Cam Equity from exercising their rights under the Amended SVCARE Option amount to a gross breach of his obligations as an attorney and as a fiduciary. The newfound position contained in his spurious lawsuit against the Schrons similarly lacks a good faith basis.

**I. <u>Grunstein's Sleight of Hand To Avoid Repayment Of The SVCARE Loan</u>**

234. The substantial monies that Schron and Schron Entities lent to SVCARE were not intended to be a gift. Nor were they intended to remain a line item on SVCARE's balance sheet until the end of time. Rather, they were advanced to provide SVCARE -- a company in which Schron and the Schron Entities owned no equity -- interim seed capital to initiate operations. Thus, under the terms of the Amended SVCARE Loan Agreement, SVCARE was obligated to

repay the SVCARE Loan to Cam Funding III by the later of (i) December 31, 2008, or (ii) when its $100 million line of credit with CapSource is paid down.

235. When the 2006 SMV/SWC refinancing closed, Cam Funding III loaned an additional $20 million to SVCARE pursuant to the terms of the Amended SVCARE Loan Agreement drafted by Grunstein and the lawyers at Troutman Sanders.

236. By late 2008, SVCARE owed to Cam Funding III (i) the full amount of the original $100 million loan, (ii) the full amount of the subsequent $20 million credit facility loan, and (iii) approximately $28 million in interest.

237. Also, by late 2008, SVCARE had paid down the $100 million CapSource line of credit to less than $3 million. Under the Amended SVCARE Loan Agreement, it was then time for Grunstein and Forman to start paying back Cam Funding III. However, in typical disregard for his clients' documented interests and his own blatant conflicts of interest, Grunstein purported to devise yet another trick to enrich himself and Forman. Seizing upon the temporary dispensation in the loan agreement for repayment while the CapSource loan was outstanding, Grunstein asserted that, if he never fully pays back the CapSource loan, then SVCARE could keep Schron's money forever. Thus, rather than finish paying down the small amount remaining on the CapSource line of credit, SVCARE negotiated an extension of the line of credit and borrowed more money from CapSource, purporting thereby to defer indefinitely SVCARE's growing obligations to Schron and the Schron Entities.

238. On or about June 6, 2009, Cam Funding III assigned the SVCARE Loan receivable to CAMFIVE, another Schron Entity.

239. Grunstein has informed Schron that SVCARE need not repay the SVCARE Loan because it has not yet paid down the CapSource line of credit, which has been increased and

extended in order to avoid the SVCARE Loan obligation. Grunstein and SVCARE's argument conflicts with the language and intent of the Amended SVCARE Loan Agreement, which Grunstein, Levinson and Troutman Sanders drafted. The Amended SVCARE Loan Agreement does not permit SVCARE to extend the CapSource line of credit indefinitely in order to avoid the repayment of the SVCARE Loan. Grunstein and Troutman Sanders drafted the Amended SVCARE Loan Agreement in a manner intended to deceive Schron into believing that the loan would be paid at maturity. Schron was unaware that Grunstein and Forman would continuously revise and increase the CapSource line of credit to attempt to avoid the SVCARE Loan maturity date.

240. To this day, SVCARE has not repaid any portion of the SVCARE Loan despite distributions by Sava to its equity holders of more than $74 million in the last twelve months alone. Moreover, Sava shows on its audited financial statements a receivable from New Mariner, an entity owned by H. Grunstein, of $134 million, which remains unpaid even as Grunstein and Forman distribute to themselves massive amounts of Sava's cash flow and refuse to repay the SVCARE Loan.

241. Grunstein's sleight of hand is plainly not what the documents intended nor what his clients expected when they extended these funds to their lawyer to fund his operating business. The extension of the CapSource line of credit was an artificial end-run around the maturity of the SVCARE Loan and represents yet another signature breach of Defendants' duties to Plaintiffs.

242. Finally, even if Grunstein and SVCARE's interpretation of the Amended SVCARE Loan Agreement were somehow correct, then Grunstein and Troutman Sanders negligently or fraudulently failed to exercise the ordinary skill and knowledge commonly

possessed by members of the legal profession when they drafted, on behalf of their client, Cam Funding III, a loan agreement that grants SVCARE, a company owned and controlled by Grunstein and Forman, the ability to avoid, in perpetuity, repaying the SVCARE Loan.

243. SVCARE's failure to repay the SVCARE Loan is a breach of the Amended SVCARE Loan Agreement and a breach of the duty of good faith and fair dealing, which has caused CAMFIVE at least $148 million in damages. In the alternative, if SVCARE is not obliged to repay the loan, the failure of that contractual provision is a result of Grunstein's, Levinson's and Troutman Sanders's malpractice and conflicts, and Defendants are liable for the same.

**J. <u>Grunstein/Troutman Sanders's Improper Bills And Unprofessional Conduct</u>**

244. Grunstein and Troutman Sanders also took advantage of their fiduciary position as counsel for Schron and the Schron Entities to deceive their clients into paying for legal services that were never performed, were not authorized, or were performed for the benefit of Grunstein-controlled entities.

**1. <u>Invoices for Services Performed for Grunstein-Controlled Entities</u>**

245. Numerous Troutman Sanders invoices billed various Schron Entities for services actually performed for entities that Grunstein directly or indirectly owns and/or controls. Because of the trust they reposed in their longstanding counsel, the Schron Entities paid many of these bills as they were submitted. On other occasions, Troutman Sanders helped itself to the money through the 2006 refinancing escrow account Grunstein had set up. Paying itself out of the escrow funds enabled Grunstein, Levinson and Troutman Sanders to avoid scrutiny for some of their fraudulent billing practices. As Plaintiffs came to appreciate their counsel's self-dealing, they have recently reviewed these bills in detail and were shocked to learn what Troutman Sanders had invoiced to Schron Entities over the past several years. Below are just a few

illustrative examples of Troutman Sanders's fraudulent billings concocted by Grunstein, Levinson and the firm.

246. Troutman Sanders invoiced SMV Special Holdings for more than 160 hours of work performed in July and August 2005, related to the acquisition of THI by Grunstein's Canyon Sudar. This billing was particularly egregious given that Canyon Sudar's purchase of THI was the result of Grunstein's expropriation of his clients' rights. Subsequently, in January of 2008, Troutman Sanders belatedly and unjustifiably billed Cam Int'l for work purportedly performed during January 2006, much of which was work performed for Canyon Sudar.

247. In early 2006, Troutman Sanders billed Cam Funding III more than $100,000 for matters entitled "SavaSeniorCare Tax and Other Advice," "C. Christian Winkle v. SavaSeniorCare LLC," and "Routine Sava Prof. & Gen Liab Advice." In other words, Troutman Sanders purposefully invoiced its clients (Schron and the Schron Entities) for operating company work performed solely in order to benefit Grunstein, the Grunstein Conspirators and entities they controlled, including Sava. That work included transfers of leases between New Mariner and Sava, work on litigation filed against Sava, and administrative and operational tasks for Sava -- an entity owned and controlled by Grunstein and Forman.

248. In November 2009 (after being fired by Schron), Troutman Sanders sent several of the Plaintiffs a host of allegedly outstanding bills for approximately $1.8 million of services purportedly performed between <u>2007</u> and 2009. Many of the services identified in these bogus invoices were services performed for Sava. For example, numerous entries concern the potential sale of Sava, and a number of others identify services that could only have benefited Grunstein-controlled entities. Troutman Sanders has used these purportedly outstanding fees as an excuse for strategically withholding from Plaintiffs documents concerning the conduct described in this

Complaint -- documents which rightfully belong to Plaintiffs and for which Plaintiffs have paid millions of dollars in attorney fees.

2. **Invoices for Unauthorized Services**

249. Grunstein and Troutman Sanders also billed Schron and various Schron Entities for millions of dollars of purported legal services that were not authorized by Schron or the Schron Entities.

250. For example, in 2008, Troutman Sanders, on behalf of Schron and SMV, began to provide legal services in connection with a possible refinancing of SMV and its subsidiary holdings through the United States Department of Housing and Urban Development ("HUD"). In September 2008, SMV paid Troutman Sanders more than $500,000 for legal services performed in relation to the possible HUD refinancing. Schron understood at that point that he and the Schron Entities had paid in full all obligations to Troutman Sanders.

251. However, in March 2009, Troutman Sanders claimed that Schron and certain of the Schron Entities owed more than $1.8 million to Troutman Sanders for purportedly unbilled services related to the contemplated HUD refinancing, many of which were supposedly performed at the same time as the services for which SMV was billed in September 2008.

252. Even though Troutman Sanders had already billed (and Schron and SMV had already paid) more than $500,000 for services concerning the HUD refinancing, Grunstein and Troutman Sanders claimed falsely that Schron had requested that these previously undisclosed HUD refinancing services not be billed until after the HUD refinancing closed. Both Troutman Sanders's belated bills and their explanation are baseless.

253. In addition, Grunstein, Levinson, and Troutman Sanders sought to bill Schron for more than 2,000 hours through March 2009 for title-related work in anticipation of the HUD refinancing. In December 2008, alone, Troutman Sanders purported to spend more than 1,300

hours on title work. Schron never authorized Grunstein or Troutman Sanders to conduct title-related services. In fact, Schron had specifically instructed Grunstein to hold off on conducting title work concerning the potential HUD refinancing because HUD had not yet even approved the hoped-for refinancing. Therefore, it was premature to begin any title-related work.

254. Schron immediately disputed these purported unbilled services.

255. The hundreds of thousands of dollars in premature title work was hardly the end of Grunstein and Troutman Sanders's billing for unauthorized and unjustified services. By letter dated March 30, 2009, Schron instructed Grunstein and Troutman Sanders to "discontinue all work and billing" on "routine corporate advice," "routine tax advice," or "special investigations." Despite this explicit instruction, Grunstein caused Troutman Sanders to bill Schron and the Schron Entities for work on the "special investigations" after the March 30 directive.

256. Specifically, the "special investigation" work referred to bills from Grunstein and Troutman Sanders for services "rendered" in connection with the U.S. Government's investigation of the MMS transaction discussed above. Yet Schron and SMV had separate counsel in that investigation, and any work that Troutman Sanders performed in connection with the investigation was done on behalf of Grunstein's interests, not those of Schron or the Schron Entities. That Grunstein and Troutman Sanders would bill Schron and the Schron Entities for such services is even more outrageous because the government investigation itself was caused by Grunstein's and Troutman Sanders's malpractice. Rather than Schron paying Grunstein's legal bills, Grunstein and Troutman Sanders should have been paying for Schron's bills.

257. Grunstein and Troutman Sanders continued to send more than $100,000 in bills to the Schron Entities for their post-March 2009 "services" in connection with the "special investigation," despite Schron's explicit written directions to discontinue such work.

3. **Invoices for Services that were Never Performed**

258. Troutman Sanders's above-referenced November 2009 invoices reflect HUD refinancing title work supposedly performed by Troutman Sanders without the approval of Schron or any of the Schron Entities. The description of services and the hour references set forth in these invoices suggest that substantial portions of these services were not actually performed.

259. For example, one "timekeeper" billed for title work tasks 21 times in a five-week span, months after most purported title work had ended, and recorded his time, without variance, in hour or half-hour increments.

260. In addition, many of the service descriptions identify more than 200 hours of title work tasks performed for SWC interests. Yet, as Grunstein and Troutman Sanders well knew, SWC properties are not part of the possible HUD refinancing, and so there was never any need to perform title work for the SWC entities. Therefore, there is no way that purported SWC title work could have been performed for SWC. Either Troutman Sanders never performed the work, it was negligent in engaging in such unnecessary legal work, or in fact, the title work was performed in connection with assisting Grunstein, Forman and H. Grunstein, including in their fraudulent scheme to transfer SWC interests to Grunstein-controlled entities.

4. **Troutman Sanders's Disingenuous Attorneys' Lien**

261. After firing Grunstein and Troutman Sanders as their counsel, Schron and the Schron Entities asked Troutman Sanders to produce Troutman Sanders's files and Jenkens & Gilchrist's files (which are in Troutman Sanders's possession) concerning services performed for

Schron and the Schron Entities. Schron and the Schron Entities are the clear owners of these files and Troutman Sanders has no legal or ethical right to withhold them.

262. Rather than comply with the firm's ethical obligations and produce the requested files to their former clients, Troutman Sanders disingenuously asserted an attorneys' lien to the files on the ground that Schron and the Schron Entities had not paid the bogus November 2009 invoices.

263. Troutman Sanders asserted the attorneys' lien even though it knew that (i) Schron and the Schron Entities disputed the November 2009 invoices, and (ii) a substantial majority of the services set forth in the November 2009 invoices were either not authorized, negligently performed, performed despite conflicts of interest that were either not waivable or not effectively waived, inappropriately billed to Schron and the Schron Entities and/or not actually performed.

264. Troutman Sanders clearly understood that Plaintiffs needed the documents to determine, to the fullest extent possible, the various wrongs which had been committed against them by Grunstein, Forman, Troutman Sanders and others. Troutman Sanders asserted its attorneys' lien specifically to prevent their former clients from discovering the full extent of Defendants' fraudulent and unprofessional conduct.

**5. <u>Grunstein's Abusive Behavior Towards Schron</u>**

265. In addition to defrauding his clients, repeatedly breaching his fiduciary duties, breaching the contractual obligations of entities he controlled, and usurping from his clients business interests and opportunities, Grunstein routinely shouted at, cursed, and threatened Schron, often in the presence of Schron's children. Grunstein's pattern of abuse and intimidation, which grew worse over the years, was an important component of Grunstein's overall attempts to manipulate, control and defraud his client.

266. When Schron would attempt, at his own initiative, to involve other lawyers in various transactions, to contemplate retaining independent counsel, or even to have outside lawyers review documents held by Grunstein and his firms concerning SMV or SWC investments, Grunstein would scream at Schron, tell him that the transactions would not work unless he was the only lawyer in charge, and threaten to "blow up" their various deals if Schron did not do what Grunstein instructed.

267. Grunstein's threats to "blow up" his various deals with Schron were no idle comments. After Schron fired him as his counsel, Grunstein took numerous steps to disrupt aspects of the SWC and SMV investments, including refusing (through his controlled entities) to cooperate in efforts to obtain HUD refinancing of SMV despite contractual and fiduciary obligations to do so.

268. During one conversation in 2008 regarding the U.S. Government investigation of the MMS transaction, Grunstein misrepresented to Schron statements that Schron's counsel for the investigation had made to the Government, instructed Schron not to speak with his investigatory counsel, and told Schron that they could only clear themselves if Schron listened to Grunstein. Grunstein made these remarks for his own benefit and in order to intimidate his client.

## K. <u>The Attempted Fraud On The Formation Deal</u>

269. By the summer of 2009, Schron's relationship with Grunstein and Troutman Sanders had become strained by Grunstein's and Troutman Sanders's wrongful conduct.

270. In an attempt to alleviate the strain between himself and Grunstein, Schron urged Grunstein and Forman to engage Formation as a potential buyer for SVCARE.

271. Schron was not interested in participating in a transaction involving nursing home operations and did not want to be a part of the potential deal. Nonetheless, Grunstein

conditioned his willingness to consider a possible sale of SVCARE to Formation on Schron's guaranty of the closing of the acquisition.

272. Grunstein proceeded to draft (and bill SMV for) a buy-sell agreement that provided no usual and customary representations, warranties and indemnities, and functionally provided Schron's guaranty that the deal with Formation would close (the "Buy-Sell Agreement"). In the absence of market terms, Grunstein would never have been able to accomplish a transaction with a third-party buyer for Sava. However, knowing Schron wanted to extricate himself from the unpalatable and overbearing relationship with the Grunstein Conspirators, Grunstein crafted an impossible out-of-market agreement that would be unacceptable to any reasonable buyer.

273. Grunstein insisted on Schron's guaranty because he saw another opportunity to take advantage of his clients for his own benefit. The draft Buy-Sell Agreement that Grunstein presented to his client contained a number of outrageously one-sided provisions, all of which directly benefited Grunstein.

274. For example, the draft Buy-Sell Agreement, which is purposefully difficult to follow, provided Grunstein and Forman's Canyon Sudar with the option of purchasing SMV for a fraction of its true value if the Formation acquisition of SVCARE did not close. Even more shocking, the draft Buy-Sell Agreement provided Canyon Sudar with a right of first refusal as to Cam-Elm, a Schron Entity that holds other Schron family interests and is only tangentially relevant to SVCARE. Grunstein did not discuss either of these provisions with Schron before presenting the draft Buy-Sell Agreement to Schron, who was then still a client.

275. In Grunstein's typically underhanded manner, he presented the draft Buy-Sell Agreement to his client with the misleading statement that Schron had requested it. Schron had made no such request.

276. In his cover letter, Grunstein disingenuously stated that Troutman Sanders acted only as "scrivener" for Schron, when in fact Schron had never spoken to any of the supposed "scriveners" about the provisions of the Buy-Sell Agreement, and indeed was completely unaware of the numerous one-sided provisions Grunstein had included in the draft. In addition, Troutman Sanders billed SMV for the draft, acting as though they had drafted the agreement on behalf of their clients, Schron and SMV, when in fact they never had a substantive conversation with their clients about the draft and the draft served only the interests of Grunstein, Forman, and the entities they controlled.

277. Shortly after receiving and scanning the bizarre terms of the draft Buy-Sell Agreement, Schron and the Schron Entities fired Grunstein and Troutman Sanders as their counsel due to their numerous improper acts, including the outrageous one-sided Buy-Sell Agreement.

**L. <u>Grunstein, Forman And H. Grunstein Misappropriate Properties From SWC</u>**

278. Even after Schron terminated the attorney-client relationship, Grunstein and his co-conspirators continued their efforts to exploit their former clients. In January 2010, Schron learned that Grunstein, Forman and H. Grunstein were in the process of misappropriating certain real estate interests that SWC had acquired in the IHS transaction. The calculating nature of Grunstein, Forman and H. Grunstein's scheme reflects a total disdain for their legal, ethical and professional obligations.

1. **SWC's Purchase of the New Mexico Properties**

279. As described above, in 2003, as part of the IHS transaction, ABE, pursuant to the SWC Master Purchase Agreement, sold to SWC certain packages of IHS real estate interests. Included within one such package were leasehold interests formerly held by two IHSLTC subsidiaries, IHS Acquisition No. 151, Inc. ("IHS 151") and IHS Acquisition No. 165, Inc. ("IHS 165"). These former IHS 151 and IHS 165 assets included the leasehold interests in three New Mexico-based nursing home properties -- Sunset Villa, Specialty Hospital of Albuquerque and Albuquerque Care Center (the "New Mexico Properties").

280. The Master Lessor and owner of the fee interests in the New Mexico Properties at the time and until recently was Spencer Investment Company ("Spencer").

281. On or about June 26, 2003, Grunstein and Jenkens & Gilchrist, on behalf of Schron, as Manager of SWC, formed three subsidiary limited liability companies to hold SWC's leasehold interests in the New Mexico Properties: CAM-Sunset Villa, LLC, CAM-Albuquerque, LLC, and CAM-Albuquerque II, LLC (collectively, the "CAM LLCs"). These CAM LLCs held the leasehold interests in the Sunset Villa, Specialty Hospital of Albuquerque and Albuquerque Care Center facilities, respectively.

2. **Grunstein Purchases the Landlord's Interests in the New Mexico Properties**

282. Grunstein and Forman's ownership, though Fundamental, of THI gave them control of the THI subsidiary that operated the New Mexico Properties.

283. Grunstein and Forman sought to acquire as well the fee titles for the New Mexico Properties, which were owned by Spencer. To that end, Grunstein and Forman planned to purchase the stock of a Spencer subsidiary that owned these fee titles.

284. However, under the clear terms of its agreement with SWC, THI required the approval of the owner of the leasehold titles connected to the New Mexico Properties before it could acquire the fee titles from Spencer. This was because the real owners of the leasehold titles -- the Cam LLCs -- were, under the SWC Master Purchase Agreement, the beneficiaries of the Agreement to Lease that prohibited THI from purchasing the New Mexico Properties or interfering with the landlord's interests.

285. Pursuant to the SWC Master Purchase Agreement, and as confirmed by subsequent agreements and representations by Jenkins & Gilchrist and Troutman Sanders, SWC owned the leasehold titles connected to the New Mexico Properties. However, Grunstein and Forman knew that SWC would not give THI or Fundamental permission to acquire the fee titles from Spencer. Rather, Grunstein and Forman knew that SWC itself would want to purchase the fee titles from Spencer if they were available for purchase.

286. At some point in or after 2004, Grunstein and H. Grunstein improperly seized control over DMV Funding, LLC ("DMV") and ABE, a DMV subsidiary. ABE is the parent company of IHSLTC, which in turn is the parent company of IHS 151 and IHS 165. Grunstein and H. Grunstein misrepresented to Spencer that IHS 151 and IHS 165 still owned the leasehold titles to the New Mexico Properties, and that these entities had approved THI's or Fundamental's acquisition of the fee titles through its purchase of the relevant Spencer subsidiary.

287. In or about January 2010, Schron discovered that Grunstein and Forman, through their companies Fundamental and THI, were negotiating with Spencer to purchase the Spencer subsidiary that owned the fee titles for the New Mexico Properties, in direct violation of SWC's rights.

288. As Grunstein, Forman and H. Grunstein understood and intended, THI's acquisition of the New Mexico Properties would effectively extinguish the leasehold interests of SWC's subsidiaries in these properties and would foreclose SWC's exercise of its right of first refusal to acquire the fee interest in the properties.

289. Attorneys for the Schron Entities repeatedly notified Spencer's and THI's attorneys that SWC (as the true owner of the leasehold interests in the New Mexico Properties) did not consent to the proposed sale of the New Mexico Properties and that such a sale would violate their legal rights. Despite these admonitions, Spencer proceeded to sell the Spencer subsidiary that owned the fee titles in the New Mexico Properties to an entity controlled by Grunstein and/or H. Grunstein. Troutman Sanders acted as counsel for Grunstein and his entities in the transaction despite having been specifically notified of the conflict with its former client, SWC, that this transaction presented.

290. Plaintiffs have reason to believe that Grunstein, Forman and H. Grunstein have engaged in similar schemes to misappropriate other real estate interests from Schron Entities, including SMV and SWC, in various other states.

**M. <u>Grunstein Files A Spurious Lawsuit Against His Former Client, Schron</u>**

291. Recently, Grunstein and Forman filed a spurious lawsuit against Schron and Schron's children in an attempt (i) to pressure Schron into allowing Grunstein and Forman to retain their ill-gotten gains, (ii) to destroy his former clients' reputation in the press, the financial community and their own community, and (iii) to gain control of SMV and SWC, the final pieces of the IHS and Mariner Transactions that Grunstein and Forman do not yet control.

292. The complaint contains numerous demonstrably false and/or misleading statements of fact. Documentary evidence, including documents and correspondence drafted by

Jenkens & Gilchrist and Troutman Sanders attorneys (including Grunstein and Levinson) demonstrate the false and/or misleading nature of these statements.

293. Moreover, in continuing disregard of his ethical obligations to his former client, Grunstein used in his complaint confidential information gained through his representation of Schron and the Schron Entities.

**As and for a First Cause of Action**
**(Against Grunstein, Forman, Levinson, Troutman Sanders, MetCap Securities, MetCap Holding & MetCap Advisory – Breach of Fiduciary Duty)**

294. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 293 above as if fully set forth herein.

295. Grunstein, Levinson and Troutman Sanders owed fiduciary duties to Plaintiffs as their attorneys.

296. Forman, MetCap Securities, MetCap Holding and MetCap Advisory owed fiduciary duties to Plaintiffs as their investment bankers.

297. As described above, Grunstein and Forman repeatedly placed themselves in positions directly adverse to those of their clients, Schron and the Schron Entities.

298. Despite these multiple direct adverse conflicts of interest, the Defendants named in this First Cause of Action (the "Fiduciary Breach Defendants") continued to provide legal and investment banking services to Plaintiffs without ever fully explaining the consequences and implications of the conflicts and without ever obtaining effective waivers of those conflicts that could be waived.

299. As described above, much of the conflicted legal and investment banking services and advice provided by the Fiduciary Breach Defendants benefited Grunstein, Forman and others to Plaintiffs' detriment.

300. As described above, Plaintiffs made certain decisions and followed certain courses of conduct that they would not have made or taken but for the conflicted legal and investment banking services and advice provided by the Fiduciary Breach Defendants.

301. As described above, Defendants breached their fiduciary duties to Plaintiffs by conduct including:

- Structuring the Mariner Transaction to benefit themselves and others to the detriment of Schron and the Schron Entities;
- Misappropriating a business opportunity that rightfully belonged to SWC by leveraging a potential legal claim belonging to SWC and then purchasing THI at a discount through Fundamental;
- Providing knowingly false representations to Schron and SMV regarding the Rent Escalation Provision of the Sava Master Lease, thereby causing Schron to enter into the disastrous Citibank Swap for the benefit of SMV/SWC;
- Causing, designing, counseling and approving the Citibank Swap for SMV/SWC and then claiming that the Citibank Swap was not entered into for SMV/SWC;
- Inducing Schron and the Schron Entities to loan $120 million to SVCARE (a company controlled by Grunstein and Forman), structuring the loan in such a way that SVCARE purportedly was only required to pay back the loan after it paid down a separate $100 million loan to another creditor, paying down nearly $98 million on that separate loan and negotiating terms with that creditor to avoid closing out the loan, and then refusing to repay the loan on the ground that so long as even a *de minimis* portion of that loan remained open, the Schron Entities' loan to SVCARE need never be repaid;

- Seizing control over three New Mexico properties and disregarding the property rights that SWC acquired even after Schron and the Schron Entities objected to these transactions;
- Drafting the deliberately complicated SVCARE Buy/Sell Agreement (i) to provide Schron's functional guaranty that the deal with Formation would close, and (ii) by including a number of outrageously one-sided provisions, all benefiting Grunstein if triggered and having scant (if any) relation to the proposed transaction;
- In connection with structuring the MMS transaction, which ultimately led to a DOJ investigation and a civil suit against Schron, Grunstein and Forman, failing to inform Schron about any of the legal risks to the transaction; failing adequately to protect Schron and the Schron Entities in the transaction; and failing to obtain the advice of an experienced independent expert in healthcare regulatory matters to give non-conflicted advice to Schron and SMV regarding the healthcare regulatory issues that related to Omnicare's execution of long-term pharmacy contracts contemporaneously with its purchase of MMS;
- Billing Schron and various Schron Entities for legal work that (i) was performed solely for the benefit of Grunstein-controlled entities, including SVCARE, Sava, THI and Canyon Sudar, (ii) was unauthorized, and/or (iii) was never performed;
- Billing Schron and the Schron Entities millions of dollars for their purported legal representation in the SWC Acquisition and the Mariner Transaction, while failing to provide copies of the closing binders for the transactions to Schron or any of the Schron Entities because withholding these documents allowed Defendants to remain in a position

of control over Schron when it came to the details of these complex transactions and also provided them the subsequent opportunity to alter the details of the various agreements.

302. As a direct result of these and other numerous breaches of fiduciary duty, Plaintiffs were damaged in an amount to be determined at trial, but in no event less than hundreds of millions of dollars. Plaintiffs are also entitled to recover millions of dollars in professional fees from Defendants in light of these breaches of fiduciary duty.

**<u>As and for a Second Cause of Action</u>**
**(Against Troutman, Fundamental, SVCARE, Sava, H. Grunstein, THI & the Breach of Duty Defendants -- Aiding & Abetting a Breach of Fiduciary Duty)**

303. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 302 above as if fully set forth herein.

304. As discussed above, Defendants Grunstein, Forman, Levinson, Troutman Sanders, MetCap, MetCap Holdings and MetCap Advisory had fiduciary duties to Plaintiffs that they breached. Plaintiffs suffered actual damages as a direct result of Defendants' breaches of their fiduciary duties. Defendants Fundamental, SVCARE, Sava, H. Grunstein and THI knowingly induced or participated in these breaches.

305. Fundamental knowingly participated in Grunstein and Forman's breach of their fiduciary duties to Plaintiffs by acquiring THI in a clear misappropriation of Schron and SWC's business opportunity.

306. SVCARE and Sava knowingly participated in Grunstein and Forman's breach of their fiduciary duties to Plaintiffs by refusing to pay back the $120 million loan to SVCARE and taking the position that the loans are not due or do not exist.

307. H. Grunstein knowingly participated in Grunstein and Forman's breach of their fiduciary duties to Plaintiffs by, among other ways, (i) participating in the structuring of the Mariner Transaction to benefit himself, Grunstein, Forman and others to the detriment of Schron

and the Schron Entities, and (ii) claiming ownership of the leasehold titles to the New Mexico Properties, among others, in violation of Schron and SWC's property rights.

308. Fundamental and THI knowingly participated in Grunstein and Forman's breach of their fiduciary duties to Plaintiffs by acquiring the fee titles for the New Mexico Properties, among other properties, in violation of Schron and SWC's property rights, including the right of first refusal to purchase the fee titles to the New Mexico Properties.

309. Troutman Sanders knowingly participated in Grunstein's and Forman's breach of their fiduciary duties by representing Grunstein and Forman and their entities in the acquisition of the fee titles to the New Mexico Properties, despite knowing that SWC objected to the acquisition.

310. To the extent that some of the breaches of fiduciary duty engaged in by the Breach of Duty Defendants were engaged in by some, but not all, of the Fiduciary Breach Defendants, the other Fiduciary Breach Defendants had knowledge of these breaches, substantially assisted in the breaches, and proximately caused the damages on which Plaintiffs' breach of fiduciary duty claims are predicated, for the reasons described above.

311. As a direct result of these and other numerous acts of aiding and abetting breaches of fiduciary duty, Plaintiffs were damaged in an amount to be determined at trial, but in no event less than hundreds of millions of dollars.

**As and for a Third Cause of Action**
**(Against Grunstein, Forman, MetCap Securities, MetCap Holdings, MetCap Advisory, Levinson & Troutman Sanders -- Fraud)**

312. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 311 above as if fully set forth herein.

313. As described above, the Defendants named in this Third Cause of Action (collectively, the "Fraud Defendants") knowingly made false representations regarding material

facts to Plaintiffs with the intention that Plaintiffs would act or refrain from acting in justifiable reliance on those representations. As a result of Defendants' false representations, Plaintiffs justifiably relied on those statements and suffered injury.

314. The Fraud Defendants were in a fiduciary relationship with the Plaintiffs and/or they had superior knowledge of the transactions at issue; they knowingly failed to disclose material information with the intent to deceive the Plaintiffs; the Plaintiffs justifiably relied on their fiduciary relationship with the Fraud Defendants and the latter's superior knowledge; and they suffered injury as a direct result of the Fraud Defendants' misrepresentations and omissions.

315. In addition, because of the existence of a fiduciary relationship, the Fraud Defendants are liable in constructive fraud. The Fraud Defendants were in a fiduciary or confidential relationship with the Plaintiffs, and in the context of that relationship, they made false representations regarding material facts, or failed to disclose material facts, with the intention that Plaintiffs would act or refrain from acting in justifiable reliance; Plaintiffs in fact justifiably relied on those false statements or the existence of the fiduciary or confidential relationship, and they suffered injury as a result.

316. As described above, Defendants' fraudulent behavior included:

- Grunstein, Levinson, and Troutman Sanders provided knowingly false representations to Schron and SMV regarding the Rent Escalation Provision of the Sava Master Lease, which Schron relied upon in not invoking those provisions and instead entering into the Citibank Swap on behalf of SMV and SWC;
- Grunstein, Levinson, and Troutman Sanders provided fraudulent and self-serving legal advice to Schron in order to dissuade him from exercising the Amended SVCARE

Option, asserting that the Amended SVCARE Option (which Grunstein and Troutman Sanders had drafted) was worthless and not effective;

- Grunstein, Levinson, and Troutman Sanders billed Schron and various Schron Entities for legal work that (i) was performed solely for the benefit of Grunstein-controlled entities, including SVCARE, Sava, THI and Canyon Sudar, (ii) was unauthorized, and/or (iii) was never performed.

317. As a direct result of these and other numerous acts of fraud, Plaintiffs were proximately damaged in an amount to be determined at trial, but in no event less than hundreds of millions of dollars. Plaintiffs are also entitled to recoup millions of dollars in professional fees paid under false pretenses to the Defendant

**<u>As and for a Fourth Cause of Action</u>**
**(Against the Fraud Defendants -- Aiding & Abetting Fraud)**

318. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 317 above as if fully set forth herein.

319. As described above, the Fraud Defendants perpetrated numerous frauds against Plaintiffs.

320. To the extent that some of the frauds perpetrated by the Fraud Defendants were made by some, but not all, of the Fraud Defendants, the other Fraud Defendants had knowledge of these frauds, substantially assisted in their achievement, and proximately caused the damages on which Plaintiffs' fraud claims are predicated, for the reasons described above.

321. As a direct result of these and other numerous acts of aiding and abetting fraud, Plaintiffs were damaged in an amount to be determined at trial, but in no event less than hundreds of millions of dollars.

**<u>As and for a Fifth Cause of Action</u>**
**(Against Grunstein, Levinson & Troutman Sanders -- Legal Malpractice)**

322. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 321 above as if fully set forth herein.

323. As described above, defendants were negligent and failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession. Defendants' negligence was the proximate cause of the actual damages Plaintiffs suffered. Defendants continued to represent the Plaintiffs in connection with the matters described above until the relationship was terminated in late 2009.

324. As described above, Defendants committed malpractice on numerous occasions, including:

- Providing services and advice related to numerous transactions, including the SWC and Mariner transactions and the 2006 SMV/SWC refinancing, despite blatant conflicts of interest, without ever fully explaining the consequences and implications of the conflicts and without ever obtaining effective waivers of those conflicts, if any, that could have been waived;
- Negligently structuring and completing the MMS transaction, which ultimately led to a DOJ investigation and civil suit against Schron, Grunstein and Forman, including: failing to inform Schron about any of the legal risks to the transaction; failing adequately to protect Schron and the Schron Entities in the transaction; failing to obtain the advice of an experienced independent expert in healthcare regulatory matters to give non-conflicted advice to Schron and SMV regarding the healthcare regulatory issues that related to Omnicare's execution of long-term pharmacy contracts contemporaneous

with its purchase of MMS; failing properly and contemporaneously to document aspects of the MMS transaction; and providing legal advice despite blatant conflicts of interest;

- Representing Schron in negotiations with Citibank and reviewing, revising and approving all relevant documentation related to the Citibank Swap, but failing to protect Schron on behalf of SMV/SWC if interest rates fell significantly and failing to advise Schron of this possibility;
- If it is found that SVCARE may continually extend the maturity date of its borrowing from another lender in order to avoid repayment of the SVCARE Loan, structuring the SVCARE Loan in such a way that SVCARE was only required to pay back the SVCARE Loan after, if ever, it fully paid down a separate loan to another creditor;
- Failing to provide competent and accurate advice regarding the Rent Escalation Provision of the Sava Master Lease;
- If, in the alternative, the Rent Escalation Provision of the Sava Master Lease is found to not provide for increased rents from Sava when SMV's financing costs increase, failing to protect Schron and SMV from the prospect of rising interest rates and financing costs by drafting an ineffective Rent Escalation Provision in the Sava Master Lease, despite repeatedly assuring Schron at the time the Sava Master Lease was executed that, under the terms of the Sava Master Lease, should SMV's financing costs increase under its floating rate loans, the rents paid to SMV by the Sava entities would increase dollar for dollar;
- If the Amended SVCARE Option is found to be invalid or unenforceable, failing to draft an effective, valid and enforceable option agreement that would allow Schron and the Schron Entities to acquire SVCARE;

- Billing Schron and the Schron Entities millions of dollars for their purported legal representation in the SWC Acquisition and the Mariner Transaction, while failing to provide copies of the closing binders for the transactions to Schron or any of the Schron Entities because withholding these documents allowed Defendants to remain in a position of control over Schron when it came to the details of these complex transactions and also provided them the subsequent opportunity to alter the details of the various agreements.

325. As a direct result of these and other numerous acts of legal malpractice, Plaintiffs were damaged in an amount to be determined at trial, but in no event less than hundreds of millions of dollars. Plaintiffs are also entitled to recoup millions of dollars in legal fees from the Defendants in connection with the acts of malpractice described herein.

**<u>As and for a Sixth Cause of Action</u>**
**(Against Grunstein, Forman, Fundamental & THI – Conversion)**

326. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 325 above as if fully set forth herein.

327. By acquiring the fee titles to the New Mexico Properties, even though they knew that SWC had not consented to the purchase of the entity that owned those fee titles, Grunstein, Forman, Fundamental and THI exercised unauthorized dominion and control over the leaseholds to the New Mexico Properties in violation of SWC's rights, including SWC's right to purchase the fee titles to the New Mexico Properties.

328. Grunstein, Forman, Fundamental and/or THI knew that SWC, through its subsidiaries, the CAM LLCs, owns the leaseholds to the New Mexico Properties, and they had no right to disregard SWC's leasehold interests and its right, to purchase the fee titles to the New Mexico Properties.

329. Grunstein and Forman, through Fundamental's and THI's acquisition of the fee titles to the New Mexico Properties interfered with and converted SWC's leasehold rights to the New Mexico Properties.

330. As a direct result of Grunstein, Forman, Fundamental and THI's acts of conversion, SWC was damaged in an amount to be determined at trial.

**As and for a Seventh Cause of Action**
**(Against H. Grunstein & Troutman Sanders -- Aiding & Abetting Conversion)**

331. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 330 above as if fully set forth herein.

332. As discussed above, Grunstein, Forman, Fundamental, and THI committed conversion related to their acquisition of the fee titles to the New Mexico Properties. H. Grunstein and Troutman Sanders had actual knowledge of Grunstein, Forman, Fundamental, and THI's violation. By claiming to own the leasehold interests in the New Mexico Properties, H. Grunstein aided and abetted Grunstein, Forman, Fundamental, and THI's conversion of SWC's leasehold rights in the New Mexico Properties.

333. Similarly, despite knowing of its former clients' objections to the acquisition of the fee titles to the New Mexico Properties, Troutman Sanders provided services to Grunstein and Forman and their entities to enable the acquisition transaction to close, thus aiding and abetting the conversion of SWC's leasehold rights.

334. H. Grunstein and Troutman Sanders had actual knowledge that the leasehold interests in the New Mexico Properties, including the right to purchase the fee titles to the New Mexico Properties, belonged to SWC under the Master Purchase Agreement, yet represented to Spencer that entities under H. Grunstein's control owned the leasehold rights.

335. As a direct result of H. Grunstein's and Troutman Sanders's acts of aiding and abetting conversion, SWC was damaged in an amount to be determined at trial.

**As and for an Eighth Cause of Action**
**(Against Forman, MetCap Securities, MetCap Holding & MetCap Advisory -- Professional Negligence)**

336. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 335 above as if fully set forth herein.

337. As investment bankers, Forman, MetCap Securities, MetCap Holding and MetCap Advisory are professionals. As described above, Defendants Forman, MetCap Securities, MetCap Holding and MetCap Advisory owed fiduciary duties to Plaintiffs as their investment bankers, but violated their fiduciary duties and failed to exercise the degree of skill and learning commonly applied by an average member of the profession, proximately causing Plaintiffs' damages, and committing professional negligence by conduct including:

- Advising Plaintiffs related to the SWC Acquisition, despite their blatant conflicts of interest, without explaining or obtaining a waiver for these conflicts, to the extent waivable, and taking advantage of their fiduciary position to benefit themselves financially, to the detriment of Plaintiffs;
- Advising Plaintiffs related to the Mariner and MMS transactions, despite their blatant conflicts of interest related to Grunstein's and Forman's ownership interests in SVCARE, Sava and THI, without explaining or obtaining a waiver for these conflicts, to the extent waivable, and taking advantage of their fiduciary position to benefit themselves financially, to the detriment of Plaintiffs;
- Advising Plaintiffs related to the 2006 SMV/SWC refinancing, despite their blatant conflicts of interest related to Grunstein's and Forman's ownership interests in

SVCARE, Sava and THI, without explaining or obtaining a waiver for these conflicts, to the extent waivable, and taking advantage of their fiduciary position to benefit themselves financially, to the detriment of Plaintiffs.

338. As a direct result of Forman, MetCap Securities, MetCap Holding and MetCap Advisory's professional negligence, Plaintiffs were damaged in an amount to be determined at trial, but in no event less than hundreds of millions of dollars. In addition, Plaintiffs are entitled to recover millions of dollars in fees paid to MetCap Securities, MetCap Holding or MetCap Advisory.

**<u>As and for a Ninth Cause of Action</u>**
**(Against All Defendants -- Unjust Enrichment)**

339. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 338 above as if fully set forth herein.

340. As explained in detail above, each of the Defendants was knowingly enriched at Plaintiffs' expense by the numerous fraudulent, negligent and otherwise wrongful actions engaged in by the Defendants.

341. Defendants received the above-referenced benefits to the detriment of Plaintiffs, and continue to retain those benefits.

342. It is against good conscience and equity to permit Defendants to keep the proceeds of their years of misconduct committed against Plaintiffs.

343. Plaintiffs were injured in that they lost numerous business interests and opportunities, paid millions of dollars in bogus and unwarranted fees, and issued millions of dollars in loans as a direct result of Defendants' wrongful conduct.

344. As to certain of these injuries, Plaintiffs have no adequate remedy at law and seek restitution and disgorgement of Plaintiffs' enrichment benefits.

**<u>As and for an Tenth Cause of Action</u>**
**(Against NSC & New Mariner -- Breach of Contract)**

345. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 344 above as if fully set forth herein.

346. As described above, Cam Funding II loaned $25 million to NSC and New Mariner.

347. NSC and New Mariner have not repaid this loan and thus have breached the loan agreement.

348. Plaintiff Cam Funding II is entitled to $25 million in principal plus $6 million in interest in damages as a result of New Mariner's and NSC's breach of their loan obligations.

**<u>As and for a Eleventh Cause of Action</u>**
**(Against Troutman Sanders – Breach of Contract)**

349. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 348 above as if fully set forth herein.

350. Plaintiffs had a legal services contract with Troutman Sanders in which Troutman Sanders agreed to perform legal services for the benefit of Plaintiffs consistent with their ethical obligations.

351. Troutman Sanders breached this contract by repeatedly giving hopelessly conflicted advice, failing to advise Plaintiffs of the numerous conflicts of interest in their continued representation, mishandling escrow accounts, and billing Plaintiffs for legal work that (i) was solely performed for the benefit of Grunstein-controlled entities, including SVCARE, Sava, THI and Canyon Sudar, (ii) was unauthorized, and (iii) was never performed.

352. Plaintiffs are entitled to damages in an amount to be determined at trial, but no less than $10 million as a result of Troutman Sanders' breach of the legal services contract.

**As and for a Twelfth Cause of Action**
**(Against MetCap Securities, MetCap Holding & MetCap Advisory -- Breach of Contract)**

353. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 352 above as if fully set forth herein.

354. Plaintiffs had an investment banking contract with MetCap Securities, MetCap Holding, and MetCap Advisory in which MetCap Securities, MetCap Holding, and MetCap Advisory agreed to perform investment banking services for the benefit of Plaintiffs consistent with their ethical obligations.

355. MetCap Securities, MetCap Holding, and MetCap Advisory breached this contract.

356. Plaintiffs are entitled to millions of dollars in damages in an amount to be determined at trial and to the recoupment of millions of dollars in investment banking fees paid as a result of MetCap Securities, MetCap Holding, and MetCap Advisory's breach of the investment banking contract.

**As and for a Thirteenth Cause of Action**
**(Against Grunstein -- Defamation)**

357. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 356 above as if fully set forth herein.

358. As described above, Grunstein made defamatory remarks about Schron to SMV principals.

359. Over the course of the past six months, prior to filing his Complaint, Grunstein told members of SMV, including Sam Domb and Ulo Barad, and principals of Cada and Mada, that Schron had stolen $50 million from SMV to recoup personal investment losses (referring to the Citibank Swap).

360. Grunstein's statements to SMV's principals were false and *per se* defamatory.

361. At the time Grunstein made these defamatory remarks, he knew that they were false.

362. Grunstein made these statements without privilege or Schron's permission.

363. Grunstein's remarks harmed Schron because the act of stealing is considered a serious crime. The remarks are also of the type that would tend to injure an individual's real estate business.

364. As a direct result of Grunstein's defamation, Schron was damaged in an amount to be determined at trial.

**<u>As and for a Fourteenth Cause of Action</u>**
**(Against Grunstein, Forman, Levinson, THI, Fundamental, Troutman Sanders, MetCap Securities, MetCap Holding & MetCap Advisory -- Accounting & Constructive Trust)**

365. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 364 above as if fully set forth herein.

366. Grunstein, Levinson and Troutman Sanders owed a fiduciary duty to Plaintiffs as their attorneys.

367. Forman, MetCap Securities, MetCap Holding and MetCap Advisory owed a fiduciary duty to Plaintiffs as their investment advisors and investment bankers.

368. As described above, Grunstein, Forman, Levinson, Troutman Sanders, MetCap Securities, MetCap Holding and MetCap Advisory fraudulently and deceptively acquired property and assets from Plaintiffs, and may not in good conscience retain those beneficial interests.

369. Due to Grunstein, Forman, Levinson, Troutman Sanders, MetCap Securities, MetCap Holding and MetCap Advisory's breaches of their fiduciary duties and fraudulent

actions, there are multiple instances in which a constructive trust is the appropriate form of relief, including:

- SWC purchased the New Mexico leasehold interests from ABE in conjunction with the IHS Transaction. Grunstein, Forman, Fundamental and THI, through an entity they controlled subsequently acquired the fee titles to the New Mexico Properties, disregarding SWC's rights in the process. Grunstein, Forman, Fundamental and THI were unjustly enriched by this conduct.
- Cam Funding III loaned $120 million in total to SVCARE and Sava, pursuant to the SVCARE Loan Agreement and the Amended SVCARE Loan Agreement. SVCARE and Sava have not repaid any portion of the SVCARE Loan to this day and instead have relied on distorted interpretations of the agreement to avoid repayment of the loan at the same time that enormous cash distributions are being paid out of these entities to Grunstein and Forman.
- CAMFIVE entrusted Troutman Sanders with an escrow account set up for the 2006 SWC/SMV refinancing. CAMFIVE transferred the escrow funds to Troutman Sanders, as its counsel, believing that the firm would protect and properly appropriate the funds. Grunstein and Troutman Sanders breached its duties and converted CAMFIVE's escrow account to pay themselves, MetCap Securities, MetCap Holding and MetCap Advisory. These payments included bills for conflicted services and services conducted for individuals other than Plaintiffs. Troutman Sanders, MetCap Securities, MetCap Holding and MetCap Advisory were unjustly enriched by these transfers.
- Troutman Sanders, MetCap Securities, MetCap Holding and MetCap Advisory billed the Schron Entities, and received payments from the Schron Entities, for purported legal

and investment banking services which, among other things, (i) were provided despite blatant conflicts of interest, (ii) benefited entities controlled by Grunstein and Forman, not the Schron Entities, (iii) were detrimental to the interests of the Schron Entities, and/or (iv) were not actually performed. Grunstein, Forman, Levinson, Troutman Sanders, MetCap Securities, MetCap Holding and MetCap Advisory were unjustly enriched by these improper bills.

370. Grunstein, Forman, Levinson, Troutman Sanders, MetCap Securities, MetCap Holding and MetCap Advisory defrauded Plaintiffs and were unjustly enriched in all of the aforementioned transactions. An accounting should be provided as to each such transaction, and a constructive trust should be imposed on all Schron Entity funds or assets acquired by Defendants as a result of any such transaction.

**<u>As and for a Fifteenth Cause of Action</u>**
**(Against Canyon Sudar & SVCARE – Breach of Contract)**

371. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 370 above as if fully set forth herein.

372. As described above, Cam Equity, SVCARE and Canyon Sudar entered into the Amended SVCARE Option, which is a valid and enforceable contract.

373. Pursuant to the Amended SVCARE Option, Cam Equity has an option and right to acquire 9,999,900 membership units of SVCARE or such greater amount equal to 99.9999% of all such units at a purchase price of $100 million, all or a portion of which, at Cam Equity's (or its designee's) option, can be paid in cash or through the assumption by Cam Equity of debt of SVCARE or its subsidiaries and the release of such obligors.

374. In addition, the Amended SVCARE Option grants Cam Equity the right, upon its exercise, and prior to closing, to, *inter alia*, replace the manager(s) of SVCARE with its own nominee.

375. By Notice of Exercise of Option dated June 22, 2010 (the "Notice of Exercise"), Cam Equity has exercised its option, granted pursuant to the Amended SVCARE Option, to acquire 9,999,900 membership units of SVCARE (equal to 99.999% of all such units and all other equity and voting rights in SVCARE that are now outstanding or may be acquired on a fully diluted basis) (the "Acquired Units"). The Notice of Exercise also states that Cam Equity is immediately removing all SVCARE managers and replacing them with an entity chosen by Cam Equity, pursuant to its rights under the Amended SVCARE Option.

376. The Notice of Exercise further states that Cam Equity has elected to pay the consideration for the Acquired Units by the assumption and satisfaction of Sava's liability to Cam Equity's affiliates. However, if such debt is determined to be less than $100 million, the Notice of Exercise states that Cam Equity will pay the remainder in cash by wire transfer.

377. Cam Equity is, in fact, able to pay the whole $100 million purchase price in cash if required (which it should not be).

378. As described above, Canyon Sudar's owners, Grunstein and Forman, and SVCARE have wrongly claimed on numerous occasions that the Amended SVCARE Option -- which Grunstein, Levinson and Troutman Sanders drafted -- is worthless and ineffective.

379. Indeed, Grunstein, Forman and SVCARE have filed a lawsuit in this Court seeking, *inter alia*, a declaration that the Amended SVCARE Option is "void, invalid, and unenforceable."

380. Grunstein, Forman and SVCARE's actions and unequivocal statements demonstrate that SVCARE and Canyon Sudar deny Cam Equity's rights and will not recognize their obligations under the Amended SVCARE Option. This constitutes a repudiation and an anticipatory breach of the Amended SVCARE Option.

381. As demonstrated by the Notice of Exercise, Cam Equity is ready, willing and able to perform under the Amended SVCARE Option.

382. Plaintiffs seek specific enforcement of the Amended SVCARE Option. Specifically, Plaintiffs seek a judgment (i) ordering Canyon Sudar and SVCARE to transfer the Acquired Units to Cam Equity, and (ii) ordering SVCARE to remove all previous managers of SVCARE and replace them with the entity set forth in the Notice of Exercise or some other manager of Cam Equity's choosing.

WHEREFORE, Plaintiffs demand judgment against the defendants as follows:

A. Awarding to Plaintiffs damages to be determined at trial, but in no event less than hundreds of millions of dollars;

B. Ordering Grunstein, Forman and Levinson to relinquish all ownership interests (direct or indirect) in SMV, SWC, SMV Special Holdings, SWC Special Holdings, Cam Equity, Cam Funding, Cam Funding II, Cam Funding III and CAMFIVE because such interests were acquired through blatant breaches of fiduciary duties owed to various of the Plaintiffs;

C. Ordering Grunstein, Forman, Levinson, Troutman Sanders, MetCap Securities, MetCap Holding and MetCap Advisory to return all professional fees received in connection with the acts of fraud, malpractice, and fiduciary duty described above;

D. Ordering that an accounting be provided as to all improper transactions and a constructive trust be imposed on all Schron Entity funds or assets that are unlawfully in the possession of the Defendants;

E. Awarding to Plaintiffs punitive damages on the First, Second, Third, Fourth, Sixth and Seventh Causes of Action;

F. Ordering Canyon Sudar and SVCARE to transfer the Acquired Units to Cam Equity;

G. Ordering SVCARE to remove all previous managers of SVCARE and replace them with the entity set forth in the Notice of Exercise or some other manager of Cam Equity's choosing;

H. Awarding to Plaintiffs their costs incurred in bringing this action, plus pre-judgment interest, post-judgment interest, and reasonable attorneys' fees; and

I. Granting to Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
August 4, 2010

DECHERT LLP

By: ______________________________
Andrew J. Levander
Kevin J. O'Brien
Steven A. Engel
Robert W. Topp
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

*Attorneys for Plaintiffs*

**VERIFICATION**

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

**RUBIN SCHRON**, being duly sworn, deposes and says:

1. I am a plaintiff in this action and an authorized representative of plaintiffs Cam-Elm Company, LLC, SMV Property Holdings LLC, SWC Property Holdings LLC, SWC Special Holdings, LLC, SMV Special Holdings, LLC, Cammeby's Equity Holdings LLC, Cammeby's Funding LLC, Cammeby's Funding II LLC, Cammeby's Funding III LLC, CAMFIVE Holdings, LLC, Cammeby's Management Co. LLC, and Cammeby's International, Ltd. I am authorized by each of these entities to make this verification on their behalf pursuant to CPLR 3020.

2. I have read the foregoing Verified Complaint and its contents are true to the best of my knowledge, except as to matters alleged on information and belief, which I believe to be true.

Rubin Schron

Sworn to before me this 4th
day of August 2010:

Notary Public

ALAN FRIEDMAN
Notary Public, State of New York
No. 01FR6096579
Qualified in Queens County
Commission Expires July 28, 2011

Exhibit "A"

The Lancaster Group, LLC
*Finite Results / Infinite Wisdom*

813 Coopers Court • Lancaster, PA 17601-1477 • Tel: 717.371.6547 • Fax: 717.892.3056 • Ed.LeBreton@comcast.net

January 23, 2006

Mr. Thomas Scott
Killian & Gephart, LLP
218 Pine Street
Harrisburg, PA 17108-0886

Dear Mr. Scott:

**Barnhill V. Trans Healthcare, Inc. et al.**
**No. 1:04 CV 1858 Middle District**

Following is the Expert Report on the above-referenced matter. The Expert Report is separated into the following three (3) sections for your review:

- Summary;
- Information Analyzed; and
- Analyses and Conclusions.

I am the CEO of The Lancaster Group, LLC. Immediately prior to my current position I was a Director in the KPMG LLP Senior Living Services practice, where I practiced accounting and consulting for more than nine (9) years. Prior to my career at KPMG LLP I served in the capacity as a Chief Financial Officer in a skilled nursing facility for more than nine (9) years. I have written expert reports and opinions on various nursing home management and financial issues and on Pennsylvania real estate and sales tax exemption issues; I have testified as an expert witness in one (1) nursing home federal trial involving financial and reimbursement issues and one (1) real estate tax exemption hearing in Pennsylvania; for the Department of Justice I have acted in the capacity of Examiner in a nursing home bankruptcy case, in which I have written an expert report and testified at federal trial; I have testified at two (2) Medicare Provider Reimbursement Review Board hearings in provider appeals relating to Medicare reimbursement principles; I have testified at several Medicare Administrative Law Judge Hearings; and I have testified as a fact witness in Pennsylvania state court in a nursing home regulatory and reimbursement trial relating to the provision of ancillary services. I have assisted investors, lenders, buyers and sellers of nursing facilities in various due diligence activities relating to the purchase/sale and merger of nursing facility companies. Additionally, I have assisted a plaintiff in settlement negotiations with a defendant nursing facility. Finally, my responsibilities include assisting clients (primarily skilled nursing facility and senior housing providers) in such areas as acquisition due diligence assistance, third party (including clinical) reimbursement, regulatory compliance, and performance improvement. My resume is included as Attachment III to this Expert Report.



EXHIBIT
E

The Lancaster Group, LLC
*Finite Results / Infinite Wisdom*



You have asked me to testify on behalf of the above-captioned plaintiff ("Barnhill") as an expert in the valuation of the common shareholdings of defendant nursing facility company[1]. I am being compensated based upon the hours of time spent working on various tasks required of this project. I have no financial interest in the outcome of this case. All opinions and conclusions stated in this Expert Report are held to a reasonable degree of professional certainty.

## *Summary*

Based upon an analysis of the information provided to me, and a comparison of publicly available financial information of publicly traded nursing facility companies (defendant's peers), I conclude the value of the common shareholdings of THI Holdings LLC is approximately $147 million.

## *Information Analyzed*

I have relied upon the following documents, materials, and information to formulate my conclusions:

- CEO Update – Sector Overview as of November 2004 (THID11812);
- Defendant's internal financial statements for the periods ending December 31, 2004 and September 30, 2005 (THID000353 – THID000359);
- Defendant's subsidiaries' federal income tax returns for the year ended December 31, 2004 (THID07609 – THID07777, THID07778 – THID 07811, THID08915 – THID09061);
- Defendant's THI of Baltimore Inc. draft audited financial statements for the year ending December 31, 2004 (THID000388 – THID000412);
- Observations of the January 4, 2006 deposition of defendant's representative, Mr. Sean Nolan; and
- Yahoo Finance internet website information (yahoo.com, Finance section).

## *Analyses and Conclusions*

**Analysis**

<u>Background</u>

[1] I understand that the defendants in this case include THI Holdings LLC. For purposes of this report, "defendant" refers to THI Holdings LLC, unless specified otherwise.

The Lancaster Group, LLC
*Finite Results / Infinite Wisdom*



Ongoing businesses are evaluated and valued based upon their expected future cash flow; an investor will pay a sum of money today in return for expected future cash payments. In this regard, all businesses are evaluated in a similar fashion. With respect to companies, including nursing facility companies (e.g., the defendant), a basis upon which to gauge value is the price investors are willing to pay for similar or like-kind enterprises (i.e., "peer companies") on a per unit basis (e.g., per dollar of cash flow) in the open market. With respect to the defendant, there are a number of peer companies that are publicly traded and thus there exists financial information on those peers in the public domain. Therefore, there exists data against which the defendant can be compared.

Peer Companies

As per the Defendant's valuation comparative in reporting proforma 2005 EBITDAR (THID11812)[2] in comparison to such peers, the following companies were considered to be peers by the defendant: Mariner[3], Beverly, Extendicare, Genesis, Manor Care and Sun. Based upon my experience in the skilled nursing facility and senior housing industry I agree that those companies can reasonably be considered peers to the defendant, with the exception of Manor Care (Manor Care typically operates at a much higher private pay census than most for-profit skilled nursing facility providers and is therefore not as comparable to the defendant as are the other companies)[4].

Gross Valuation

The EBITDAR or EBITDA[5] of an ongoing enterprise is multiplied by a factor to arrive at a gross value of the ongoing enterprise, or the amount that an investor would pay today for the expected future cash flows to be generated by the enterprise ("gross value"). Therefore, in its most elementary form, the computation of gross value is the product of two variables: (i) EBITDAR or EBITDA and (ii) the multiplier. Fortunately, the EBITDAR or EBITDA variable is known or can be computed and the multiplier variable can be deduced from an analysis of the enterprise's peers.

---

[2] Earnings before interest, (income) taxes, depreciation, amortization and rent; a common surrogate for operating cash flow.
[3] Since the time of the defendant's valuation comparative Mariner has been privatized and is no longer a publicly traded company. Therefore, since financial information is no longer publicly available on Mariner, Mariner has been eliminated as a peer company for purposes of this Expert Report.
[4] Had Manor Care been considered a peer, the results of the valuation would be a higher value placed on the common shareholdings of the defendant.
[5] Earnings before interest, taxes (income), depreciation and amortization; another common surrogate for operating cash flow, computed after consideration of rent expense, as differentiated from EBITDAR, which is computed prior to the deduction of rent expense from net revenues.

The Lancaster Group, LLC
*Finite Results / Infinite Wisdom*



Net valuation

Once the enterprise's gross value is determined, a net value is computed by deducting from the gross value those items that the common shareholders would not realize in a sale of the enterprise for value. Those items include the value of preferred shareholdings, which stand in a primary position to the common shareholdings when, among other things, realizing the proceeds from a sale of the enterprise. For example if the net value of the enterprise is $170 million and the value of the preferred shareholdings is $35 million, then the net value of the common shareholdings would be $135 million.

EBITDAR and EBITDA

Utilizing EBITDA as a basis of valuation is more meaningful than the use of EBITDAR since not all peer organizations rent assets to a comparable extent; the use of EBITDA instead of EBITDAR "normalizes" the differences in organizations' form of financing (i.e., debt vs. rental arrangement). For example certain companies have little or no rent expense and therefore their EBITDAR will approximate their EBITDA (very little rent or "R" is deducted from EBITDAR to arrive at EBITDA), whereas other companies with high rent expense will have much lower EBITDA than EBITDAR (a high amount of rent or "R" is deducted from EBITDAR to arrive at EBITDA).

Enterprise Value

Enterprise value is the theoretical value of an enterprise, based upon its expected future cash flows. For publicly traded companies, enterprise value is the sum of the organization's net debt[6] and market capitalization of common stock (number of shares outstanding multiplied by the price per share). The reason for the inclusion of the net debt in the computation of enterprise value is the theory that if the organization had less or no debt, its shares would trade at a higher price (greater market capitalization), equivalent to the decrease in the amount of debt. Therefore, for publicly traded companies, enterprise value is the sum of (i) the value provided by the common shareholders through the market capitalization and (ii) the value provided by the lenders through debt instruments. For example, if a public company's market capitalization is $300 million and its net debt is $200 million, the enterprise value is $500 million.

[6] "Net debt" is defined as total debt less available cash.

The Lancaster Group, LLC
*Finite Results / Infinite Wisdom*



EBITDA Multiples and Enterprise Value

An organization's enterprise value can be expressed as a multiple of EBITDA, which indicates the premium that an investor is willing to pay today in return for expected future cash flow. Conversely, an organization's EBITDA can be multiplied by a factor to arrive at the enterprise value. The same relationship is true for adjusted enterprise value[7] and EBITDA. For example, an EBITDA multiple of five (5) times adjusted enterprise value indicates that the investor is willing to pay five-times the current EBITDA (i.e., an expected pay-back on investment of five years), in return for the common stock and assumption of the net debt of the enterprise.

When expressing enterprise value as a multiple of EBITDA, "adjusted" EBITDA is used in the computation. Adjustments are made to EBITDA to arrive at adjusted EBITDA, a more meaningful measure of financial performance. Certain adjustments are made to EBITDA to remove the impact of one-time only events, events that will no longer occur, or events that are reasonably expected to occur, but which have not in the past.[8] In summary, investors are not willing to provide the organization credit for past events that will not recur, but will provide credit for future events that are reasonably expected to occur.

**Conclusion**

Defendant Common Shareholding Value

To arrive at the value of the defendant's common shareholdings, an analysis of the peer organizations was performed, which included the following steps:

1. Identify the peers (accomplished as described in the "Peer Companies" subsection of this Expert Report).
2. Obtain publicly available financial information of the peers (accomplished through the Yahoo Finance internet website, summarized on Attachment I).
3. Compute the adjusted enterprise value for each of the peers utilizing the information obtained in step 2 above (Attachment I).

[7] Enterprise value less net debt, the theoretical equivalent to "equity."
[8] In his deposition, Mr. Sean Nolan responded to an inquiry by indicating that adjustments to EBITDA are made for one-time only events. The example discussed by Mr. Nolan was a situation whereby an organization's EBITDA was artificially low due to the one-time write-off of old accounts receivable (through an allowance for doubtful accounts). In his discussion Mr. Nolan suggested that to compute EBITDA, the one-time accounts receivable write-off would be eliminated and replaced with an industry average of bad debts, such as 1.5% to 2.0% of net revenues. I agree with Mr. Nolan's position.

The Lancaster Group, LLC
*Finite Results / Infinite Wisdom*

 813 Coopers Court • Lancaster, PA 17601-1477 • Tel: 717.371.6547 • Fax: 717.892.3056 • Ed.LeBreton@comcast.net
Mr. Thomas Scott
Killian & Gephart
January 23, 2006

4. Compute the relationship between the adjusted enterprise value and EBITDA for each of the peers utilizing the information obtained in step 2 above and computed in step 3 above (Attachment I).
5. Compute the adjusted EBITDA for the defendant, utilizing internal financial statements and federal income tax returns[9] (Attachment II).
6. Compute the defendant's adjusted enterprise value based upon its adjusted EBITDA and the peers' weighted average relationship between EBITDA and adjusted enterprise value (Attachment II).
7. Deduct from the defendant's adjusted enterprise value, the value of the preferred shareholdings to arrive at the net value of the common shareholdings (Attachment II).

Utilizing the peers' average adjusted enterprise value in relation to EBITDA, the net value of the common shareholdings of the defendant is computed as follows:

Adjusted EBITDA ($37,912,109) x multiplier (4.85) = adjusted enterprise value ($183,873,730). Adjusted enterprise value ($183,873,730) – preferred shareholdings ($37,314,000) = value of common shareholdings ($146,559,730). One should note that the value of the common shareholdings as computed using the adjusted enterprise value methodology considers the impact of debt on the value of the common shareholdings and therefore, this value is not further reduced by the outstanding indebtedness.

Qualitative Factors

That an organization has struggled to be profitable does not conclusively determine that inherent value does not exist. For example, a third party may be able to operate the organization in a more effective manner to derive value from the organization's underlying assets. Additionally, with respect to potential merger candidates, the reduction in corporate overhead and other expenses that can be shared would result in a lower expense in comparison to the same volume of revenue. In summary, the combination of a struggling organization with a stronger more effectively operated and profitable organization can lead to value of the combined entity greater than the sum of its parts. An industry such as the one in which the defendant operates has natural barriers to entry (i.e., the individual state Certificate of Need process) which can make the organization attractive to potential suitors, who wish to, but cannot obtain

[9] Typically, to compute an enterprise's earnings, EBITDA or other financial position or performance indicators audited financial statement are utilized. However, the defendant has not issued audited financial statements for the years ending December 31, 2003 through 2005 and therefore draft audit and internal financial statements are the best available information. Additionally, federal income tax returns are a source of information "certified" to be true and correct by the tax payer and therefore provides some level of assurance on their accuracy.

regulatory approval to operate skilled nursing facilities, one example of inherent value of the organization.

I hope this information proves useful to you. If you have any questions, please feel free to contact me at (717) 371-6547. I reserve the right to amend this report as additional information is made available.

Sincerely,

*The Lancaster Group, LLC*

Ed LeBreton
*CEO*

Attachments

# ATTACHMENT I
# PEER INFORMATION

ATTACHMENT I

THI Holdings LLC Peers

**VALUATION MEASURES**

| | Beverly | Extendicare | GHCI | Sun Healthcare |
|---|---|---|---|---|
| Market Cap (intraday): | 1.28B | 1.08B | 714.43M | 103.66M |
| Enterprise Value (3-Jan-06)[3]: | 1.62B | 1.72B | 1.02B | 225.55M |
| Trailing P/E (ttm, intraday): | 16.09 | 9.73 | 17.35 | 11.95 |
| Forward P/E (fye 31-Dec-06) [1]: | 12.48 | N/A | 15.22 | N/A |
| PEG Ratio (5 yr expected): | 0.34 | N/A | 1.13 | N/A |
| Price/Sales (ttm): | 0.58 | 0.64 | 0.42 | 0.12 |
| Price/Book (mrq): | 3.5 | 2.62 | 1.08 | N/A |
| Enterprise Value/Revenue (ttm)[3]: | 0.73 | 1.03 | 0.6 | 0.27 |
| Enterprise Value/EBITDA (ttm)[3]: | 6.861 | 7.497 | 6.205 | 8.109 |

**FINANCIAL HIGHLIGHTS**

| | | | | |
|---|---|---|---|---|
| **Fiscal Year** | | | | |
| Fiscal Year Ends: | 31-Dec | 31-Dec | 30-Sep | 31-Dec |
| Most Recent Quarter (mrq): | 30-Sep-05 | 30-Sep-05 | 30-Sep-05 | 30-Sep-05 |
| **Profitability** | | | | |
| Profit Margin (ttm): | 4.01% | 6.80% | 2.51% | 1.02% |
| Operating Margin (ttm): | 7.54% | 9.92% | 6.26% | 2.12% |
| **Management Effectiveness** | | | | |
| Return on Assets (ttm): | 7.60% | 7.97% | 5.14% | 3.41% |
| Return on Equity (ttm): | 29.06% | 30.05% | 6.95% | N/A |
| **Income Statement** | | | | |
| Revenue (ttm): | 2.21B | 1.67B | 1.68B | 847.58M |
| Revenue Per Share (ttm): | 20.313 | 24.257 | 85.391 | 55.298 |
| Qtrly Revenue Growth (yoy): | 11.30% | 11.50% | 5.90% | 7.70% |
| Gross Profit (ttm): | 841.11M | 1.45B | 670.21M | 334.76M |
| EBITDA (ttm): | 235.52M | 228.89M | 163.62M | 27.81M |
| Net Income Avl to Common (ttm): | 91.14M | 116.98M | 42.42M | 3.64M |
| Diluted EPS (ttm): | 0.73 | 1.62 | 2.106 | 0.56 |
| Qtrly Earnings Growth (yoy): | -10.00% | 47.70% | -5.20% | N/A |

**ATTACHMENT I**

| | Beverly | Extendicare | GHCI | Sun Healthcare |
|---|---|---|---|---|
| **Balance Sheet** | | | | |
| Total Cash (mrq): | 217.84M | 68.39M | 101.60M | 13.61M |
| Total Cash Per Share (mrq): | 1.989 | 0.967 | 5.196 | 0.886 |
| Total Debt (mrq): | 544.70M | 709.34M | 410.17M | 137.66M |
| Total Debt/Equity (mrq): | 1.49 | 1.673 | 0.625 | N/A |
| Current Ratio (mrq): | 1.537 | 0.982 | 2.076 | 0.845 |
| Book Value Per Share (mrq): | 3.338 | 5.964 | 33.660999 | -7.137 |
| **Cash Flow Statement** | | | | |
| Operating Cash Flow (ttm): | 109.04M | 175.66M | 124.98M | -15.21M |
| Levered Free Cash Flow (ttm): | 5.45M | 83.50M | -17.77M | -439.62K |

| | | Beverly | Extendicare | GHCI | Sun Healthcare |
|---|---|---|---|---|---|
| Adjusted Debt (Debt less Cash) | | 326,860,000 | 642,950,000 | 308,570,000 | 124,050,000 |
| Adjusted EV (EV less Adj Debt) | | 1,293,140,000 | 1,077,050,000 | 711,430,000 | 101,500,000 |
| Adjusted EV/EBITDA | | 5.49 | 4.70 | 4.34 | 3.65 |
| Weighted Average Adjusted EV/EBITDA | 4.85 Used in computations | | | | |

This section is used to compute the EBITDA Multiple

# ATTACHMENT II
# VALUE COMPUTATIONS

ATTACHMENT II

Trans Holdings LLC
Computation of Common Shareholdings Value
As of 12/31/2004
Based Upon Federal Income Tax Returns

| Trans Holdings Subsidiary | Source | Net Income (1) | Depr/Amort | Interest | Unadjusted EBITDA | EBITDA Adjustments (2) | Adjusted EBITDA |
|---|---|---|---|---|---|---|---|
| THI of Baltimore, Inc. | THID07609 | 6,289,927 | 11,305,434 | 12,166,089 | 29,761,450 | | 29,761,450 |
| Trans Healthcare, Inc. | THID08915 (1) | (2,957,413) | 5,593,343 | 10,415,640 | 13,051,570 | (9,668,579) | 3,382,991 |
| THI of Nevada II, Inc. | THID07778 | 465,902 | 2,543,744 | 1,758,022 | 4,767,668 | | 4,767,668 |
| THI Allied Services | | - | - | - | - | | - |
| Totals | | 3,798,416 | 19,442,521 | 24,339,751 | 47,580,688 | | 37,912,109 |
| Average EBITDA Multiple | | | | | | | 4.85 |
| Adjusted Enterprise Value | | | | | | | 183,873,730 |
| Value of Preferred Shareholdings | THID000355 | | | | | | (37,314,000) |
| Value of Common Shareholdings | | | | | | | 146,559,730 |

(1) Excluding gains/losses on the sale of assets
For Trans Healthcare, Inc., excludes a loss on disposition of 3,869,007.

(2) EBITDA Adjustments

| | | |
|---|---|---|
| For Trans Healthcare, Inc.: | | |
| Eliminate negative bad debt expense | (6,119,015) | 2004 net income included negative bad debt expense; prior year recovery/reversal |
| Replace with 1.5% of net revenues | (3,549,564) | As per Sean Nolan deposition, 1.5% of net revenue ($236,637,582) is appropriate |
| Total | (9,668,579) | |

# ATTACHMENT III
# RESUME

**LEON E. "Ed" LeBRETON**
**CEO – The Lancaster Group, LLC**
Mr. LeBreton is the Chief Executive Officer of The Lancaster Group, LLC (1/2004 – present). Immediately prior to his tenure at The Lancaster Group, LLC, Mr. LeBreton served as a director in the KPMG LLP Senior Living Services Practice located in the Harrisburg office (1/1995 – 1/2004).

His extensive knowledge and experience is concentrated in health care finance and operations, including acquisition and financing due diligence, performance improvement, third-party reimbursement (including billing and cost reporting), litigation support (including designation as an expert witness, trial tesitmony and writing expert reports) and regulatory compliance. Aspects of his advisory experience include:

**Relevant Experience**

- Over 20 years experience in healthcare and long term care and senior housing operations and finance.
- Testifying at trial in federal court as an expert witness.
- Assisted counsel in valuation of settlement agreement and ability of defendant to liquidatethe same.
- Through due diligence, assisted buyers of nursing facilities in valuing the ongoing business, as impacted by proforma adjustments to operations.
- Computed approximate value of a skilled nursing facility Medicaid Certificate of Need.
- Department of Justice approved independent Fee Examiner in a federal multi-site, multi-state nursing facility bankruptcy matter.
- Testifying before the Medicare Provider Reimbursement Review Board as an expert witness.
- Testifying before the Pennsylvania Medicaid Office of Hearings and Appeals (predecessor to the Bureau of Hearings and Appeals) as an expert witness.
- Representation of various long term care clients in the appeal of audit adjustments to the Medicaid and Medicare cost reports.
- Representation of long term care clients in Administrative Law Judge appeals of denied Medicare claims.
- Member of audit team for government owned, not-for-profit and private and publicly traded for-profit health care entities.
- Preparing related party analyses and requests for exception to the Medicare related party principles.
- Assisting SNF providers with the defense against government allegations of cost report and billing fraud.
- Assisting SNF providers entering or operating under bankruptcy protection in various accounting, reimbursement and other operational matters.
- Assisting Pennsylvania not-for-profit entities in the request for sales tax and real estate tax exemption under the Pennsylvania Act 55 and other related guidelines.
- Assisting SNF providers as an expert witness in their defense against general or professional liability matters.
- Performance improvement and business planning services for various long term care provider clients.

- Assisting SNF providers in third party ancillary (including rehabilitative therapy) dispute resolution, including calculation of Prospective Payment System contract therapy rates.
- Presentations to provider and provider organizations addressing various due diligence and Medicare and Medicaid reimbursement issues.
- Performing Medicare and Medicaid billing training to SNF providers.
- Assisting SNF providers with the submission of Medicare and Medicaid claims.
- Operational and financial analysis regarding Medicare SNF PPS and consolidated billing issues including regulatory compliance.
- Operational assessments of nursing facilities assisted living facilities and Continuing Care Retirement Communities (CCRCs).
- Assisting providers with a competitive bidding process for the procurement of ancillary services.
- Preparation of Medicare and Medicaid cost reports for nursing facility chains (including the home office), hospital-based and freestanding nursing facilities, and home health agencies.
- Assistance in the Medicare and Medicaid provider application process and education on the Medicare and Medicaid billing systems.
- Analysis of managed care contracts and pricing of the same.

**Background**
Prior to his consulting experience at The Lancaster Group, LLC and KPMG LLP, Mr. LeBreton served in the capacity of chief financial officer of a 361-bed long-term care facility for nine years (9/1985 – 12/1994). Mr. LeBreton received Bachelor of Science degrees in Accounting and Finance from the University of Delaware in 1985.

**Speeches**
Mr. LeBreton has participated as an instructor/speaker on topics such as Medicare SNF PPS and Consolidated Billing and Mergers and Acquisitions Due Diligence at various seminars and conventions for associations such as the American Health Care Association (AHCA), American Health Lawyers Association (AHLA), Gulf States Association of Homes and Services for the Aging (Gulf States AHSA), Louisiana Nursing Home Association (LNHA), Pennsylvania Association of Non-Profit Homes for the Aging (PANPHA), the Pennsylvania Health Care Association (PHCA), the Hospital and Healthsystem Association of Pennsylvania (HAP), the New York Association of Homes and Services for the Aging (NYAHSA), the University of Louisiana at Lafayette and various Healthcare Financial Management Association (HFMA) meetings.

**Other**
Mr. LeBreton is a certified public accountant and is a member of the American Institute of Certified Public Accountants, American Health Lawyers Association, Pennsylvania Institute of Certified Public Accountants and the Healthcare Financial Management Association. Mr. LeBreton volunteers for St. Leo the Great School.

By: Donna J. Fudge
Identification No.: 95030
BUCKLEY & FUDGE, P.A.
650 16th Street North
St. Petersburg, FL 33705
Tel. No.: (727) 490-3100
Email: dfudge@buckleyandfudge.com

THIS IS NOT AN ARBITRATION CASE; AN ASSESSMENT OF DAMAGES IS REQUIRED; JURY TRIAL DEMANDED

Attorney for Defendants,
TRANS HEALTHCARE, INC. and
TRANS HEALTH MANAGEMENT, INC.

| | |
|---|---|
| FRANCINA SPIVERY-JONES, Administratrix of the Estate of JAMES HENRY JONES, deceased<br><br>Plaintiff,<br><br>v.<br><br>TFN HEALTH CARE INVESTORS, LLC, LYRIC HEALTH CARE, LLC, LYRIC HEALTH CARE HOLDINGS, III, INC., REST HAVEN NURSING CENTER (WHITEMARSH), INC., d/ba/ ANDORRA WOODS HEALTHCARE CENTER, ENCORE HEALTHCARE, INC., TRANS HEALTHCARE, INC., and TRANS HEALTH MANAGEMENT, INC.<br><br>Defendants. | COURT OF COMMON PLEAS<br>MONTGOMERY COUNTY<br><br>NO. 2006-06672 |

**DEFENDANTS, TRANS HEALTHCARE, INC. AND TRANS HEALTH MANAGEMENT, INC.'s, ANSWERS AND OBJECTIONS TO PLAINTIFF'S "CORPORATE STATUS" INTERROGATORIES**

COME NOW, Defendants, TRANS HEALTHCARE, INC. and TRANS HEALTH MANAGEMENT, INC. (hereinafter "Defendants"), hereby file by and through the undersigned counsel these Answers and Objections to Plaintiff's "Corporate Status" Interrogatories.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by facsimile and by U. S. Mail to **Brian L. Strauss, Esquire,** Wilkes & McHugh, P.A., One Liberty Place, Suite 3175, 1650 Market Street, Philadelphia, Pennsylvania 19103, **David M. McGeady,**

EXHIBIT
F

**Esquire**, Burns, White & Hickton, 100 Four Falls, Suite 515, 1001 Conshohocken State Road, West Conshohocken, Pennsylvania 19428 and **Steven Sinkway, Esquire,** Burns White & Hickton, 100 Four Falls, Suite 515, 1001 Conshohocken State Road, West Conshohocken, Pennsylvania 19428, on this 2 day of ~~August~~ Sept., 2009.

**Donna J. Fudge, Esquire**
Pennsylvania I.D. No.: 95030
**BUCKLEY & FUDGE, P.A.**
650 16th Street North
St. Petersburg, Florida 33705
Telephone: (727) 490-3100
Facsimile: (727) 490-3101
Attorneys for Defendants THI and THMI

"Corporate Status" Interrogatories

1. Do Defendants contend that Trans Healthcare, Inc. is no longer an active corporation?

**ANSWER:**

Trans Healthcare, Inc. is in receivership pursuant to the documents filed in this case.

2. Please state the name, job title and employer of the person most knowledgeable about the current status, business operations, and activities of Trans Healthcare, Inc.

**ANSWER:**

Trans Healthcare, Inc.
Receiver
Michael L. Sandnes
Executive Sounding Board Association, Inc.
Baltimore, MD 21202

3. Do Defendants contend that Trans Health Management, Inc. is no longer an active corporation?

Yes.

**ANSWER:**

4. Please state the name, job title and employer of the person most knowledgeable about the current status, business operations, and activities of Trans Health Management, Inc.

**ANSWER:**

None within the knowledge, custody or control of Trans Healthcare, Inc.

5. Is Trans Healthcare, Inc. owned by (either directly or indirectly), or affiliated in any way with an entity known as Fundamental Long Term Care, Inc.?

**ANSWER:**

No

6. Is Trans Health Management, Inc. owned by (either directly or indirectly), or affiliated in any way with an entity known as Fundamental Long Term Care, Inc.?

**ANSWER:**

Yes. Fundamental Long Term Care, Inc., purchased the stock of Trans Health Management, Inc., in February 2006.

7. Is Trans Healthcare, Inc. owned by (either directly or indirectly), or affiliated in any way with an entity known as Pathways Healthcare?

**ANSWER:**

No. This Defendant is not owned or affiliated in any way with an entity known as "Pathways Healthcare."

8. Is Trans Health Management, Inc. owned by (either directly or indirectly), or affiliated in any way with any entity known as Pathways Healthcare?

**ANSWER:**

No

9. If the answer to any of the preceding four (4) interrogatories was in the affirmative, please describe the nature of the ownership or affiliation referenced in Defendants' interrogatory answer(s).

**ANSWER:**

See above.

TRANS HEALTHCARE, INC

By: [signature]
(Signature)

MICHAEL L. SANDNES
Receiver for Trans Healthcare, Inc.
and its Related Entities

**STATE OF MARYLAND )**

**COUNTY OF BALTIMORE )**

**BEFORE ME,** the undersigned authority, personally appeared MICHAEL L. SANDNES, on behalf of TRANS HEALTHCARE, INC who is personally known to me, and deposes and says that the foregoing is true and correct in all respects.

**SWORN TO AND SUBSCRIBED** before me, this 26th day of August, 2009.

[signature]
**NOTARY PUBLIC**
**State of Maryland**

My Commission Expires:
10/1/2009

LESLEY T. BAILEY
Notary Public, State of Maryland
County of Baltimore
My Commission Expires October 1, 2009

TRANS HEALTHCARE, INC

By: *[signature]*
(Signature)

MICHAEL L. SANDNES
Receiver for Trans Healthcare, Inc.
and its Related Entities

**STATE OF MARYLAND )**

**COUNTY OF BALTIMORE )**

**BEFORE ME,** the undersigned authority, personally appeared MICHAEL L. SANDNES, on behalf of TRANS HEALTHCARE, INC who is personally known to me, and deposes and says that the foregoing is true and correct in all respects.

**SWORN TO AND SUBSCRIBED** before me, this 26th day of August, 2009.

*[signature]*
**NOTARY PUBLIC**
**State of Maryland**

My Commission Expires:
10/1/2009

LESLEY T. BAILEY
Notary Public, State of Maryland
County of Baltimore
My Commission Expires October 1, 2009

Donald S. Zakarin
Todd E. Soloway
Eric M. Fishman
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Telephone: (212) 421-4100

*Attorneys for Plaintiffs Allen Bodner and DMV Funding LLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
ALLEN BODNER and DMV FUNDING LLC,

Plaintiffs,

-against-

Index No. __________

**COMPLAINT**

LEONARD GRUNSTEIN, HARRY GRUNSTEIN, MURRAY FORMAN, LAWRENCE LEVINSON, TROUTMAN SANDERS LLP, FUNDAMENTAL LONG TERM CARE HOLDINGS, LLC, THI OF BALTIMORE, INC., KENNETH TABLER, METCAP SECURITIES, LLC, METCAP HOLDING, LLC, METCAP ADVISORY SERVICES, LLC, JOHN DOES 1 through 10, and XYZ CORPS. 1 through 10,

Defendants.
------------------------------------------------------------------------X

EXHIBIT
6

Plaintiffs Allen Bodner and DMV Funding LLC ("Bodner" and "DMV" are collectively referred to as "Plaintiffs" except where otherwise noted), by and through their attorneys, Pryor Cashman LLP, bring this lawsuit against defendants Leonard Grunstein ("Grunstein") Murray Forman ("Forman"), Harry Grunstein ("H. Grunstein"), Lawrence Levinson ("Levinson"), Troutman Sanders LLP ("Troutman"), Fundamental Long Term Care Holdings, LLC ("Fundamental"), THI of Baltimore, Inc. ("THI"), Kenneth Tabler ("Tabler"), MetCap Securities, LLC, MetCap Holding, LLC, MetCap Advisory Services, LLC, John Does 1 through 10, and XYZ CORPS. 1 through 10 (collectively sometimes referred to herein as "Defendants"), and allege as follows:

**THE NATURE OF THE ACTION**

1. This action is brought by Plaintiffs against the Defendants for, among other things, fraud, conversion, breach of fiduciary duty, unjust enrichment, accounting and legal malpractice arising out of Defendants' secret and knowingly wrongful schemes to divest Bodner and DMV of their interests in a lucrative healthcare/real estate venture.

2. The mastermind of these schemes was Grunstein, a New York real estate attorney. Through Grunstein's controlling positions as lawyer for the Plaintiffs, legal architect of many of the transactions at issue, and his largely concealed, self-dealing and conflicting personal financial interests as a principal in these same transactions, Grunstein seized the opportunity to enrich himself to the detriment of his clients, by misappropriating the real estate and healthcare business assets that were under Bodner's and DMV's ownership and control.

**PARTIES**

3. Plaintiff Bodner is an individual who resides in Brooklyn, New York.

4. Plaintiff DMV is a limited liability company organized under the laws of Delaware. Its principal place of business is in New York, New York.

5. Defendant Grunstein is an individual who resides in Bergen County, New Jersey. At all relevant times, Grunstein was a practicing attorney and a member of the New York State Bar, who specializes in corporate real estate transactions. From 2003 until in or about March 31, 2005, Grunstein was a partner in the New York office of the law firm of Jenkens & Gilchrist Parker Chapin LLP ("Jenkens"). On or about April 1, 2005, Grunstein and some or all of the attorneys who on March 31, 2005 were partners or employees of Jenkens's New York office left Jenkens (which subsequently became defunct) and became partners or employees of Troutman, taking with them the clients and, upon information and belief, all of the files of such clients they represented up through and including March 31, 2005 at Jenkens.

6. By 2009, Grunstein was the leader of Troutman's real estate capitalization and investment practice groups and, upon information and belief, accounted for a substantial portion of the revenues of Troutman's New York office, much of which was attributable to the legal representation of Rubin Schron and companies associated with him.

7. Upon information and belief, upon being sued by the United States in connection with a separate nursing home and real property transaction orchestrated and documented by Grunstein, Levinson and Troutman and in which Forman and H. Grunstein also participated with Grunstein, in or about November 2009, Troutman required Grunstein to take a leave of absence from the firm.

8. Defendant Levinson is a resident of Roslyn, New York. At all relevant times, Levinson has been a practicing attorney in New York and a member of the New York State Bar. Levinson is currently a partner in the New York office of Troutman. Levinson has long been a

partner of Grunstein servicing Grunstein's clients as directed by Grunstein and dependent on Grunstein for his work and has followed Grunstein from Jenkens to Troutman.

9. Jenkens (which would be a defendant but for the fact that it has been liquidated) was formerly a corporation with its principal place of business in Dallas, Texas. Grunstein and Levinson were partners in Jenkens's New York office. On or about April 1, 2005, with Jenkens subsequently dissolving due largely to problems with fraudulent tax shelters created by attorneys in its Chicago office, the 90-attorney New York City office, even including its physical location in the Chrysler Building, and prominently including Grunstein and Levinson, was acquired by Troutman.

10. Defendant Troutman is a limited liability partnership with its principal place of business in Atlanta, Georgia. Troutman's New York office, where Grunstein and Levinson were partners (before Grunstein's leave of absence), has more than 100 attorneys and, upon information and belief, is functionally the successor in interest to the New York office of Jenkens. Many of the wrongful acts alleged herein were undertaken by Grunstein and Levinson while partners at Troutman.

11. Defendant H. Grunstein is an individual who formerly resided in Maryland before moving back to Israel. H. Grunstein is Grunstein's brother.

12. Defendant Forman is an individual who resides in Nassau County, New York and who is a partner or co-managing member with Grunstein in a variety of businesses involved in the transactions at issue herein, including MetCap Securities, MetCap Holding, MetCap Advisory and Fundamental. Upon information and belief, Forman has acted as an investment advisor and banker through one or more of the MetCap entities and has also managed the affairs

of companies owned by DMV, ostensibly on behalf of DMV and Bodner but, in fact, in furtherance of Forman's and Grunstein's separate and conflicting interests.

13. Defendant Fundamental is a limited liability company organized under the laws of Delaware with its principal place of business at The Highlands, 920 Ridgebrook Road, Sparks, Maryland. Upon information and belief, it is owned equally by Grunstein and Forman. In 2006 it acquired THI.

14. Defendant THI is a Delaware limited liability company with its principal place of business at The Highlands, 920 Ridgebrook Road, Sparks, Maryland. Upon information and belief, it is a wholly owned subsidiary of Fundamental and, through wholly owned subsidiaries, operates nursing home facilities leased or subleased from IHS Long Term Care, Inc. ("IHSLTC") throughout the United States. Before being purchased by Fundamental, THI was a wholly owned subsidiary of THI Holdings LLC.

15. Defendant Tabler is, upon information and belief, an employee of Fundamental and takes his instructions and directions from Forman and Grunstein. As directed by Forman and Grunstein, Tabler has purported to act as "controller" of ABE Briarwood Corp. ("ABE"), a company wholly owned by DMV. Tabler is a resident of Maryland.

16. Defendant MetCap Holding, LLC is a New York limited liability company with its principal place of business at 405 Lexington Avenue, New York, New York. Each of Grunstein, Forman, Levinson and another Troutman partner own 25% of MetCap Holding which serves as a holding company for the various MetCap entities, including MetCap Securities LLC and MetCap Advisory Services, LLC (hereinafter the MetCap entities shall be referred to collectively as "MetCap"). Upon information and belief, the MetCap entities use the offices of

Troutman and the actions of MetCap Securities and MetCap Advisory are directed by Forman and Grunstein.

17. Defendant MetCap Securities is a New York limited liability company with its principal place of business at 405 Lexington Avenue, New York, New York. MetCap Securities is a wholly owned subsidiary of MetCap Holding and is registered with the Securities Exchange Commission and in California, New York, New Jersey and Connecticut as a broker-dealer.

18. Defendant MetCap Advisory is a New York limited liability company with its principal place of business at 805 Third Avenue, New York, New York. MetCap Advisory is a wholly owned subsidiary of MetCap Holding.

19. John Does 1 through 10 and XYZ CORPS. 1 through 10 are persons and/or entities whose identity(ies) are presently unknown to Plaintiffs, but who, upon information and belief, participated, conspired and/or aided and abetted in the wrongful acts against Plaintiffs in connection with the causes of action set forth herein.

**JURISDICTION AND VENUE**

20. This Court has jurisdiction over this matter pursuant to N.Y. CPLR § 301 and/or § 302(a).

21. Venue is proper pursuant to N.Y. CPLR § 503.

**THE BACKGROUND**

22. Over a decade ago, Integrated Health Services Inc. ("IHS", the "Debtor") was one of the largest owners and operators of nursing homes in the United States. While IHS owned many of its health-care properties, certain of its facilities were located on land and/or in buildings owned by various other parties who leased the buildings to IHS and its subsidiaries for the

operation of nursing homes. On February 2, 2000, IHS filed for relief under Chapter 11 of the Bankruptcy Code.

23. At the time of the bankruptcy, IHS's assets included approximately 175 nursing homes, the real estate underneath 40 of these homes, and leasehold interests related to an additional 135 homes. In connection with the transactions by which IHS's plan of reorganization was accomplished, IHSLTC was formed for the purpose of holding certain of these assets.

24. Three years later, on January 28, 2003, IHS developed its Chapter 11 plan of reorganization through a series of complicated transactions that involved multiple entities.

25. Grunstein and others recognized that there were opportunities for profit in IHS's bankruptcy estate and Grunstein suggested to his client, Rubin Schron, that with financing supplied by Schron entities, the real estate assets might be acquired in separate packages, some of which, along with other assets, could be sold off to help finance the acquisition of the real estate assets, which would then be leased to a licensed nursing home operator(s) to generate rental income for the real estate assets acquired.

26. With the involvement and financial capacity supplied by Schron, IHS's reorganization plan was implemented which entailed a separation of real estate from nursing home operations and with the real estate assets themselves separated into different packages. Jenkens ultimately became the recipient of millions of dollars in legal fees from Schron interests and without any investment, Grunstein acquired an interest in SWC Property Holdings LLC ("SWC"). Through its purchase of one of the packages of real estate assets created as part of the reorganization/sale of IHS in the bankruptcy proceeding from ABE (which was the entity that acquired IHS in the bankruptcy sale), and through secured loans extended to ABE, SWC helped finance ABE's acquisition.

27. In addition, Grunstein's and Forman's investment banking firm, MetCap, was paid millions of dollars in brokerage commissions in connection with these transactions. After DMV acquired ABE (as set forth below), upon information and belief, Forman and Grunstein, through one or more of their MetCap entities, operated, ostensibly on behalf of DMV and Bodner (but in actuality for their own benefit), ABE and IHSLTC.

### A. IHS Is Acquired By ABE As Part Of The Reorganization Plan

28. The reorganization of IHS entailed the execution of various steps enabling the acquiring companies to finance the acquisition through the sale of portions of the assets of IHS in a series of transactions. In addition to the financing obtained through asset sales, as contemplated by Grunstein, Schron and the Schron interests provided cash and financing, secured by mortgages on properties and pledges of the stock of ABE and IHSLTC.

29. Initially, IHS formed two wholly-owned subsidiaries, IHSLTC and IHS Therapy Care, Inc. ("Therapy Care"). With the exception of specifically identified excluded assets and liabilities, IHS assigned all of its assets and liabilities relating to its nursing home and long-term care businesses to IHSLTC and assigned all of its assets and liabilities relating to its therapy businesses to Therapy Care.

30. In or about January 2003, ABE, then controlled by Uri Kaufman, entered into a stock purchase agreement with IHS whereby it purchased all of the capital stock of both IHSLTC and Therapy Care.

31. Concurrently with the stock purchase agreement between ABE and IHS, ABE agreed to sell certain of the assets, including the capital stock of Therapy Care and other properties to third parties, retaining other assets. The proceeds of the sale of stock and assets were used to help defray the acquisition price.

32. Initially, ABE divided the real estate assets, both fee interests and leasehold interests, into A, B, C and S packages of real estate and leaseholds.

33. As consideration for SWC's agreement to fund in part ABE's purchase under the IHS stock purchase agreement, SWC acquired all of the real estate assets within the "A" and "S" packages from ABE which contained both fee interests and leaseholds. One of the real estate assets included within the S package was a leasehold interest in New Mexico, the conveyance of which from IHSLTC to SWC was to have been properly effected and documented by Grunstein and Levinson.

34. Through its ownership of all of the stock of IHSLTC, ABE retained ownership of the assets and properties contained in the "B" and "C" packages of real estate assets.

35. As a fundamental part of the overall plan of reorganization, it was contemplated that ABE, which was not licensed as a nursing home operator, would enter into an omnibus agreement with THI, which was a licensed nursing home operator, pursuant to which certain of the nursing home facilities would be leased or subleased to THI, and THI would undertake operation of such facilities while other facilities would be sold to third parties.

36. On April 11, 2003, ABE entered into an Agreement to Lease with THI to operate the A Package and B Package, and further, pursuant to the Agreement to Lease, THI was the lessee or sublessee-operator of the B Package real estate assets owned by IHSLTC.

37. Upon information and belief, in or about August 2003, the transactions involving ABE, IHSLTC, SWC, THI and third parties were implemented. Jenkens, MetCap, Grunstein and Forman were paid millions of dollars in fees and commissions in connection with these transactions.

B. **Bodner Takes Ownership Of DMV, ABE, And IHSLTC Leaseholds**

38. In or about January 2004, Grunstein, who was familiar with Bodner through their common association with Rubin Schron, approached Bodner and suggested an opportunity to participate in a real estate venture involving dozens of health care facilities. Grunstein advised Bodner that he was structuring the acquisition of ABE and/or IHSLTC, which had been financed by the Schron interests (which consequently had a security interest in ABE and assets that it owned). Grunstein advised that ABE was currently owned by Uri Kaufman and that ABE indirectly, through IHSLTC, owned a large group of real estate assets involving leases to nursing home facilities.

39. DMV, of which Bodner owned 100%, was formed by Grunstein and Levinson for the purpose of acquiring IHSLTC, and ultimately came to own 100% of IHSLTC through DMV's 100% ownership of ABE, for which DMV paid five million dollars.

40. Grunstein initially advised Bodner that while he would become the owner of DMV and through his ownership of DMV, the owner of IHSLTC and/or ABE, Bodner would not be required to manage any of the real estate assets owned or controlled by IHSLTC or its subsidiaries because Grunstein and Forman, through one or more of their MetCap entities, would provide the management services. Grunstein later requested that his brother, H. Grunstein, who supposedly had experience in the nursing home business, become involved as an owner of DMV to assist in the management of its affairs.

41. Bodner, who had no experience in the health care business, agreed to the inclusion of H. Grunstein in the ownership and management of DMV, subject to certain conditions and assurances.

42. As structured by Grunstein and Levinson, Bodner, through DMV, acquired from Cammeby's Funding LLC ("Cammeby's Funding") the loan to ABE/IHSLTC from Cammeby's

Funding that had enabled ABE to acquire IHSLTC and the corresponding option to acquire 2/3 of the stock of IHSLTC and/or ABE. As they initially structured the transaction, Grunstein and Levinson required that Bodner individually guarantee the repayment of the loan from Cammeby's Funding used to acquire the ABE/IHSLTC loan and option to acquire 2/3 of the stock of IHSLTC and/or ABE. Bodner ultimately succeeded in eliminating Grunstein's and Levinson's demand that he personally guarantee repayment of DMV's borrowings from Cammeby's Funding, leaving DMV as the borrower and sole source of repayment of the monies loaned by Cammeby's Funding.

43. DMV exercised the option to acquire 2/3 of the stock of IHSLTC, leaving ABE a 1/3 minority owner of the stock of IHSLTC. As a result, DMV initially became the owner of 2/3 of the stock of a company that, through various subsidiaries, owned, controlled or was the lessee of valuable real estate assets that were leased or subleased to THI or THI subsidiaries for the operation of nursing homes throughout the United States. Consistent with the elimination of the personal guarantee of the loan from Cammeby's Funding, DMV's ownership of the stock in IHSLTC (and ultimately its ownership of ABE) and the income from the rent payable by THI to IHSLTC and its subsidiaries constituted the sole source from which repayment to Cammeby's Funding could be effected.

44. As will be described in detail below, Grunstein, Forman, MetCap, H. Grunstein and others later fraudulently transferred DMV assets to themselves in violation of the rights not only of DMV and Bodner but also in violation of the rights of Cammeby's Funding, by stripping DMV of the assets and income necessary to repay the existing debt to Cammeby's Funding, which Grunstein, Levinson and Jenkens had themselves documented and created.

45. Grunstein assured Bodner that he would eventually reap significant profits from ownership of the LLC that would be formed and from the transactions being structured by Grunstein through DMV's ownership of these real estate assets (the B and C leaseholds).

46. Having solicited Bodner's involvement, Grunstein, Levinson and Jenkens proceeded to represent him as counsel in the series of transactions they structured and documented. Bodner relied entirely on Grunstein and his law partners and associates to structure the entities and transactions in Bodner's best interests as their client.

47. Subsequent to DMV's acquisition of 2/3 of the stock ownership of IHSLTC through its loan transaction with Cammeby's Funding, Grunstein arranged DMV's acquisition of the remaining 1/3 of the stock ownership of IHSLTC through the acquisition of ABE by DMV. As a result, as of no later than 2005, DMV wholly owned both ABE and ISHLTC and through such ownership, DMV was the ultimate lessor of the B package properties to THI, entitled to the payment of the base rent and additional rent provided for under the Agreement to Lease between ABE and THI.

48. Particularly in light of the entitlement of IHSLTC to "additional rent" from THI under the Agreement to Lease with ABE which was calculated based on the earnings of THI from the operation of the nursing homes, Bodner agreed to Grunstein's request that Harry Grunstein receive a 50% interest in DMV, thereby being able to utilize his purported health care expertise to create value.

49. Because the source of repayment of DMV's loan obligations to Cammeby's Funding was the base leasehold payments and additional rental payments due from THI to IHSLTC pursuant to the terms of the Agreement to Lease between THI and ABE, it was important to manage and monitor the arm's length relationship between THI on the one hand and

DMV, ABE and ISHLTC on the other. Upon information and belief, Grunstein, Forman and the Metcap entities they controlled managed the relationship with THI on behalf of DMV, supposedly assuring the payment of base rent and additional rent and the servicing of DMV's debt to Cammeby's Funding.

50. THI was originally independent of any of the persons or entities represented by Grunstein, Forman, Levinson, and Jenkens or Troutman and the lease arrangements with THI were arm's length arrangements that were or should have been beneficial to IHSLTC. Upon information and belief, these facilities were expected to eventually generate in excess of $50 million and, through base rent and additional rent, should have paid DMV millions of dollars annually.

**C. IHSLTC Subleases B Package Properties To THI**

51. As stated above, in early 2003, ABE had agreed to purchase IHSLTC.

52. In April 2003, ABE entered into an agreement to lease with THI, a nationwide health care services company, whereby THI agreed to manage and operate a group of IHSLTC's nursing homes within certain groups of nursing home properties, labeled as the A Package and B Package (the "Agreement to Lease").

53. Upon information and belief, Grunstein and Levinson drafted the Agreement to Lease so that IHSLTC's subsidiaries would enter into long-term net leases with THI's subsidiaries for each of the A and B Package nursing homes for a fifteen-year initial term.

54. Under Section 5 of the Agreement to Lease, the base rent on the B Package, the package of properties owned or controlled by ABE through its ownership of IHSLTC, was initially set at $1 million with annual 4% escalations. Subsequently, ABE and THI agreed to abate rent to $600,000 annually for the first three years on the B Package properties, which period ran from September 1, 2003 to September 1, 2006.

55. In addition to paying base rent, after the initial year, the THI subsidiaries leasing the individual properties within the B package from IHSLTC were required to pay additional (percentage) rent that is calculated by taking the sum of (i) twenty percent of the combined EBITDA, as described in the Agreement to Lease, of all of the THI lessees (including both the A Package for which SWC or its subsidiaries was the lessor, and B Package, for which ABE/IHSLTC or their subsidiaries was the lessor) in excess of a first threshold (defined as a sum of approximately $10 million) and (ii) thirty percent of the combined EBITDA of all of the THI lessees (both A and B Packages) in excess of a second threshold (defined as a sum of approximately $35 million). Upon information and belief, at the time that ABE and THI entered into this agreement, it was estimated that the combined EBITDA of the THI lessees would be approximately $50 million.

56. By the formulation in the Agreement to Lease, had the EBITDA of the THI subsidiaries leasing the A Package and B Package nursing home facilities been $50 million, the percentage rent payable to DMV (as sole owner of ABE and IHSLTC) would have been $9.5 million annually (20% of EBIDTA from $10 million to $35 million or $5 million plus 30% of EBIDTA from $35 million to $50 million or an additional $4.5 million). When added to the base rent, the annual rent for the B package was projected to be $10.5 million after the first year, with annual escalations based on 4% of base rent.

57. Upon information and belief, but for the actions described below undertaken by Grunstein, Forman, the Metcap entities, H. Grunstein, Levinson and their confederates, DMV would today be receiving annual rental income of at least $12 million to $15 million, an amount that would have long ago enabled DMV to repay its loan from Cammeby's Funding and provided annual income to Bodner of millions of dollars.

58. The base rent and additional rent for the B Package leases were an aggregate dollar amount for all of the leases and each THI lessee was jointly and severally responsible to pay the aggregate dollar rent amount.

59. In the event any single lease was terminated, the THI lessees were still obligated to pay the entire aggregate rent – a minimum of $600,000 plus EBITDA adjustments for the first three years under the abated rental, then to a minimum of $1 million (plus escalations and additional rent) – which would not be reduced in any way as a result of the lease termination.

60. The Agreement to Lease also provided specific restrictions on the right of THI and its subsidiaries to acquire rights in the properties leased to them by SWC and ABE/IHSLTC (DMV), precluding them from buying the properties or directly entering into leases with the landlords to assure that the rights of SWC or ABE/IHSLTC, and therefore the rights of DMV, as the owner of ABE and IHSLTC, could not be invaded by THI:

> "THI and THI Lessees shall NOT have any right under any provision of this Agreement, the Leases or the Underlying Leases as to any purchase or option as to the fee title to the Premises, and any purchase or option as to the fee title to the Premises or any renewal, extension, renegotiation, amendment, assignment or replacement of the Underlying Leases, shall be exclusively reserved to Lessors, and THI and the THI Lessees shall not interfere in any manner with, or seek to acquire, the foregoing opportunities which are reserved to Lessors."
> [Agreement to Lease, Section 3(d).]

61. In addition to the Agreement to Lease, each ABE/IHSLTC subsidiary, as landlord, entered into a sublease with a THI subsidiary, as tenant, with respect to the leaseholds on each nursing home property. Among other things, the subleases prohibited the THI subsidiaries from selling or assigning the sublease in certain circumstances.

62. Specifically, Section 9.1 of the subleases provided that the THI subsidiary shall not sell or assign the sublease without the ABE/IHSLTC subsidiary's consent. It also provided that "any transactions whereby Tenant is no longer 100% directly or indirectly owned by <u>THI</u>

Holdings LLC, shall be deemed a prohibited Transfer . . . Any attempted Transfer in violation of the terms and covenants of this Section 9.1 shall be void." (emphasis added)

63. Section 12.2 of the subleases provided monetary and other remedies for ABE/IHSLTC upon a breach by a THI subsidiary of Section 9.1. One such remedy under Section 12.2(c) is the ability of the ABE/IHSLTC subsidiary to "[e]nforce, by all legal suits and other means, its rights hereunder, including the collection of Rent and other sums payable by Tenant hereunder . . ." And under Section 12.3(a), in the event of a breach by a THI subsidiary of Section 9.1, the THI subsidiary "shall pay to Landlord all Rent payable under this Lease by Tenant to Landlord to the date upon which this Lease or Tenant's right to possess the Premises shall have been terminated . . ."

64. Consistent with the foregoing sublease provision, which upon information and belief was prepared and drafted by Grunstein and Levinson, THI Holdings LLC was contractually obligated to own and control the THI subsidiaries at all times. Any sale by THI Holdings LLC of the THI subsidiaries would be void under the sublease.

**D. The Corporate Governance – Protection For Bodner**

65. Grunstein and Levinson, acting as Bodner's counsel, created a framework that placed Bodner and H. Grunstein as co-owners and co-managing members of DMV, supposedly intended to protect each of them against any unilateral actions of the other and to thereby enable them to protect and preserve the valuable real estate ownership interests of DMV through its stock ownership of ABE and IHSLTC and its subsidiaries.

66. In furtherance of the implementation of the transactions structured and documented by Grunstein, Levinson and Jenkens, an Amended and Restated Operating Agreement (the "Operating Agreement") was created for DMV dated as of January 30, 2004.

The Operating Agreement divided ownership of DMV equally between its two managing members: Bodner and H. Grunstein, each of whom owned 50% membership interests in DMV.

67. DMV's Operating Agreement provided that Bodner's approval was required before DMV could take "any action" and Bodner could not be removed as one of the two managing members of DMV without his approval and agreement. By virtue of such provisions, neither Bodner nor H. Grunstein could take unilateral action with respect to the business of DMV or take any action with respect to its wholly owned companies, including ABE and IHSLTC.

68. The Operating Agreement also named Bodner and H. Grunstein as managers of DMV, charged with running DMV's operations. All management and fiduciary powers over the business and affairs of DMV rested with Bodner and H. Grunstein. In fact, as a practical matter however, the operations of DMV were run by Grunstein and Forman through their MetCap entities.

69. The Operating Agreement, drafted by Grunstein and Levinson, provided Bodner and H. Grunstein with full power and authority to carry out and perform all acts on behalf of the DMV. Some of those specific powers included, without limitation: selling, transferring or disposing of all or any portion of DMV's assets and properties (which assets and properties primarily consisted of DMV's ownership of the stock of ABE and IHSLTC); making any expenditures or borrowing any money; maintaining adequate books and records of all operations and expenditures; dismissing employees; and authorizing the taking of all actions, including the decision to exercise the option to acquire the shares of ABE and IHSLTC and of all of its subsidiaries.

70. Given that the membership interests were equally divided and both Bodner and H. Grunstein were co-managing members, a critical protection for both Bodner and H. Grunstein

was the requirement that any action taken by DMV be subject to their agreement and unanimous approval. Accordingly, Section 4.1(e) of the Operating Agreement specifically required the managers of DMV to obtain unanimous approval "for the taking of any action." As a result, neither Bodner nor H. Grunstein could unilaterally take any action on behalf of the company, including selling, assigning, transferring or disposing of any of the assets of DMV (which primarily consisted of the ownership of the stock of both ABE and IHSLTC, and hence the real estate assets owned or controlled by IHSLTC).

71. In addition, the Operating Agreement further protected Bodner's and H. Grunstein's interests by making it impossible to remove or fire either of them without their respective consents. Rather, the Operating Agreement provided that only Bodner could terminate his status as managing member of DMV: "[Allen] Bodner, in his capacity as manager, may be removed and replaced <u>only by</u> Mr. Bodner or his estate or personal representatives in his or their capacity as a Member of the Company." Nor could a member transfer or dispose of any member's interests in DMV without the full consent of both managers. <u>See</u> Operating Agreement, Section 4.1(c) (emphasis added).

72. Under the Operating Agreement, net profits and losses were to be allocated equally to the members. Bodner and H. Grunstein would share equally in DMV's profits while also sharing equally in DMV's losses. <u>See</u> Operating Agreement, Section 5.2.

73. In accordance with their equal ownership of DMV, which owns 100% of ABE and IHSLTC, Bodner and H. Grunstein were elected directors on IHSLTC's Board of Directors, and acting by unanimous written consent, elected H. Grunstein as IHSLTC's President and Chief Executive Officer and Bodner as Senior Vice President and Secretary. In addition, Bodner was elected President and Director of ABE and H. Grunstein was elected Secretary and Treasurer.

74. While DMV was ultimately entitled to the benefit of the rental payments to be made by THI through its ownership of ABE and IHSLTC, it was provided in an agreement between Cammeby's Funding and DMV that DMV could receive no distribution (from ABE's Agreement to Lease with THI) until the loan from Cammeby's Funding to DMV was repaid. Upon information and belief, Grunstein, Forman and their MetCap entities were responsible for managing the financial affairs of ABE and IHSLTC (and hence, ultimately, DMV), and for assuring that the rental payments required to be made by THI were timely received in proper amounts, including additional rent, and that the rental payments were properly applied in reduction of the loan to DMV from Cammeby's Funding.

75. All of the above-described transactions were orchestrated and documented by Grunstein, Levinson and Jenkens in their capacity as counsel for Bodner and DMV and they owed a fiduciary duty to act in the best interests of Bodner and DMV and to exercise their best efforts as counsel to protect the interests of Bodner and DMV and not to act contrary to the interests of their clients.

76. In a February 26, 2004 email, Levinson assured Bodner that DMV's Operating Agreement would protect Bodner's interests. Levinson wrote: "There are new provisions [in the Operating Agreement] which reemphasize as per your discussions with Len Grunstein that the consent of both you and Harry [Grunstein] as Managers is required for various material actions, such as a merger, consolidation, bankruptcy, etc. Hopefully, if these are all satisfactory to you we can proceed to sign the dozens of documents that need to be signed by DMV, IHS Long Term Care, Inc. and its subsidiaries."

77. Throughout their engagement, Grunstein and Levinson continually provided Bodner with legal advice aimed to assure Bodner that they and their firms were representing

Plaintiffs' interests, as they were required to do as Bodner's counsel and as counsel for the entities that Bodner owned.

78. Unbeknownst to Bodner, however, Grunstein and his cohorts structured the transactions and controlled the documentation of the transactions with the intention of enabling Grunstein and his cohorts to steal many millions of dollars. Instead of receiving his share of the base rent and percentage rent that should have been derived from leases with nursing home facilities that rented the real property or leased by IHSLTC, Bodner was paid only an annual $50,000 consulting fee pursuant to a contract created by Grunstein and even that contractual payment was ultimately terminated at Grunstein's direction.

79. In order to conceal his actions, despite having formed DMV and prepared all of the documents for the ownership and management of DMV, including its operating agreement, Grunstein, his partner Levinson and attorneys working under their supervision and control at Jenkens, did not provide any drafts or explanations of the documents to Bodner. Instead, Grunstein maintained and controlled all of the documentation and retained most of the final executed documents.

80. In fact, based on subsequent events, set forth in detail below, Grunstein, Forman, and the MetCap entities breached their fiduciary duties and acted fraudulently and contrary to the interests of their clients Bodner and DMV and in furtherance of their private conflicting interests, and in so doing, diverted millions of dollars of real estate assets and rental payments from DMV and Bodner to themselves.

81. In addition, based on subsequent events, Jenkens, Troutman, Grunstein and Levinson committed malpractice by failing to properly protect the interests of DMV and Bodner and, in fact, facilitating or permitting the massive breach of duty and fraud by Grunstein, Forman,

their MetCap entities and H. Grunstein which resulted in DMV apparently having been stripped of its assets and deprived of the rental payments to which it is entitled under the Agreement to Lease.

82. In breach of their fiduciary obligations to Bodner and DMV, Grunstein, Forman and their MetCap entities made certain that the Cammeby's Funding loan was neither paid down nor repaid and, as will be set forth in detail below, Grunstein, Forman and their MetCap entities either intentionally failed to collect and properly apply the base rent and additional rent paid or payable by THI.

83. Beyond fraud, breach of fiduciary duty or malpractice, there is no other explanation for the results that have obtained from the actions of Grunstein, Forman, the MetCap entities, H. Grunstein, Levinson, Jenkens and Troutman. Instead of DMV and Bodner owning valuable real estate assets that are leased or subleased to an independent group of nursing home operators and which are paying base and percentage rents in amounts sufficient to repay the loans made by Cammeby's Funding to DMV to acquire ABE and IHSLTC and their assets and to generate millions of dollars in annual rental payments over and above such loan repayments, Bodner has inexplicably and improperly been ousted from all positions with ABE and IHSLTC; DMV, with no action or approval by Bodner, has somehow allegedly been stripped of its ownership of ABE and, consequently, its ownership of IHSLTC; according to H. Grunstein's attorney, DMV has allegedly been reduced to a shell without assets (but with a multi-million dollar debt to Cammeby's Funding used for the acquisition of the very assets of which it has been deprived); DMV has apparently not received the benefit of THI's annual multi-million dollar rental obligation pursuant to the Agreement to Lease; Bodner's contractually agreed upon $50,000 annual consulting fee has been terminated; and, upon information and belief, real estate

assets owned or leased by IHSLTC and which were leased or subleased to nursing home facilities which were unrelated to any entity or person involved in the transactions orchestrated by Grunstein have been sold, relinquished or otherwise diverted from DMV with any benefit thereon being misappropriated by Grunstein, Levinson, Forman, H. Grunstein and/or the MetCap entities or other entities controlled by them.

84. Bodner was entitled to and expected no less than the proper performance of his fiduciary duty by his co-managing member of DMV, H. Grunstein. Instead, after Bodner was persuaded by Grunstein to yield to H. Grunstein a 50% interest in DMV, and hence in ABE and IHSLTC, H. Grunstein quickly became a tool utilized by Grunstein to strip DMV of its multi-million dollar assets and to oversee the unlawful ouster of Bodner from his positions as officer and director of ABE and IHSLTC, an ouster which removed the one person who could have and would have been in a position to prevent the misappropriation from DMV of millions of dollars of assets and rental income by Grunstein, Forman, Fundamental and the MetCap entities.

**E. Scheme To Deprive DMV Of The "B Package"**

85. Grunstein and Levinson were required to structure the transactions so that DMV, through its ownership of the stock of ABE and IHSLTC, was the ultimate owner of the assets and properties of IHSLTC, which in February 2004 consisted of the B Package properties that were owned and/or being leased by IHSLTC from third party landlords and, in turn, leased by IHSLTC to THI subsidiaries pursuant to the Agreement to Lease. Bodner never received any profits from DMV's ownership of ABE and IHSLTC which would come from the rental payments from THI with respect to the B Package leaseholds. Instead, as detailed below, Defendants entered into a scheme to misappropriate from Bodner the benefit of DMV's ownership of ABE and IHSLTC and the rental payments required to be paid under the Agreement to Lease by THI.

**F. The Required Payments To Cammeby's Funding Were Not Made**

86. Bodner placed his trust and confidence in his lawyers, Jenkens and Troutman, in Forman and the MetCap entities that managed the affairs of DMV, ABE and IHSLTC, and his business partner, H. Grunstein. He expected and was entitled to expect that they would manage the business and assets of DMV in its and his best interests.

87. As Forman and the MetCap entities undertook the responsibility for the day to day operations of DMV, he expected and believed that they would service and repay DMV's loan from Cammeby's Funding using the base rent and additional rent payments due from THI to do so; exercise the rights provided ABE/IHSLTC (and hence DMV) under the terms of the Agreement to Lease, including conducting appropriate audits to verify that THI was properly paying additional rent due and owing; and file the appropriate tax returns and prepare the necessary statements.

88. Instead, Grunstein, Levinson, H. Grunstein, Forman and the MetCap entities embarked on a course of self-dealing, involving fraud, fraudulent conveyances, breaches of fiduciary duty, misappropriation, including misappropriating corporate opportunities, and breach of contract.

89. The rental obligations of THI were not used to pay the Cammeby's loan. These payments amounted to or should have amounted to millions of dollars per year. Had the payments been applied honestly and per agreement and not been diverted, the loan would have been long since retired, and DMV would now be receiving millions of dollars a year from base rent and additional rent payable by THI under the terms of the Agreement to Lease, 50% of which income would belong to Bodner as a 50% owner of DMV.

### G. Grunstein And Forman Form Fundamental And Purchase THI

90. Without the knowledge, consent or agreement of Bodner, Defendants Grunstein, Levinson, Forman, the MetCap entities, Tabler and H. Grunstein undertook to divest DMV, ABE, and IHSLTC of their assets by, *inter alia,* placing themselves in positions to wrongfully assign and otherwise transfer the leasehold interests for the facilities that were in the B Package to entities that they now controlled.

91. Upon information and belief, while still a partner of Troutman, in or about late 2005 or early 2006, Grunstein informed THI that it was in default on its leases with SWC's subsidiaries (the owner of the A and S Package real estate assets) and/or its leases with IHSLTC and its subsidiaries (the owner of the B Package real estate assets).

92. Although Grunstein was the attorney for SWC and IHSLTC (and hence to Bodner and DMV) in matters relating to the THI leases and had in fact been involved in the drafting of the Agreement to Lease and the leases and subleases between THI subsidiaries and SWC and IHSLTC subsidiaries and despite the fact that Forman and the MetCap entities were managing the business relationships between THI on the one hand and DMV, ABE and IHSLTC on the other, instead of advising their clients, SWC, DMV, ABE, IHSLTC and Bodner of the existence of such alleged defaults and of an opportunity to acquire THI, Grunstein, Forman and the MetCap entities acted for their own personal benefit, informing THI's principals that they could avoid the default only by selling THI, at a discounted value, to Fundamental, a health care company they created and which they, along with Levinson and another Troutman partner, owned.

93. This plan was achieved without the knowledge, permission or consent of Bodner or DMV (and H. Grunstein could not have provided any permission on behalf of DMV without Bodner's agreement).

94. On February 28, 2006, Grunstein's threats to THI bore fruit. On that date, he and Forman caused THI Holdings LLC to enter into a stock purchase agreement with Fundamental whereby THI Holdings LLC agreed to sell all of its issued and outstanding capital stock in THI and its subsidiaries to Fundamental at a price far below fair market value. Forman signed the stock purchase agreement on behalf of Fundamental and listed his title as Fundamental's President.

95. As a result, THI Holdings LLC no longer owned or controlled THI or its subsidiaries. This agreement violated Section 9.1 of the subleases executed between the ABE/IHSLTC subsidiaries and the THI subsidiaries, which prohibited any transaction whereby THI Holdings LLC no longer owned the THI subsidiaries.

96. This agreement also denied Bodner a business opportunity that was rightfully his, and created irreconcilable conflicts as Grunstein and Forman continued to manage and control the entities owned by Bodner through DMV, which entities were now landlords to Grunstein and Forman's company, Fundamental.

97. At no time did Grunstein advise Bodner or DMV of this opportunity or offer this opportunity to acquire THI to Bodner or DMV despite the fact that Grunstein and Forman acquired their knowledge of the alleged default only as a result of their positions as counsel for Bodner and DMV and as principals of the MetCap entities that were providing the day-to-day operational services on behalf of DMV, ABE and IHSLTC and supervising the rental obligation owed by THI to IHSLTC.

98. At no time did Grunstein advise Bodner, DMV, ABE, or IHSLTC that there was an opportunity to acquire the nursing home facilities from THI at a very favorable price.

99. At no time did Grunstein or Forman seek the permission of, or any conflict waiver from, Bodner or DMV to become the owner of the entities that were the lessees of the real estate assets owned by IHSLTC and which owed millions of dollars a year in rental payments to IHSLTC, including percentage rent based on the EBITDA of the THI facilities.

100. As a result of their covert acquisition of THI through Fundamental, Grunstein and Levinson, as partners of Troutman, and Forman, Tabler and the MetCap entities placed themselves in an irretrievably conflicted position with their position as counsel to Bodner and DMV and as the persons and entities who were charged with managing the landlord/tenant relationship between ABE and IHSLTC on the one hand and THI on the other.

101. These Defendants were now acting on both sides of the transaction. On the one hand, Grunstein, Levinson and Troutman were legal counsel to IHSLTC, ABE, DMV and Bodner with respect to the leases with the THI affiliates and, on the other hand, through Grunstein's and Levinson's ownership of Fundamental, they now co-owned THI and its affiliates who were the tenants of the B Package health care facilities.

102. Similarly, Forman, Tabler and the MetCap entities were also acting on both sides of the transaction. On the one hand, Forman, Tabler and the MetCap entities were entrusted with the day to day management of the affairs of DMV, ABE and IHSLTC, particularly in connection with managing the landlord/tenant relationship between THI and DMV, ABE and IHLTC and assuring that the base rent and additional rent were properly calculated and paid, and on the other hand, through Fundamental, which along with Grunstein and Levinson, they now owned THI and its affiliates, which were the tenants that owed and were required to pay the base rent and additional rent.

103. Upon information and belief, as a direct result of this irreconcilable conflict and preferring their own private interests over that of DMV, Bodner, ABE and IHSLTC, these Defendants saw to it that DMV, ABE and IHSLTC never received any rent payments from THI or Fundamental to which they were entitled.

104. Upon information and belief, while some rental payments may have initially been paid to these Defendants by THI for the benefit of IHSLTC, these Defendants saw to it that the rental payments were not applied to the payment of the loan from Cammeby's Funding and excluded Bodner from any participation or information regarding their actions.

105. The actions of Grunstein, Levinson and Troutman (through the actions of its partners) were in complete dereliction of New York's canons of legal ethics as their ownership of Fundamental (and now THI) created a direct adverse conflict of interest between themselves and DMV and Bodner, which conflict was not disclosed and was not approved or waived.

106. The actions of Forman, Tabler and the MetCap entities were in violation of their fiduciary duties by creating a direct conflict between their responsibility to supervise and manage the relationship between IHSLTC, ABE and DMV on the one hand and THI on the other with respect to the payment of base and additional rent and to assure that THI properly and fully paid all rent due and owing and their undisclosed personal interests as owners of Fundamental and through Fundamental, owners of THI.

**H. Defendants Assigned Or Transferred IHSLTC's Leases To Fundamental**

107. A major effect of Fundamental's acquisition of THI, as contemplated and implemented by Grunstein and Forman, was to divert IHSLTC's profits from the B Package leaseholds to themselves, while at the same time divesting Bodner and DMV of the multi-million

dollar value of their ownership of ABE and IHSLTC and their valuable leasehold interests in the B Package real estate assets.

108. As the new owner of THI and hence the operator of the IHSLTC leased health care facilities, Fundamental was obligated to pay IHSLTC a guaranteed base rent plus additional percentage rental payments based on a percentage of the computed value of THI's (Fundamental's subsidiaries') combined EBITDA.

109. Grunstein and Forman were fully aware, as a result of Grunstein's unique position as architect of the transactions and attorney for Bodner and DMV, and as a result of Forman's and the MetCap entities role in managing the affairs of DMV, ABE and IHSLTC in connection with the leases with THI, that there was a great opportunity for enormous profit in ownership of THI if they could bypass IHSLTC and deal directly with the fee owners of properties leased to IHSLTC and subleased to THI subsidiaries.

110. By eliminating the separation between the operation of the nursing homes and the real estate assets that Grunstein, Levinson, Forman and the MetCap entities had engineered at the outset and thereby eliminating the differential between the rent payable by THI to IHSLTC and the rent payable by IHSLTC and ABE to the owners of the property, Grunstein could divert to himself, Levinson, Forman and Fundamental the entire economic benefit of the real estate assets that was supposed to flow to Bodner, DMV, SWC and the Schron interests who had financed the acquisition to begin with. And this profit could be obtained despite the fact that Grunstein, Levinson and Forman invested nothing in the transactions.

111. Grunstein, Jenkens and Troutman had been paid millions of dollars for their legal services with respect to the transactions, and MetCap had received millions of dollars for broker's commissions.

112. The execution of their plan was simple and was made even easier by the fact that Grunstein had installed his brother H. Grunstein in a position of ownership and authority at DMV and, through his co-ownership of DMV, at IHSLTC and ABE. The assurances given to Bodner, and the conditions upon which Bodner relied to protect his interests, including, but not limited to, those in the Amended and Restated Operating Agreement for DMV, were violated by the very advisors who drafted the documents, emails and other writings upon which Bodner relied.

113. Upon information and belief, H. Grunstein, co-managing member of DMV and hence, through his co-ownership of DMV, co-owner of ABE and IHSLTC, with the guidance and assistance of Grunstein, Forman, Levinson, Tabler and the MetCap entities, without the authority, knowledge or permission of Bodner or DMV, unilaterally assigned or transferred, or is assigning or transferring, IHSLTC's rights under the third party leases to Fundamental and otherwise improperly and unlawfully authorizing or permitting said Defendants to divert or reduce rent payments owed to IHSLTC from THI in breach of his fiduciary duty.

114. Upon information and belief, instead of IHSLTC receiving base and additional rental payments from the THI lessees, Fundamental/THI placed itself in the direct position as tenant with the over-landlords, eliminating IHSLTC and reaping the profits from the operation of the health facilities without having to pay additional rent to IHSLTC or has simply failed and refused to pay the base and additional rent owed to IHSLTC, instead unlawfully retaining that differential for itself while Forman and the MetCap entities have ignored their obligations to assure the proper and full payment of base and additional rent due from THI under the Agreement to Lease and all leases entered into thereunder.

115. By their actions, Defendants divested DMV of its valuable assets (ownership of IHSLTC and ABE) by stripping IHSLTC of its status as landlord to THI or by failing and refusing to cause THI to pay IHSLTC the rent owed to it, while leaving DMV with the debt it owes to Cammeby's, which it incurred to acquire the valuable real estate assets that Grunstein, Forman and Levinson, who created the whole structure, have now misappropriated without cost to themselves.

116. The foregoing actions of Grunstein, Forman, Levinson, H. Grunstein and the MetCap entities constitutes a knowing and intentional fraudulent conveyance of the assets of DMV intended to defraud DMV and its creditors by stripping it of its assets at a time that they knew it had an outstanding financial debt to Cammeby's Funding.

117. The Defendants' diversion of IHSLTC's rights and assets to Fundamental was in patent violation of DMV's Operating Agreement, which required the co-managing members (Bodner and H. Grunstein) to act unanimously: "approval of both Managers shall be required for the taking of any action."

118. Bodner, as co-managing member of DMV, did not approve of the removal of the valuable assets owned by DMV through its ownership of the stock of ABE and IHSLTC. There was no shareholder vote of IHSLTC (which would have required a vote by DMV) to approve stripping it of its assets and neither Bodner nor DMV would have approved and could not have lawfully approved as such diversion of assets constitutes a fraudulent conveyance – and any alleged approval by H. Grunstein was both insufficient and unlawful as a fraudulent conveyance, as was fully known to Grunstein, Levinson and Forman.

119. Bodner relied upon and trusted his counsel to structure and document all transactions in his interest and not to further their conflicting and private financial interests at his expense.

120. By diverting and misappropriating the entire value of DMV for their own benefit, Grunstein, Levinson and Troutman betrayed Bodner's trust and breached their duties as attorneys and their fiduciary duties.

121. By diverting and misappropriating the entire value of DMV for their own benefit, Grunstein, Forman, the MetCap entities, Tabler, Levinson and H. Grunstein breached their fiduciary duties; breached the contractual rights of Bodner; tortiously interfered with Bodner's rights under the DMV's Operating Agreement; breached ABE's and IHSLTC's contractual rights under the Agreement to Lease and the leases entered into thereunder; tortiously interfered with ABE's and IHSLTC's contractual rights under the Agreement to Lease and the leases entered into thereunder; and, committed conversion.

### I. Defendants Assigned South Carolina Health Care Facility To Fundamental

122. Just one example of Defendants' implementation of their scheme to divest Bodner of his assets occurred in South Carolina.

123. Under the Agreement to Lease between ABE/IHSLTC and THI, the Magnolia Place-Greenville health facility in Greenville, South Carolina was part of the B Package leasehold facilities.

124. As a result, in April 2003, an ABE/IHSTLC wholly owned subsidiary, Magnolia Place-Greenville, Inc., leased the health care facility from its owner, Kessler/South Carolina, LLC.

125. A THI affiliate, THI of South Carolina at Magnolia Place at Greenville, LLC, became the operating lessee of the property.

126. On August 7, 2007, Magnolia Place-Greenville, Inc. entered into an Agreement of Subordination, Non-Disturbance and Attornment with Kessler/South Carolina LLC and its lender Prudential Mortgage Capital Company, LLC. The agreement was signed by H. Grunstein on behalf of Magnolia Place-Greenville, Inc., the wholly owned subsidiary of ABE/IHSLTC.

127. At no time did H. Grunstein advise Bodner of the foregoing agreement or secure his authorization for such agreement. H. Grunstein, regardless of any inducements by his brother, had no authority to act without the consent of Bodner or to make any agreements respecting any of the assets or rights owned directly or indirectly by DMV without the consent and agreement of Bodner.

128. Notwithstanding the terms of the agreement, by unilaterally authorizing Magnolia Place-Greenville, Inc. to enter into such an agreement, H. Grunstein violated his fiduciary duties to Bodner and acted in violation of the operating agreement of DMV and fraudulently conveyed DMV's property. Having tortiously induced unilateral actions by H. Grunstein in derogation of Bodner's and DMV's property rights and in violation of the DMV Operating Agreement, on December 18, 2008, Kessler/South Carolina LLC, Magnolia Place-Greenville, Inc., and THI of South Carolina at Magnolia Place at Greenville, LLC entered into Assignment of Rights Under Lease (the "Assignment"). At this time, Fundamental had already acquired THI and its subsidiaries, and Grunstein, Levinson and Forman were owners of the THI subsidiary.

129. Under the Assignment, Magnolia Place-Greenville, Inc., the ABE/IHSLTC wholly owned subsidiary, without the permission, authority or consent of Bodner or DMV, assigned all of its right, title, and interest under its lease with Kessler/South Carolina LLC to THI

of South Carolina at Magnolia Place at Greenville, LLC, thereby transferring the value of the leasehold interest owned by IHSLTC and the rental differential owed by THI to IHSLTC to THI itself and hence to Grunstein, Levinson and Forman.

130. Ken Tabler executed the Assignment on behalf of Magnolia Place-Greenville – he listed his title on the document as "Vice President of ABE," but in fact, Bodner never consented to or authorized the employment of Tabler in any capacity by ABE, IHSLTC or any other entity, and, in fact, Tabler is actually an employee and pawn of Grunstein, Forman, and Levinson.

131. Tabler was not employed by DMV, IHSLTC or ABE but instead was and is an employee of Fundamental, which is the owner of THI, the entity benefiting by the looting of the assets of DMV and Bodner.

132. Upon information and belief, Tabler was intentionally misidentified as Vice President of ABE at the direction of Grunstein, Levinson and Forman as part of their plan of misappropriating the property and assets of DMV, ABE and IHSLTC for their own benefit.

133. While Tabler was misidentified by or at the direction of Grunstein, Levinson and Forman in certain ABE filings in Nevada (where it is incorporated) as "Controller" of ABE (a position never authorized by Bodner or DMV), Tabler is an employee of Fundamental, the beneficiary of the assignment he executed purportedly on behalf of ABE/IHSLTC.

134. Upon information and belief, Grunstein and Levinson (and hence Troutman) and Forman and H. Grunstein were the masterminds of the Assignment, directing Tabler to falsely execute documents he had no authority or right to execute, concealing such actions from Bodner, knowing that the effect of the Assignment would be to (1) divest Plaintiffs of their interests in the rental payments made from THI to ABE/IHSLTC; and (2) allow Defendants to reap huge

profits from the operation of the health care facility without the necessity of paying ABE/IHSLTC the proper rent owed under the lease.

135. As a result, the THI subsidiary now completely avoided rental payments to the ABE/IHSLTC subsidiary, but instead only having to pay the lesser rent to the over-landlord, thereby pocketing the differential that belonged to the ABE/IHSLTC subsidiary and depriving DMV and Bodner of their assets.

136. This was the very type of transaction that Levinson represented to Bodner in his February 26, 2004 email that Bodner would be protected against where he assured Bodner that "the consent of both you and Harry [Grunstein] as Managers is required for various material actions . . ."

137. Bodner relied on Grunstein, Levinson, Jenkens and Troutman, and was entitled to rely upon them as his attorneys, to protect his interests, not to misuse, for their own benefit, the knowledge that they acquired by virtue of the work that they performed for him as a client, for which they were paid enormous legal fees, but to represent and protect his interests.

### J. Defendants Wrongfully Purchased Landlord's Interests In Fee-Owned Health Facilities In New Mexico

138. Defendants' scheme to steal real estate interests from Bodner and DMV did not end there. Instead, Defendants set out to acquire numerous fee-owned health facilities without obtaining the necessary consent from either SWC or DMV. One such example of Defendants' scheme occurred in New Mexico.

139. As described above, in 2003 ABE sold to SWC certain packages of IHS real estate interests. Included within one such package were leasehold interests formerly held by two IHSLTC subsidiaries: IHS Acquisition No. 151, Inc. ("IHS 151") and IHS Acquisition No. 165, Inc. ("IHS 165"). IHS 151 and IHS 165 held the leasehold interests in three Albuquerque-based

nursing home properties – Sunset Villa, Specialty Hospital of Albuquerque and Albuquerque Care Center (the "New Mexico Properties"). As a result of the transaction with ABE, SWC acquired, or was supposed to have acquired, the leasehold interests in the New Mexico Properties from IHS 151 and IHS 165.

140. The Master Lessor and owner of the fee interest in the New Mexico Properties at the time and until recently was Spencer Investment Company ("Spencer").

141. For reasons similar to their reason for misappropriating the South Carolina property – to divert profits properly belonging to Bodner, DMV, and, in this case, SWC – Grunstein and Forman also sought to acquire the fee titles for the New Mexico Properties, which was owned by Spencer, rather than having SWC become the fee owner.

142. Grunstein and Forman's ownership, through Fundamental, of THI gave them control of the THI subsidiary that operated the New Mexico Properties. But under Section 3.1 of the Agreement to Lease, THI was prohibited from purchasing the New Mexico Properties from Spencer without first obtaining the approval of the owner of the leasehold titles connected to the New Mexico Properties and a beneficiary of the Agreement to Lease, which, pursuant to agreements that were to have been prepared and/or approved by Grunstein and Levinson, was to have been SWC.

143. Grunstein, however, knew he couldn't obtain approval from SWC because SWC itself would want to purchase the lucrative fee titles directly from Spencer if they were available for purchase.

144. Instead, upon information and belief, to facilitate his theft of the Right of First Offer of these New Mexico properties, in blatant breach of the Agreement to Lease and in utter disregard for his fiduciary duties as an attorney owed to Plaintiffs and SWC, Grunstein caused

his brother, H. Grunstein, to misrepresent to Spencer that IHS 151 and IHS 165 had owned the leasehold titles to the New Mexico properties, and had never transferred their interests to SWC.

145. While Bodner and DMV understand and believe that the only entity entitled to acquire the New Mexico properties was SWC, to the extent that the conveyance of the properties to SWC had not been implemented, IHS 151 and IHS 165 were the owners of the properties and the only entities therefore entitled to exercise their right to purchase.

146. In material breach of his fiduciary and contractual obligations, without consulting Bodner, who co-owned the IHSLTC entities through his co-ownership of DMV, H Grunstein falsely and fraudulently informed Spencer that IHS 151 and IHS 165 had approved THI's purchase of title to the New Mexico Properties.

147. Having caused H. Grunstein to falsely and fraudulently misrepresented the facts to Spencer, in complete breach of their obligations under the Agreement to Lease and in violation of their respective duties as attorneys for DMV and Bodner and as managers of the day to day affairs of DMV and IHSLTC, Grunstein and Forman succeeded in causing Spencer to sell the fee titles in the New Mexico Properties to a THI-related entity, owned by Grunstein and Forman, thereby diverting valuable assets from the only parties properly entitled to acquire the properties, SWC or, absent proper transfer of the properties to SWC from IHSLTC, IHSLTC.

148. Contrary to Defendants' representations, SWC did in fact acquire the New Mexico Properties from IHS 151 and IHS 165, thus requiring Defendants to obtain SWC's consent before THI could acquire the fee titles from Spencer.

149. But if one accepts Defendants' fraudulent version of the facts – that the transfer of the New Mexico Properties to SWC never occurred – then the only entity entitled to make the purchase was IHSLTC, the owner of the leasehold titles to the New Mexico Properties, and,

under the Agreement to Lease, Defendants were required to obtain consent from DMV, as owner of IHSLTC, and Bodner, as co-owner of DMV, to purchase the New Mexico Properties.

150. No such authorization or consent, as required, was ever obtained from Bodner. Instead, Defendants misrepresented that H. Grunstein was the owner of DMV with the sole authority to cause IHSLTC to provide the necessary consent to THI, thus permitting THI to take direct ownership of the fee-owned health care facilities in New Mexico.

151. Having acquired health care facilities in breach of their obligations to Bodner and DMV, Defendants have embarked upon a fraudulent course of action, involving intentional misrepresentations, outright theft and breaches of fiduciary duty, all calculated to vastly enhance the value of their purloined health care assets by eliminating the obligation to pay IHSLTC, the "middleman," the rent and percentage rent due and instead diverting the differential between the rent due to DMV and the rent payable by DMV to themselves, including by unilaterally divesting DMV of real estate assets owned by DMV's subsidiaries or by purchasing such assets in violation of the Agreement to Lease.

152. Upon information and belief, since acquiring THI, Defendants have engaged in similar schemes to steal other real estate interests from Bodner and DMV and have concealed the full extent of their actions by refusing to provide any documents to Bodner or DMV and by pretending that DMV is an empty shell with no assets.

**K. Defendants Wrongfully Terminated Bodner As President Of ABE**

153. Bodner, who was President and a Director of ABE from DMV's acquisition in or about 2004, was improperly terminated as President and Director of ABE without his knowledge or approval as part of Grunstein's improper acts.

154. ABE, a Nevada corporation, files a yearly annual list of its officers, directors and agents with the Nevada Secretary of State. From 2004 through 2008, Bodner was listed as President and Director of ABE.

155. But on August 4, 2009, again following his master's directions, Tabler signed a filing with the Secretary of State of Nevada listing H. Grunstein as its President, Secretary, Treasurer and Director and removing Bodner as President and Director. This filing was backdated as effective from November 2008 to November 2009.

156. Neither Tabler nor H. Grunstein had the slightest authority to remove Bodner as President and Director of ABE. There was no vote of shareholders. There was no meeting of the Board of Directors of ABE. There was no authority ever granted by Bodner, either as President and Director of ABE or as co-managing member of DMV, to remove him as President and Director of ABE.

157. Upon information and belief, Grunstein caused Bodner's removal to eliminate any impediment to his scheme to divest DMV and Bodner of any interest in the real estate assets of IHSLTC and ABE and to place them instead in his own pocket and that of Forman and Levinson.

158. In August 2009, Bodner requested information from Troutman without any response. Thereafter, on September 29, 2009, Bodner received a letter from Larry Hutcher, an attorney at Davidoff Malito & Hutcher LLP, who purported to represent H. Grunstein, IHSLTC, and ABE.

159. Upon information and belief, based on instructions provided by Grunstein, without any reference to a single document, Hutcher claimed that "[a]lthough DMV has not been formally dissolved it is no longer an operating entity. As such it does not maintain any books or

records which are capable of being produced." He later contended that Bodner is "not the owner of [ABE] and [IHSLTC], whether based on your status as a member of DMV or otherwise."

160. On March 9, 2010, Plaintiffs, through their attorneys, sent a letter to Troutman requesting information regarding the foregoing allegations, and also requesting the production of any and all documentation in Troutman's possession that pertains to Bodner, DMV, ABE and/or IHSLTC, documentation to which Bodner and DMV, as clients of Troutman, were absolutely entitled to receive.

161. On March 15, 2010, Troutman responded by letter, falsely or mistakenly stating that it had never represented Bodner, DMV, or ABE, and directed all further correspondence to Hutcher.

162. On March 24, 2010, Plaintiffs sent another letter to Troutman asking for a further explanation regarding Troutman's unsubstantiated assertion that it never represented Bodner, DMV, or ABE, particularly when there was evidence of telephone calls and meetings between Bodner and Troutman attorneys and there were many documents drafted by Troutman attorneys on behalf of Bodner, DMV, and ABE, both when such attorneys were at Jenkens and thereafter.

163. To date not a single document has been produced.

**FIRST CAUSE OF ACTION**
**(Breach of Fiduciary Duty Against Grunstein, Levinson, and Troutman)**

164. Plaintiffs hereby repeat and reallege the allegations in paragraphs 1-163 of the Complaint.

165. At all times, Bodner relied on the fiduciary relationships that existed between Bodner on the one hand and Grunstein, Levinson, and Troutman on the other, as his legal counsel. As a result, Grunstein, Levinson, and Troutman were fiduciaries with respect to his legal duties to Bodner.

166. As described above, in breach of their fiduciary duties, Grunstein, Levinson, and Troutman repeatedly placed themselves in positions in which their interests were directly adverse to Bodner and they proceeded to act in furtherance of their own pecuniary interests and in violation of Bodner's rights, divesting him of the value of his interests in DMV, IHSLTC and ABE.

167. Grunstein, Levinson, and Troutman breached their fiduciary duties to Bodner by engaging in the following activities, including but not limited to: causing IHSLTC to assign its interests in the B Package leaseholds to Fundamental; causing IHSLTC to assign its Right of First Offer to Fundamental and permitting Fundamental and THI to purchase fee-owned health care facilities without Bodner's approval and without consideration; divesting IHSLTC of leasehold interests, including in South Carolina and elsewhere; terminating Bodner's right to be paid his consulting fee; purporting to terminate Bodner's interests in ABE and DMV; advising Bodner that he had absolute rights of co-authorization and all decisions would be made in conjunction with Bodner and then conspiring to ignore and evade Bodner; and unlawfully and illegally diverting the rental and EBITDA obligations from THI and Fundamental elsewhere.